USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: 6/10/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEKISUI AMERICA CORPORATION, and SEKISUI MEDICAL CO., LTD.,

Plaintiffs,

-against-

RICHARD HART and MARY LOUISE TRUDEL-HART,

Defendants.

**MEMORANDUM DECISION**

12 Civ. 3479 (SAS) (FM)

**FRANK MAAS**, United States Magistrate Judge.

I. Background

This case arises out of a corporate marriage gone bad. Judge Scheindlin referred the case to me to resolve certain discovery disputes raised in letters sent to her by the defendants' counsel. Following the referral, defense counsel also raised several related issues.

As the parties' letters and pleadings reveal, in late 2008, one of the Sekisui plaintiffs (hereinafter "Sekisui") expressed its intent to acquire American Diagnostics, Inc. ("ADI"), a privately-held company controlled by defendant Richard Hart ("Hart") and his wife, Mary Louise Trudel-Hart (together, the "Hart Defendants"). ADI was engaged in the discovery, manufacture, and marketing of medical diagnostic products, and Hart was its president. The closing took place early in 2009, after which Hart remained with ADI as its chief executive officer. Shortly before the closing, Hart

evidently instructed ADI's employees to delete any emails that no longer required any action.

The agreement governing Sekisui's purchase of ADI's stock contained a number of representations and warranties by the Hart Defendants, including assurances that ADI was in compliance with all applicable laws, that its facilities were adequate for its business needs, and that its pharmaceuticals contained no defects. Despite these assurances, and its own due diligence, Sekisui apparently became disenchanted with its acquisition soon after it had occurred. Accordingly, on October 14, 2010, Sekisui terminated Hart's employment and provided both Hart Defendants with a notice that it would seek to recover damages for various alleged wrongs ("Notice of Claim").

The complaint subsequently filed in this action on May 2, 2012, originally contained two claims, alleging breach of contract and fraud. (See ECF No. 1) ("Compl."). By opinion and order dated October 17, 2012, however, Judge Scheindlin dismissed the fraud claim. (ECF No. 28). Discovery with respect to the remaining contract claim has been underway for some time and currently is scheduled to end on July 31, 2013. (See ECF No. 36).

In their letters to the Court, the Hart Defendants seek four principal forms of relief. First, they seek sanctions for the undisputed destruction of the contents of Hart's ADI email folder. (See, e.g., letter from Franklin B. Velie to the Court, dated Mar. 22, 2013) ("3/22 Letter"). Second, they seek the production of a communication that they maintain falls within the crime-fraud exception to the attorney-client privilege. (See letter

from Mr. Velie to the Court, dated Apr. 4, 2013) ("4/4 Letter"). Third, they seek sanctions for the spoliation of the email folder of Hugh Fryer, a current employee of the acquired company (now known as Sekisui Diagnostics). (Id.). Finally, after some further review of Sekisui's document production, they ask the Court to strike Sekisui's complaint, or impose other sanctions, based upon the alleged destruction of other ADI employees' files. (See letter from Mr. Velie to the Court, dated Apr. 19, 2013) ("4/19 Letter").

I heard oral argument concerning certain of the Hart Defendants' requests on April 8, 2013, and also have reviewed additional letters and documentation submitted by the parties since then. My rulings with respect to the matters raised in the letters follow.

II. Hart's Email Folder

Although Sekisui terminated Hart and sent both Hart Defendants the Notice of Claim on October 14, 2010, the company failed to implement a litigation hold until January 31, 2012, more than fifteen months later. Sekisui also did not notify Northeast Computer Services ("NCS"), the outside vendor managing ADI's computer operations, that there was a need to preserve relevant electronically-stored information until July 26, 2012, nearly three months after this suit was filed. In the interim, in March and October 2011, Dicey Taylor ("Taylor"), ADI's human resources and office manager, authorized NCS to erase the email folders of several ADI employees, including Hart, who obviously

was a key player in the transaction whereby Sekisui acquired ADI.[1] (See 4/19 Letter at 1; letter from Karen L. Hagberg to the Court, dated Mar. 27, 2013 ("3/27 Letter")). The ostensible reason for Taylor's decision to delete Hart's emails was that ADI's servers "were regularly experiencing problems due to storage availability issues." (3/27 Letter at 1).

