**MORRISON | FOERSTER**

1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104-0050

TELEPHONE: 212.468.8000
FACSIMILE: 212.468.7900

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG,
SINGAPORE

September 20, 2013

Writer's Direct Contact
212.468.8032
KHagberg@mofo.com

Hon. Shira A. Scheindlin
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: *Sekisui America Corporation et al. v. Hart et al.*, Case No. 12-cv-3479 (SAS) (FM)

Dear Judge Scheindlin:

We write in response to Defendants' September 16, 2013 pre-motion letter ("Defs.' Letter") regarding Defendants' proposed motions *in limine*.[1]

I. <u>**Plaintiffs Are Not Pursuing Time-Barred Claims.**</u>

Plaintiffs notified Defendants' counsel prior to the filing of the letters that Plaintiffs are not pursuing claims alleging breach of any provision of the Stock Purchase Agreement ("SPA") that has allegedly expired. Plaintiffs' claims at trial will be limited to breaches of paragraphs 4.12 and 4.14 of the SPA. Defendants have conceded that claims under paragraph 4.14 have not expired (Defs.' Letter at 2 n.2), and claims under paragraph 4.12 were preserved when they were included in the timely claim notice on October 20, 2010. Therefore Defendants' contentions on this point are moot.

---

[1] As an initial matter, at the August 26, 2013 conference, the Court extended the page limit for letters from three pages, including exhibits, to ten double-spaced pages. To comply with the page limit, Plaintiffs' letter did not include exhibits, although Defendants' letter did. To avoid prejudice, Plaintiffs include exhibits with this letter, including the full reports of all three of Plaintiffs' experts because Defendants seek to exclude the entire reports but only attached selected portions to their pre-motion letter.

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Two

## II. Plaintiffs' Experts' Opinions Comply With the Standards of *Daubert* and Rule 702.

Defendants seek to exclude Plaintiffs' expert reports in their entirety, but were very selective in the portions they attached and referred to in their letter. When the experts' opinions are viewed in their entirety (and without Defendants' mischaracterizations of those opinions), it is clear that none of Plaintiffs' experts' opinions should be excluded.

### A. Guy Erb's Opinions Are Proper.

#### 1. Mr. Erb's Damages Calculations Are Not Based on Time-Barred Claims.

Mr. Erb's damages calculations are not based on time-barred claims. Notably, Defendants include no citation for this contention. While the background section of Mr. Erb's report cites to the Complaint and various representations and warranties in the SPA, the $10.7 million damages figure referenced in Defendants' letter is specifically broken up into approximately $6.7 million in damages for Femtelle and approximately $4 million in damages for "Then-Current Products." (*See, e.g.*, Ex. 1 ¶ 63, Ex. 1.) Mr. Erb will testify that the loss in value of Femtelle and the Then-Current Products is attributable to actionable breaches for which Plaintiffs will seek to prove liability at trial. (*See, e.g., id.* ¶¶ 62-63.)

#### 2. Mr. Erb Did Not Improperly Rely on the Confidential Memorandum.

Defendants' argument that Mr. Erb improperly relies on the Confidential Memorandum is wrong in several respects. *First*, as is stated throughout Mr. Erb's report—and conceded by Defendants in footnote 5 of their letter—Mr. Erb is not relying on the Confidential Memorandum. Instead, "the starting point for [Mr. Erb's] estimates of the overpayment of purchase price is the KPMG SFAS 141R Valuation Study." (*Id.* ¶ 65.) This was a study created by an independent accounting firm shortly following the acquisition that allocated the purchase

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Three

price of ADI among its constituent purchased assets. (*Id.*) As noted in the study, the projections used were provided to KPMG by ADI's management—which included Mr. Hart, ADI's CEO at the time. The fact that ADI management's projections following the acquisition were comparable to those used in the Confidential Memorandum is meaningless. If KPMG, Sekisui and ADI had believed that different projections were warranted, then Mr. Erb would have used those modified projections. But all parties agreed that, as of the acquisition date, those were the accurate figures to use in valuing ADI's assets. Further, KPMG's study went far beyond reliance on the Confidential Memorandum, including projecting revenues and costs for twenty years or more and discounting those projections by accounting for the relative risk associated with future expected performance. Mr. Erb, who has over 20 years of experience valuing companies, recognized that KPMG's study was a contemporaneously created and reliable starting point for his valuation, and thus he properly relied on it in his analysis.