Sekisui concedes that the deletion of the Hart emails was a serious mistake, but notes that its counsel made full disclosure to the Hart Defendants' counsel soon after learning of Taylor's actions. (Tr. of Conf. on Apr. 8, 2013 ("Tr."), at 3; 3/27 Letter at 1). According to Sekisui, Taylor did not authorize the deletion of the Hart email folder to spoliate evidence, but, rather, as part of a good faith effort to free up space on the ADI email server, which was continuing to receive junk mail in Hart's account despite his departure from the firm. (3/27 Letter at 1-2). Before taking that step, Taylor evidently "identified and printed any emails that she deemed pertinent to the company." (See letter from Ms. Hagberg to the Court, dated Apr. 24, 2013 ("4/24 Letter"), at 2).

The Hart Defendants do not view Taylor's actions quite as benevolently. They note that in late April 2012, days before this suit was filed, Jamie Wallace, an NCS employee, sent an email to Doug LeMasurier, the NCS employee in charge of the ADI account, noting that:

> Several months ago, maybe in the summer, [Taylor] told me to delete [Hart's] mailbox. I followed this by "are you sure?

---

[1] The Hart Defendants represent that Hart is ill and that it is uncertain whether he will ever be able to assist his counsel in the defense of this case. (4/19 Letter at 2).

> are you sure? are you sure?" She was very certain that she wanted it deleted, apparently she thought that there wasn't any more useful information or whatever they needed they captured. I would have personally archived it. . . . I thought I heard that [Hart's] email had been combed through by the Sekisui lawyers before [Taylor] told me to delete it.

(4/19 Letter Ex. 4).

In a later email, LeMasurier also stated that:

> Hart's mailbox was deleted and cannot be retrieved, there is no backup of this file. We recommended that it not be deleted, but we were instructed by an American Diagnostica [sic] employee to delete the file.

(Id. Ex. 5).

After Sekisui's counsel learned of the destruction of the Hart emails, Sekisui undertook a search of several alternative sources, including Taylor's printouts, the ADI email server, the files of other custodians, Hart's own hard copy files, and an ADI computer that Hart had used. (3/27 Letter at 2-3). From these alternative sources, Sekisui recovered at least 36,000 Hart emails. (See letter from Ms. Hagberg to the Court, dated Apr. 15, 2013 ("4/15 Letter"), at 2). Sekisui alleges that, despite this volume of emails, Hart in fact used email "sparingly," suggesting that many of the recovered emails were incoming emails, and that Hart frequently used personal email accounts, rather than his work email account, for business purposes. (3/27 Letter at 2; Tr. at 5). According to Sekisui, Hart would forward work emails to either his Hotmail account or his wife's personal email account. (3/27 Letter at 2-3). Sekisui contends that there also is an ADI

computer that Hart never returned which may contain additional emails to or from Hart. (Id. at 3).[2]

Based on these facts, the Hart Defendants contend that the destruction of Hart's email folder was the result of Sekisui's "willful, wanton and reckless disregard for its discovery obligations," thereby entitling them to "an adverse inference [as] to any Sekisui witness testifying to any condition allegedly due to [Hart's] actions or as to which he allegedly had knowledge." (3/22 Letter at 3). Sekisui counters that Taylor made a unilateral decision to delete the Hart folder without consulting the company's leadership. (3/27 Letter at 1-2). Sekisui further argues that the sole remaining claim in this case – breach of contract – will simply require the finder of fact to consider the truth of the Hart Defendants' statements; thus, whether Hart knew that their representations were untrue or intended to defraud Sekisui is irrelevant. (Id. at 3). In Sekisui's view, the Hart emails therefore are "of only marginal relevance to [the Hart] Defendants' defense to this case." (Id.). Sekisui further maintains that the significant number of Hart emails that have been located shows that any prejudice that the Hart Defendants may have suffered is "minimal." (Id.).