*Second*, even if Mr. Erb had relied directly on the Confidential Memorandum in his damages analysis, that reliance would still have been acceptable. Defendants misleadingly attempt to argue that, because Plaintiffs were not entitled to rely on the Confidential Memorandum to prove liability for fraud, then the figures in the Confidential Memorandum must be ignored for all purposes. There is no basis for that conclusion. Plaintiffs are not arguing that the failure to meet projections in the Confidential Memorandum provides a basis for liability—either for breach of contract or fraud. Rather, at most, the figures in the Confidential Memorandum were used by KPMG (at ADI's suggestion) to allocate the $25.5 million purchase price among ADI's various assets. There is nothing improper with that legally required allocation, and Defendants cite no authority claiming otherwise.

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Four

### 3. Mr. Erb's Valuation Damages Methodology is Proper.

Defendants mischaracterize Mr. Erb's damages calculation as "the difference between what was represented as value and what later turned out to be the true value." (Defs.' Letter at 4.) Mr. Erb's actual statement regarding his damages approach is "the difference between the actual value of the property received and what was paid for it." (Ex. 1 ¶ 17.) This is an appropriate and approved damages methodology under these circumstances. *See, e.g.*, No. 87-CV-973, *Galli v. Metz*, No. 87-CV-973, 1991 U.S. Dist. LEXIS 12709, at *50 (N.D.N.Y. Sept. 9, 1991) (recognizing that "[t]he measure of damages for breach of warranty is the difference between the value of the goods accepted and the value they would have had if the same had been as warranted" and determining that a reduction in the purchase price was the appropriate remedy) (*rev'd in part on other grounds*, 973 F.2d 145 (2d Cir. 1992)).

Indeed, the sources cited in Defendants' letter support Mr. Erb's approach. The Hall & Lazear reference manual, for example, makes clear although "expectation" damages are "generally" used for breach of contract damages, it is not always appropriate. (Ex. 2 at 284-85.)[2] In fact, where the reliance principle is used, the breach-of-contract plaintiff receives *lower* damages. (Ex. 2 at 286-87 n.9 ("Reliance damages are defined as damages that do not place the injured party in as good a position as if the contract had been fully performed (expectation damages) but in the same position as if promises were never made.  Reliance damages reimburse the injured party for expenses incurred in reliance of promises made.").)

---

[2] In truth, terms such as "expectation," "reliance" and "benefit-of-the-bargain" are not necessarily helpful in discussing damages methodologies, because they are not used consistently.  For example, Mr. Erb used the term "reliance" in his report, but clarified at his deposition that such a term is not necessarily accurate for his methodology. (Ex. 3 at 66:4-23.)

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Five

Here, Mr. Erb properly concluded that, in reliance on Defendants' representations and warranties, Plaintiffs paid a certain price for ADI. If those representations had not been made, Plaintiffs would have paid a different price. Put another way, the amount that Plaintiffs paid for ADI represents the value of the company as warranted, and Mr. Erb's analysis then determines the value of the company as accepted, and concludes that damages are the difference between those amounts. The case law fully supports this methodology. *See Galli*, 1991 U.S. Dist. LEXIS 12709, at *50 (damages for breach of representations and warranties in a stock purchase agreement resulted in a reduced purchase price as "the difference between the value of the goods accepted and the value they would have had if the same had been as warranted"); *U.S. v. Van Gorp*, 697 F.3d 78, 87 (2d Cir. 2012) (describing "run-of-the-mine" breach of contract damages as "the difference between the value that the [injured party] received and the amount that it paid"). Even Defendants' rebuttal expert agrees that the proper method for calculating damages for a breach of representation and warranty is to determine "had the misrepresentations regarding representation and warranties that were alleged not taken place, how different would the purchase price be." (Ex. 4 at 145:20-23; *see also id.* at 157:20-158:10.) In short, Mr. Erb's valuation methodology is permissible under the law and the facts of this case.

    4.    <u>Whether a Decline in EBITDA Constitutes a Material Adverse Effect is Not Relevant to Mr. Erb's Damages Calculation</u>.

Defendants' argument that a decline in TTM EBITDA does not constitute a material adverse effect is irrelevant to Mr. Erb's damages calculation. Mr. Erb was explicit on this point:

> My purpose [in calculating TTM EBITDA] was not to value the company with those numbers by using a multiple method, which is normally the end result of a calculation, including the adjustments or add-backs for such items as salaries. My intent was not the value of the company with that comment, but I thought it was

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Six

noteworthy that monthly declines had occurred. *They had no relationship to my damages calculations.*

(Ex. 3 at 21:25-22:15 (emphasis added).) Defendants misstate Mr. Erb's report in this regard.[3]

Plaintiffs disagree with Defendants' sweeping conclusion that such a decline in EBITDA could never constitute a material adverse effect, but, as Plaintiffs informed Defendants, that is not one of Plaintiffs' claims in this case. Nor did Mr. Erb use such an alleged decline to calculate damages.