To secure an adverse inference instruction based on the spoliation of evidence, a party must establish that (a) the party having control over the evidence had an obligation to preserve it; (b) the records were destroyed with a "culpable state of mind;"

[2] Sekisui concedes that the Hart Defendants have themselves turned over thousands of ADI emails as part of their document production in this case. (4/15 Letter at 2).

and (c) the destroyed evidence was "relevant" to the moving party's claim or defense, "such that a reasonable trier of fact could find that it would support that claim or defense." Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012) (quoting Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002)). Although courts disagree as to the level of culpability necessary to secure particular sanctions, see, e.g., Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 516 (D. Md. 2010); Rimkus Consulting Grp. v. Cammarata, 688 F. Supp. 2d 598, 614 (S.D. Tex. 2010), in the Second Circuit even the mere negligent destruction of evidence may be sufficient to warrant sanctions. Residential Funding, 306 F.3d at 108.[3] Nonetheless, a court should never impose spoliation sanctions of any sort unless there has been a

---

[3] On June 3, 2013, the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States Courts approved the publication for public comment of an amended Fed. R. Civ. P. Rule 37(e). Henry Kelston, Proposed Discovery Amendments Move to Public Comment, Law Technology News (June 6, 2013), http://www.law.com/jsp/lawtechnologynews/PubArticleLTN.jsp?id=1202603039841&Proposed_Discovery_Amendments_Move_to_Public_Comment (last visited June 7, 2013). That rule, if adopted, would generally abrogate the Residential Funding holding that sanctions may be imposed for the mere negligent destruction of evidence. As revised, the rule would permit the imposition of sanctions or an adverse-inference jury instruction "only if the court finds that the party's actions [a] caused substantial prejudice in the litigation and was willful or in bad faith; or [b] irreparably deprived a party of any meaningful opportunity to present or defend against the claims in the litigation." (Mem. from Hon. David G. Campbell, Chair, Advisory Committee on Federal Rules of Civil Procedure, to Hon. Jeffrey S. Sutton, Chair, Standing Committee on Rules of Practice and Procedure (May 8, 2013) at 43, http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/CV05-2013.pdf (last visited June 4, 2013)). In other words, under the proposed amendment, unless a moving party were able to establish that it was "irreparably deprived" of a "meaningful opportunity to present or defend against" claims, it would be required to demonstrate that the non-moving party acted willfully or in bad faith to obtain sanctions.

showing – inferential or otherwise – that the movant has suffered prejudice. See Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 431 (S.D.N.Y. 2010) ("No matter how inadequate a party's efforts at preservation may be, . . . sanctions are not warranted unless there is proof that some information of significance has actually been lost."); id. at 441 ("It is difficult to see why even a party who destroys information purposefully or is grossly negligent should be sanctioned where there has been no showing that the information was at least minimally relevant.").

Here, there is no question that Sekisui had an obligation to preserve Hart's relevant emails long before Taylor approved their deletion from the Sekisui server. Indeed, if Sekisui had taken reasonable precautions when it filed its Notice of Claim, a time when Sekisui presumably knew litigation might result, Taylor would not have been able to take the steps that led to the destruction of those emails. The failure to take such reasonable measures to preserve Hart's email files constitutes at least negligence.

In Residential Funding, the Second Circuit held that "[t]he sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." Residential Funding, 306 F.3d at 108. Gross negligence obviously also warrants such a sanction in appropriate cases. See In re Pfizer Sec. Litig., 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (citing Harkabi v. SanDisk Corp., 275 F.R.D. 414, 419 (S.D.N.Y. 2010)). Nevertheless, in Chin, the Second Circuit recently "reject[ed] the notion that a failure to institute a 'litigation hold' constitutes gross negligence per se," concluding, as Magistrate Judge

Francis previously had suggested, that "'the better approach is to consider [the failure to adopt good preservation practices] as one factor' in the determination of whether discovery sanctions should issue." 685 F.3d at 162 (quoting Orbit One Commc'ns, 271 F.R.D. at 441).