> 5. Mr. Erb's Calculation of Remediation Expenses is Proper Expert Testimony.

Defendants curiously argue that Mr. Erb's detailed calculation of nearly $3 million in damages for remediation expenses should be excluded because "the calculations could have been done by an accounting firm." (Defs.' Letter at 6.) While Plaintiffs could have retained an accounting firm, it retained Mr. Erb instead—and Defendants are not arguing that Mr. Erb did not have the requisite expertise. Rather, Defendants argue that, because the calculation only required arithmetic (which is a gross understatement of the tasks that Mr. Erb performed), the Court would not benefit from Mr. Erb's expertise.[4] Mr. Erb's calculation of remediation expenses took dozens—if not hundreds—of hours to compute and spans twenty-six pages of

---

[3] Defendants misrepresent Mr. Erb's report by selectively citing his report and ignoring his testimony. Mr. Erb noted that an undisclosed deterioration in ADI's financial performance "would have provided an early indication that ADI's actual financial performance *might* fall short of projections." But, "[o]f particular importance was the interruption in sales that resulted from the necessity of bringing product quality and records into compliance with regulatory requirements. It is reasonable to conclude that such an interruption in sales would have had a harmful impact on SD-ADI product sales." (Ex. 1 ¶ 80.)

[4] Mr. Erb did not state, as Defendants' contend, that no expertise was required. Rather, he stated that "[t]he calculations in and of themselves were not complicated." (Ex. 3 at 113:23-24.)

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Seven

detailed calculations. (Ex.1, Exs. 6a-6h.) While any one calculation might involve simple arithmetic, the scope and complexity of these calculations in the aggregate and the analysis of the underlying company books and records is not an analysis normally undertaken by lay people.

### B.     Carrie Kuehn's Opinions Are Proper.

Defendants mischaracterize the opinions of Ms. Kuehn as well. Ms. Kuehn is a regulatory affairs expert and, based on her knowledge of FDA regulations, she opines on the complicated structure of the FDA regulations (Ex. 5 at 5-9), including nine separate sections of the Quality System Regulations ("QSRs") (*id.* at 10-34). Ms. Kuehn reviewed over 100,000 documents produced in this litigation and identified numerous shortcomings in the ADI quality system prior to Plaintiffs' acquisition. This is proper expert testimony. *See Pension Comm. of Univ. of Montreal Pension Plan v. Citgo Group Ltd*, 691 F. Supp. 2d. 448, 466-67 (S.D.N.Y. 2010) (permitting expert to testify regarding objective industry standards and factual narrative that was intertwined with opinion testimony).

Defendants attack Ms. Kuehn's opinions as "legal opinions" while failing to attach the page of her report that summarizes those opinions. As detailed in her report, her primary opinions are that, prior to the acquisition in April 2009: ADI lacked a functioning Quality Management System; there was a "vast gap" between ADI's pre-acquisition procedures and what is required under the FDA regulations, and it would have required extensive monetary and personnel resources to bring ADI into compliance with FDA regulations after the acquisition; ADI's procedures were inadequate and did not form a functioning quality management system; evidence shows that the limited resources of ADI were often used for commercial matters, rather than issues of FDA compliance; there is evidence that some ADI products were commercialized

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Eight

in disregard of FDA regulations; ADI failed to engage in adequate risk management activities; and, ADI failed to engage in continuous improvement activities, such as Corrective and Preventative Actions, as required by the FDA. (Ex. 5 at 4.) These are not legal opinions. They are opinions based on Ms. Kuehn's analysis of the QSR requirements and the evidence regarding ADI's pre-acquisition quality system.

### C. Timothy Ulatowski's Opinions Are Proper.

Defendants also mischaracterize Timothy Ulatowski's opinions regarding the viability of ADI's 510(k) submission for Femtelle. Mr. Ulatowski, who at one time headed the section of the FDA that reviews 510(k) submissions, based his opinions in part on his 37-year tenure at the FDA. His main opinion, after carefully reviewing the Femtelle 2007 and 2009 submissions as well as the relevant correspondence with the FDA, was that the Femtelle application was destined to fail. In other words, in his opinion, there was nothing that Plaintiffs could have done in June 2010 to convince the FDA to clear the submission and allow Femtelle to be marketed in the United States. This is not a legal opinion, but rather an expert opinion based on a review of the record and decades of relevant expertise.