In this case, although NCS recommended against the deletion of the Hart emails, there has been no showing that Taylor directed their erasure for any malevolent purpose. Nonetheless, because Sekisui failed to implement a litigation hold, NCS was able to delete the entire active email folder of an important witness – perhaps the key witness – at a time when Sekisui obviously knew that it might commence a lawsuit seeking substantial monetary damages. This may well rise to the level of gross negligence. The mere fact that Sekisui acted with a culpable state of mind, however, does not by itself entitle the Hart Defendants to sanctions. The Hart Defendants must also show the emails were relevant, see Residential Funding, and, more fundamentally, that they suffered prejudice. Orbit One Commc'ns, 271 F.R.D. at 431. As Judge Francis observed in Orbit One Communications, "once it has been established that discovery-relevant material has been destroyed in bad faith or through gross negligence, it may be presumed that it would have been harmful to the spoliator. . . . But that is a far cry from presuming that evidence is discovery-relevant merely because it has been destroyed as the result of a party's failure to abide by recommended preservation practices." 271 F.R.D. at 441.

In light of the dismissal of Sekisui's fraud claim, the central question for the finder of fact in this case will be whether the Hart Defendants' representations and warranties were accurate. See Galli v. Metz, 973 F.2d 145, 150 (2d Cir. 1992) (quoting CBS Inc. v. Ziff-Davis Publishing Co., 75 N.Y.2d 496, 503 (1990)) ("express warranties are 'as much a part of the contract as any other term.'"). Assuming that certain of those representations and warranties were materially false, Sekisui will presumably be entitled to contract remedies even if the Hart Defendants proceeded in the utmost good faith. See Pittsburgh Coke & Chemical Co. v. Bollo, 421 F.Supp. 908, 928 (E.D.N.Y. 1976), aff'd, 560 F.2d 1089 (2d Cir. 1977) ("[I]t has long been known that if a material state of facts is warranted to exist which turns out not to be the case, the warrantor is liable for the loss or damage caused; and it is no defense that he acted upon misinformation and in good faith."). Accordingly, to the extent that the Hart emails may have permitted inferences to be drawn concerning the Hart Defendants' state of mind prior to Sekisui's acquisition of ADI, they would, at best, be of limited utility.

Hart's emails nonetheless may have reflected steps that he took that undercut Sekisui's contention that the Hart Defendants' representations and warranties were materially false. For example, in the stock purchase agreement, the Hart Defendants represented and warranted that ADI's facilities were adequate for the company's current and currently proposed business needs. (See Compl. ¶ 26(b)). Any emails relating to the adequacy of ADI's facilities that Hart sent or received thus would be relevant not merely to establish his state of mind, but also with respect to the accuracy of that representation

and warranty. While this is but one example, it is not difficult to envision numerous respects in which Hart's incoming and outgoing emails might be relevant.

After learning of the deletion of Hart's emails from the ADI email server, Sekisui took a number of steps to ameliorate any potential prejudice to the Hart Defendants. First, Sekisui reviewed the emails that Taylor had printed out to determine whether any were responsive to the Hart Defendants' document requests. (See 4/24 Letter at 2). Those printouts have been produced. Second, Sekisui reviewed the email folders of other ADI employees in an effort to find relevant emails to or from Hart. (See 3/27 Letter at 3). Third, Sekisui located and searched a laptop computer that Hart had used. (See id.). Finally, Sekisui has located other decommissioned laptops and is in the process of searching those devices as well. Through these means, Sekisui has, to date, been able to recover more than 36,000 emails to or from Hart, and it is possible that more may be located as the other laptops are searched. (4/15 Letter at 2).

Tellingly, despite their complaints about Taylor's decision to allow NCS to delete Hart's email folder, the Hart Defendants have yet to produce – or even describe – so much as a single relevant email that Sekisui has failed to produce. Indeed, the Hart Defendants have not even shown that there are any relevant emails that they produced from Hart's retained laptop (or elsewhere) that Sekisui has failed to produce from its own files. In these circumstances, although the Hart Defendants may have convincingly established that Sekisui destroyed Hart's emails with the requisite culpable state of mind, they have not shown, as they must, that relevant information potentially helpful to them is

no longer available. Until such a showing is made, the Hart Defendants are not entitled to an adverse inference instruction (much less any harsher remedy) as a discovery sanction.