Defendants also assert, without citation to Mr. Ulatowksi's report, that Mr. Ulatowski should be barred from opining on the motivations and intent of fact witnesses. Plaintiffs do not disagree with this basic point. Nothing in Mr. Ulatowski's report, however, opines on intent or motivation of any fact witness.

Finally, Defendants argue that Mr. Ulatowski merely recites facts in the record. This is not accurate. *First*, Defendants' exhibit excludes Mr. Ulatowski's detailed explanation of the FDA regulations and the process of FDA review of 510(k) submissions. (Ex. 6 at 5-18.) This

ny-1109238

MORRISON | FOERSTER

Hon. Shira A. Scheindlin
Page Nine

information is both relevant and, Plaintiffs believe, useful to the Court. *Second*, Mr. Ulatowski provides a timeline summarizing the complex 510(k) submissions and requests for additional information from the FDA. As this Court has acknowledged, 510(k) submissions are "highly technical in nature." *See Medism v. BestMed LLC*, 861 F. Supp. 2d. 158, 177 (S.D.N.Y. 2012). Mr. Ulatowski's summary is appropriate as the documents are "studded with complex terminology" that may be difficult to understand "without the aid of expert testimony." *Pension Comm.* 691 F. Supp. 2d. at 462 (permitting expert to summarize complicated documents).

### III.     Defendants' Request For Additional Sanctions is Baseless.

During the August 26, 2013 hearing, Defendants claimed that they would seek additional sanctions based on the decommissioning of a server and a resultant loss of data. As explained in the attached declaration of Doug LeMasurier, President of Northeast Computer Services, who provided technical support to ADI from 2009 to 2013, the server upgrade project at issue did not result in the loss of any ADI files or data. (Ex.7.) Defendants' accusations are based on a misreading of a proposal to upgrade the ADI servers. Plaintiffs' counsel explained this to Defendants during the meet-and-confer process, but Defendants nevertheless chose to include this argument in their letter. It has no basis and should be disregarded.

Defendants' letter also includes a list of certain Standard Operating Procedures ("SOPs") and a snapshot of a file from 2006 listing those documents, and argues that Plaintiffs must have destroyed these SOPs because they existed at one time. This argument is baseless as all of the documents listed were produced by Plaintiffs, often multiple times.[5]

---

[5] EQP011, EQP011-1F and EQP011-2F appear at SEK00329472; SEK00391237-40; SEK00386082-85; SEK00329470; SEK00391235; SEK00390015; SEK00329471;

ny-1109238

**MORRISON | FOERSTER**

Hon. Shira A. Scheindlin
Page Ten

      Defendants' final argument for sanctions is that Defendants should be sanctioned for *producing* recovered documents from the files of Janet Silbert, Mikhail Smirnov and Leigh Ayres. As Plaintiffs previously explained, Plaintiffs hired an outside expert consultant to assist in combing through old computers and backup servers to locate missing emails. Plaintiffs learned shortly before the August 26 hearing that additional emails had been located at an offsite backup server, which had to be restored, processed for review, reviewed and processed for production. Due to a processing error, the September 13 production did not include all of the documents that Plaintiffs intended to produce. Plaintiffs became aware of that upon receiving Defendants' pre-motion letter and promptly remedied the error and produced over 15,000 additional documents. Plaintiffs have expended considerable time and expense searching for, restoring and producing these documents. These good faith efforts should not be the subject of sanctions.

      Respectfully submitted,

*Karen L. Hagberg /ck*
Karen L. Hagberg

cc:    Franklin B. Velie, Esq. (fvelie@sandw.com; via ECF)
         Jonathan G. Kortmansky, Esq. (jkortmansky@sandw.com; via ECF)

---

SEK00391236; SEK00390016; EQP025 and EQP025-1F appear at SEK00336547-52; SEK00386115-20; SEK00329497-98; SEK00390027-28; EQP036 appears at SEK00329506-16; SEK00386137-47; SEK00710642-56; EQP042 and EQP042-1F appear at SEK00329519-23; SEK00386161-165; SEK00715491-95; SEK01400629-33; SEK00710657-68; SEK00329518; SEK00702010. These documents, as well as the snapshot that Defendants located, have been made available to Ms. Kuehn. While Ms. Kuehn informed counsel that her overall opinions will not change as a result of these documents, she is willing to provide amendments to certain minor observations in her report.

ny-1109238