III. Crime-Fraud Exception

After the Sekisui acquisition, ADI retained Advanced Quality Solutions, Inc. ("AQ") in late April 2010, to assess the degree to which ADI's facility conformed to Food and Drug Administration requirements. (See letter from Ms. Hagberg to the Court, dated Apr. 10, 2013 ("4/10 Letter"), Ex. A). The resulting report focused on conditions at ADI in May 2010 – post acquisition – and hence was of marginal relevance to Sekisui's claims in this suit. (See 4/4 Letter at 1). In an attempt to cure this defect, ADI entered into a second agreement with AQ in late September 2010, which called for AQ to conduct an evaluation of ADI's compliance during the period from 2005 through April 2009 – i.e., prior to Sekisui's purchase of the company. (See 4/10 Letter Exs. B, E). AQ submitted that second report to Sekisui on October 13, 2010. The day before it was sent, however, Sekisui's then counsel, Morgan, Lewis & Bockius LLP ("Morgan Lewis"), asked AQ to sign a "Consulting Agreement" intended to bring the report "under the attorney-client privilege." (Id. Exs. C-E). AQ then issued a "final" report dated October 16, 2010. (Id. Ex. F). Both the second and final AQ reports bear the legend: "Privileged and Confidential, Attorney Client Work Product Attorney Client Privilege." (Id. Exs. E, F).

Sekisui maintains that it is entitled to withhold the AQ reports pursuant to United States v. Kovel, 296 F.2d 918, 921-22 (2d Cir. 1961). (Tr. at 12). In Kovel, the Second Circuit recognized that the attorney-client privilege extends to "communications

by an attorney's client to an accountant hired by the attorney to assist the attorney in understanding the client's financial information." United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir. 1995). The protections afforded by Kovel have since been extended to other experts assisting counsel. See Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 72 (S.D.N.Y. 2010) ("Kovel has been construed broadly to include . . . investigators, interviewers, technical experts, and other specialists in a variety of social and physical sciences.") (internal citations omitted); see also In re Grand Jury Subpoenas Dated Mar. 24 2003, 265 F. Supp. 2d 321, 330-31 (S.D.N.Y. 2003) (extending Kovel to public relations consultant hired by counsel). Despite its initial reliance on Kovel (and presumably its progeny), however, Sekisui subsequently agreed to produce both reports, subject to the Hart Defendants' agreement that this disclosure will not give rise to a subject matter waiver. (Tr. at 12).

Prior to the issuance of the October 13 report, Morgan Lewis sent Sekisui an eleven-page memorandum, dated September 29, 2010, setting forth the firm's "Preliminary Analysis of Potential Claims" against the Hart Defendants. (Id. Ex. G) ("Morgan Lewis Memorandum"). That document inadvertently was produced to the Hart Defendants' counsel, but has since been clawed back. (See 4/4 Letter at 2). Based in part on Sekisui's initial attempt to claim privilege for the October 13 version of the AQ report, the Hart Defendants speculate that the Morgan Lewis Memorandum may have "provided a road map for [Sekisui] to file [a] baseless claim without having to reveal that prior to filing [it] had confirmed the baselessness of [its] claim." (See Tr. at 12; 4/4 Letter at 2

(suggesting that there is "probable cause" to so find)). Their "theory," more particularly, is that Sekisui commissioned a report for the relevant period, received it, said "oh, my God, this is terrible," "deep sixed it," and then procured another sanitized report. (Tr. at 10). On this basis, they seek disclosure of the Morgan Lewis Memorandum.

In essence, the Hart Defendants argue that Morgan Lewis conspired with Sekisui to file a claim that they both know is meritless. This is a serious accusation. To invoke the crime-fraud exception, however, a party must have more than a "theory." The party seeking disclosure must show that a prudent person would conclude from the evidence that there is a "reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud" that was furthered by the withheld communication. United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997). If that showing is made, a court may conduct an in camera review to determine whether the facts accord with the requester's belief, such that the exception applies. Id.

Here, in response to the Hart Defendants' concerns, Sekisui has voluntarily produced both the second and final AQ reports. Sekisui further has represented that there is no other AQ report relating to the pre-acquisition period. Accordingly, to the extent that Sekisui commenced this action despite its receipt of a report demonstrating the falsity of its allegations, the Hart Defendants now have that report. The Hart Defendants therefore have all the ammunition they need to establish Sekisui's alleged misconduct.[4]

---

[4] Sekisui and its counsel of course deny that there has been any misconduct.

Not content with receiving the AQ reports, the Hart Defendants have asked that the Court review the Morgan Lewis Memorandum in camera. (See Tr. at 8 ("The easy way to get through this since, [Sekisui] seem[s] to be willing to let you look at them, please look at the [memorandum] and ask them about the second report."). When that request was made during oral argument, I in fact agreed to undertake the requested review, and Sekisui did not object. (Id. at 8-9). Although the Court's inspection of the Morgan Lewis Memorandum clearly would not vitiate any applicable privilege or protection, in camera review of a document still represents a significant intrusion on a party's rights. See United States v. Zolin, 491 U.S. 554, 572 (1989). The Supreme Court consequently has held that, "[b]efore engaging in in camera review to determine the applicability of the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person' . . . that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." Id. (quoting Caldwell v. Dist. Ct., 644 P.2d 26, 33 (Colo. 1982)). I was not aware of the Zolin decision when I agreed to conduct the in camera review.

Although a healthy degree of skepticism is probably an admirable trait for a litigator, Sekisui has produced the reports that the Hart Defendants suggest would evidence the baselessness of its claims. Moreover, Sekisui and its counsel have represented that there are no other AQ reports regarding the preacquisition period that have been "deep sixed." Accordingly, although the Hart Defendants and their counsel

may find the timing of various events to be curious, there simply is no evidence that would cause a reasonable person to conclude that Sekisui and its counsel have not been proceeding in good faith. The Court therefore declines the invitation to review the Morgan Lewis Memorandum in camera to determine whether there is a basis upon which the Hart Defendants could invoke the crime-fraud exception to compel its disclosure.

IV. Fryer Email Folder

The Hart Defendants also seek relief related to Hugh Fryer, who joined ADI in 2006 and remains in its employ. (4/4 Letter at 3). Fryer currently serves as the Director of Business Development for Sekisui Diagnostics, ADI's successor. Both Sekisui and the Hart Defendants have identified Fryer in their Rule 26(a) disclosures as a person likely to have discoverable information. (Id.).

The Hart Defendants initially complained that Fryer's email folder for the relevant period was empty, but later acknowledged that Sekisui produced 2,590 emails for him for the period "prior to 2010" and 8,343 emails for the period "after 2010." (See 4/4 Letter at 3; letter from Mr. Velie to the Court, dated Apr. 5, 2013). In their view, this "disparity . . . raises the issue whether [Sekisui] destroyed Hugh Fryer emails for the period prior to 2010." (Id.). Sekisui has indicated, however, that any disparity is the result of the search terms employed, and it denies that any of Fryer's emails were removed from the ADI email server. (Tr. at 22). In these circumstances, the mere fact that Sekisui has produced a comparatively smaller number of emails for Fryer during the preacquisition period clearly does not warrant the imposition of spoliation sanctions.

V. Other Custodians' Emails

Although the Hart Defendants' letter regarding Fryer did not seek sanctions based on perceived deficiencies in Sekisui's email productions for other custodians, their counsel also alleged that the email files of several other ADI employees were intentionally deleted. (See 3/22 Letter at 1-2; 4/19 Letter at 1-4 & n.12). Sekisui has provided reasonable explanations as to why it should not be held responsible for the deletion of the emails of certain such individuals. For example, Melissa Knight, an ADI accountant, was hired in 2007 and terminated in 2008, prior to Sekisui's acquisition of ADI, and therefore long before this litigation could have been anticipated. Sekisui also has no record of erasing her email folder. (Tr. at 22). Charles Roy similarly was hired and fired before the Sekisui acquisition. (Id. at 23). Janet Silbert was a part-time employee, secured through a temporary agency, who never was on the ADI payroll. (Id. at 23-24). There has been no showing that she played any role of consequence in the ADI acquisition.

The Hart Defendants indicate that there are eleven other custodians – Michael Smirnov, Abha Malik, Chris Markline, Megan Miller, Adrian Nugent, Leigh Ayres, Joseph Azary, Vincent Forte, Robert Greenfield, David Teicher, and Kevin Morrissey – whose email folders either were or "may have been" deleted from the ADI server. (3/22 Letter at 2). Sekisui notes that four of these employees (Malik, Markline, Miller, and Nugent) were not among the custodians whose folders the parties eventually agreed would be searched. (3/27 Letter at 2 n.1). As to "six other custodians"

(presumably Ayres, Azary, Forte, Greenfield, Teicher, and Morrissey), Sekisui initially stated that it had, in fact, preserved their folders, noting that the dearth of responsive emails concerning them may be attributable to the Hart Defendants' "2009 instruction to ADI employees to delete unwanted email." (Id. n.3). Sekisui also represented that Azary was only with the company a "short time" and apparently was hired "after the acquisition." (Tr. at 24). Finally, Sekisui stated (somewhat inconsistently) that it was "still investigating the whereabouts of . . . Smirnov's email folder, and has enlisted the services of a forensic consultant to locate those files." (3/27 Letter at 2).[5]

Although Sekisui initially represented that the email folders of all of these custodians (other than possibly Smirnov) had been preserved, the Hart Defendants have adduced evidence establishing that, at least with respect to Ayres, this likely is not so. Indeed, in an email dated October 11, 2010, Taylor instructed NCS to "delete" Ayres "from the Exchange Outlook server – totally into cyberspace. Do not archive." (4/19 Letter at 1). Taylor also noted that "Kevin" had approved this action. (Id.). Ayres previously had been the ADI employee responsible for ensuring ADI's compliance with FDA regulations; at the time of the email, Morrissey was ADI's president and chief operating officer. (Id. at 1-2). Given Ayres' important role at the company, and

[5] The Hart Defendants contend that Sekisui subsequently admitted that it had deleted Smirnov's email folder, explaining that this could have occurred only after Smirnov left the company in March 2012 (after the litigation hold was implemented). (See 4/19 Letter at 3). While Sekisui has not directly responded to this accusation in its subsequent letter to the Court, I am unaware of any such admission on its part. Indeed, Sekisui's representation to the Court regarding Smirnov during oral argument was that it had not yet determined what happened to his emails. (Tr. at 24).

Morrissey's involvement in the decision, the phrasing of Taylor's email is, at first blush, extremely troublesome. In context, however, it appears to have been sent in response to a request to delete Ayres' email address following her departure from ADI because it had been receiving nothing but "junk email" that was cluttering ADI's server. (See 4/24 Letter Ex. 1). Sekisui further notes that, despite Taylor's instructions, it has produced "nearly 7,000 emails and attachments from . . . Ayres' archived email files, plus several thousand more Ayres emails from other custodians' files." (4/24 Letter at 2) (emphasis added). In light of this representation, there is, at present, no basis for this Court to conclude that the Hart Defendants have been prejudiced by Taylor's instruction to destroy Ayres' active email folder without archiving its contents.

In sum, based on the limited record presently before the Court, the Hart Defendants have not made the showing necessary to secure an adverse inference instruction with respect to any of the eleven additional custodians. In particular, they have not shown that there is reason to believe that these custodians had discovery-relevant information which is no longer available. Nor have they shown that they have suffered any prejudice.

At best, as frequently occurs in e-discovery sanctions motions, the Hart Defendants have established the presence of some smoke, intimating that there consequently must have been a fire. While the Court is not in a position to say that the Hart Defendants will never be able to make the requisite showing, the proof that they have adduced thus far clearly is insufficient to warrant an adverse inference instruction

(or any other draconian sanctions) with respect to any of the additional custodians about whom they complain.

VI. Conclusion

For the reasons set forth above, the Hart Defendants' requests for sanctions and an in camera inspection of the Morgan Lewis memorandum are denied. The Hart Defendants may, however, renew their sanctions motion at a later stage of this case if they are able to establish that they have been prejudiced by the destruction of relevant electronically-stored information.

SO ORDERED.

Dated: New York, New York
June 10, 2013

FRANK MAAS
United States Magistrate Judge

Copies to:

Hon. Shira A. Scheindlin (By Hand)
United States District Judge

All Counsel via ECF