E1HFSEK1                      Trial

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x
3
    SEKISUI AMERICA CORPORATION
4   etT al,

5                Plaintiffs,

6         v.                              12 CV 3479 (SAS)

7   RICHARD HART, et al,

8                Defendants.

9   ------------------------------x
                                         New York, N.Y.
10                                       January 17, 2014
                                         10:00 a.m.
11
    Before:
12
                    HON. SHIRA A. SCHEINDLIN,
13
                                         District Judge
14
                         APPEARANCES
15
    MORRISON & FOERSTER LLP
16       Attorneys for Plaintiffs
    KAREN HAGBERG, ESQ.
17  CRAIG B. WHITNEY, ESQ.
    LEDA A. MOLOFF, ESQ.
18  NATALIE ANNE FLEMING NOLEN, EQ.

19  SULLIVAN & WORCESTER LLP
         Attorneys for Defendants
20  FRANKLIN B. VELIE, ESQ.
    JONATHAN G. KORTMANSKY, ESQ.
21  SIOBHAN BRILEY, ESQ.

22

23

24

25

E1DFSEK1                      Trial

1              (Trial resumed)

2              (In open court)

3    CARRIE KUEHN,

4         called as a witness by the Plaintiff,

5         having been previously duly sworn, testified as follows:

6    CROSS-EXAMINATION

7    BY MR. VELIE:  (Continued)

8    Q.  Good morning, Ms. Kuehn.

9    A.  Good morning.

10   Q.  Your report at page 16 -- I'll show it to you if you don't

11   recall it, but you testified yesterday that ADI's definition of

12   design inputs was fundamentally inaccurate.  Do you recall

13   that?

14   A.  Yes, I recall that.

15            MR. VELIE:  May I please have Plaintiff's Exhibit 67?

16            THE COURT:  By the way, you did not discuss the case

17   at all with counsel?

18            THE WITNESS:  I did not, your Honor.

19   Q.  Did you discuss the case with anyone?

20   A.  No, I did not.

21   Q.  It's Plaintiff's Exhibit 67 and we're going to be looking

22   together at the page --

23            THE COURT:  Plaintiff's Exhibit 67?

24            MS. BRILEY:  Yes.  Do you have it?

25            THE COURT:  If it's in the book.

E1HFSEK1                          Kuehn - cross

1          MR. VELIE:  Yes, it should be.

2          THE COURT:  I have it.

3   Q.  Do you have it before you, Ms. Kuehn?

4   A.  Yes.

5   Q.  Please turn to the page which ends 830.

6   A.  I see it.

7   Q.  Do you see where it says 4.6?

8   A.  Yes, I do.

9   Q.  The definition is, "Design input means the physical

10  requirements."  Is that what you referred to?

11  A.  I see that, yes.

12         MR. VELIE:  May I please have Defendant's Exhibit

13  9F's?  Do we have to put this on the screen or do we have paper

14  copies?

15         MS. BRILEY:  We have paper copies.

16         THE COURT:  9F is the section of the CFR.  Obviously

17  there's no possible objection to the regulation.

18         MS. HAGBERG:  No, your Honor.

19         THE COURT:  Okay.

20  Q.  And you recognize this, Ms. Kuehn, do you not, as 21 CFR

21  820.3 --

22         THE COURT:  Point what?

23  A.  I have point 1.

24         THE COURT:  I see on the back is point 3.  Point 3,

25  definition.

E1HFSEK1                        Kuehn - cross

1   A.  Yes.

2   Q.  And definitions drop down to F?

3   A.  Yes.

4   Q.  Do you see where it says, "Design input means the physical

5   and performance requirements of the device that are used as the

6   basis for device designs"?

7   A.  Yes, I see that.

8   Q.  Do you see, Ms. Kuehn, that is substantially identical to

9   the definition you criticized in the defendant's documents?

10  Yes or no?

11  A.  Yes.  No, I see that, but their definition goes on beyond

12  what is written next to design input.  My criticism was about

13  the entire characterization of design inputs which is

14  fundamentally incorrect.

15  Q.  You acknowledge with me, do you not, that the definition

16  was correct?

17  A.  Some of the wording in their definition is clearly taken

18  from the CFR's, yes.

19  Q.  Substantially identical?

20          THE COURT:  I don't understand your answer then.  You

21  say what you were criticizing was not 4.6 but the subsets 4.6.1

22  through .9?  Is that what you're criticizing?

23          THE WITNESS:  Yes, your Honor.  It shows a lack of

24  understanding of what design inputs actually are.

25          THE COURT:  In what way?

E1HFSEK1                          Kuehn - cross

                THE WITNESS:  For example, validation protocols have

nothing to do with design inputs.  Those come much later in the

design process.  Product -- let me just look here.  The

language regarding the 510(k) submissions to earmark the

project plan, these are not design inputs, your Honor.  These

are aspects of other parts of the design process, so when I

look -- and this is not the only definition that is incorrect

in this SOP.  Taken in a whole it shows a lack of understanding

of the design control process.

                THE COURT:  Okay.  It does say, "Design input

includes, but is not limited to," it lists nine specifics.

You're saying none of them are included?

                THE WITNESS:  Some of them can be used as design

inputs, but, for example, as I mentioned, the design validation

protocols, the peer process protocols, those are not

validations, nor do they have anything to do with design inputs

and this type of lack of understanding persists throughout the

SOPs.  This is simply one example, your Honor.

Q.  You say the definition was an example?

A.  Yes.

Q.  Perhaps we can agree on this.  Research use only products,

it's okay for a company like ADI to sell research use products

to people who are going to use them for research uses only,

isn't that correct?

A.  If they are correctly labeled per the regulations, then

E1HFSEK1                    Kuehn – cross

1    yes.

2    Q.   So they have to be correctly labeled by the regulation as

3    RUO, research use only?

4    A.   Yes, that's correct.

5    Q.   Otherwise they're not covered by the QSRs, are they?

6    A.   If they are intended for research use only they are not

7    covered by the QSRs.

8    Q.   Ms. Kuehn, you've had a chance to reflect about our

9    discussion yesterday.  Are you prepared to acknowledge that you

10   did not get a complete data set or would you like me to take

11   you through more data that you were not given?

12   A.   It would appear that I was missing some information in the

13   data set I reviewed.

14   Q.   Do you have any idea how much data you were missing?

15   A.   I have no idea.

16   Q.   Does the fact that you have no idea how much data you were

17   missing lead you as a scientist, as an expert who is here to

18   help this Court and as an honest person, can you now concede

19   that you have less certainty now than when you gave this report

20   and gave this opinion?

21   A.   Yes.

22   Q.   You are less certain?

23   A.   Yes, I am.

24          MR. VELIE:  This shortens my cross substantially, your

25   Honor.  May I have a second?

E1HFSEK1                        Kuehn – cross

1           (Pause)

2   Q.  You gave some testimony yesterday about management review

3   minutes and you thought that the minutes were inadequate, is

4   that correct?

5   A.  That's correct.  Well, I'm sorry, let me amend that.  Not

6   that the minutes were necessarily inadequate, that the minutes

7   reflected the content of management review meetings that did

8   not meet the requirements.

9   Q.  I so recall.  I apologize for mischaracterizing.

10  A.  Okay.

11  Q.  The FDA is not even permitted to look at management review

12  minutes, are they?

13  A.  No, they're not, the idea being that they want to encourage

14  medical device manufacturers to honestly evaluate their own

15  quality systems, and so FDA is not entitled to see management

16  review minutes during inspections.

17  Q.  Let's talk for a minute about the audits.

18          THE COURT:  When you refer to the word audits you mean

19  audits and inspections?

20          MR. VELIE:  Yes, your Honor.  I apologize.  I, for my

21  sins, I am not an FDA expert.

22          THE COURT:  But I've learned that much.  They do

23  inspections.

24          MR. VELIE:  Right.

25  Q.  I want to talk about the Intertek ISO audits and the FDA

E1HFSEK1                          Kuehn - cross

1    inspections.  Just in bulk you testified just at the very end

2    of your direct that you thought the audit findings confirm your

3    conclusions, is that correct?

4    A.  I found that the Intertek auditor observed findings and

5    recorded them in his audit reports that were consistent with

6    what I observed in the documents that I reviewed.

7    Q.  We can agree that no Intertek audit team during the

8    relevant period ever withheld ISO certification, isn't that

9    correct?

10   A.  I agree.

11   Q.  Therefore, wouldn't you agree that those trained

12   professional auditors, each audit team saw what you saw and

13   decided it was not sufficiently material to withdraw ISO

14   certification.  Can you agree with that?

15   A.  To the extent that they were evaluating ADI for its

16   conformity with the ISO standard, they felt that what they saw

17   was adequate to achieve certification.

18   Q.  The question I asked you is they must have seen these same

19   things that you referred to but just didn't think that they

20   were sufficiently material to withhold ISO certification.

21   A.  I don't know what they were thinking, but they seemed to

22   think that ISO certification was appropriate.  That's as far as

23   I can go with that.

24   Q.  Okay.  And with respect to the FDA inspections which

25   occurred in 2004 and 2005 before the relevant period and in

E1HFSEK1                    Kuehn - cross

1   2011 after the relevant period, in all instances an EIR was

2   delivered indicating that the FDA was not going to pursue any,

3   they weren't going to send a warning letter and they weren't

4   otherwise going to take any regulatory action, isn't that

5   correct?

6   A.   They closed the inspections in response to whatever they

7   received from ADI following the 483s, that's correct.

8   Q.   So similarly, whatever, before and after the audit period,

9   the FDA saw, and you referred to as supporting your opinion,

10  was insufficiently material to the FDA to require even a

11  warning letter, isn't that correct?

12  A.   A warning letter is a very significant action by FDA.  So

13  they are not going to send one just because.

14          THE COURT:  Well, that's what he asked you.  It wasn't

15  material enough to send a warning letter.

16  A.   Well, it means they felt the response they already received

17  was adequate.  I can't say whether FDA would have considered it

18  material or not.  I simply don't know.

19          THE COURT:  Okay, but they didn't consider it material

20  enough to warrant a warning letter?

21          THE WITNESS:  Yes, I would agree.  I guess that's

22  true.  Yes.

23  Q.   There is, let's look together at one additional audit,

24  Defendant's Exhibit U, which is an audit, what I've been

25  referring to perhaps ignorantly as a customer audit.  Do you

E1HFSEK1                    Kuehn - cross

1    prefer supplier audit?

2    A.  It depend on whose perspective you're looking from.  So

3    from ADI's perspective it would perhaps be a customer audit.

4    From the auditor's perspective we would refer to this as a

5    supplier audit.  Either way I think is fine.

6    Q.  You've seen this before, right?  When I say this, I mean

7    DXU.

8    A.  I have not seen this before.

9    Q.  I'm only going to call your attention to two things.  One

10   is the date which is 13-14 August 2012, approximately three

11   years plus after Sekisui bought ADI.

12   A.  Okay.  I see that.

13   Q.  And I'm going to read from the audit overview and

14   recommendations in the middle of the paragraph where we have

15   marked it in yellow.  "The overall risk of the supplier --"

16            MS. HAGBERG:  Your Honor, I have an objection before

17   you ask your question.  This is outside the relevant period by

18   three years, your Honor.

19            MR. VELIE:  So conceded.

20            MS. HAGBERG:  And Ms. Kuehn has not looked at

21   anything, at audits that were after 2009 with respect to --

22            THE COURT:  I thought -- maybe I'm confused.  The

23   second FDA inspection, wasn't that 2011?

24            MS. HAGBERG:  She did look at that because it related

25   back to the 2004 --

1           THE COURT:  If she can look at that, she can look at

2   this.  We can't cherry pick.  If she looked at the FDA

3   inspection from 2011 she can now look at the 2012 audit.

4   Q.  I'm calling your attention to the statement in the audit

5   overview and recommendations.  I believe it's the third

6   sentence.  The overall risk of the supplier is medium with

7   85 percent of compliance rating?

8   A.  I'm sorry, where are you reading?  I was looking at the

9   highlighted version.

10  Q.  It's highlighted on the screen.

11  A.  I see it now.

12  Q.  "The overall risk of the supplier," meaning Sekisui in this

13  case, "is medium with 85 percent of compliance rating.  The

14  manufacturing of the product is not a risk, but the QMS,"

15  quality management system, "is a risk.  SD," Sekisui

16  Diagnostics, three years after the audit is done -- I'm sorry,

17  after the deal is done and they buy ADI, "SD is currently

18  non-compliant to ISO 13485 and FDA standards as per Siemans

19  audit team based on this audit."  Do you see that?

20  A.  I do see that.

21  Q.  You do understand, do you not, Ms. Kuehn, that this is the

22  only audit that we have that shows the company non-compliant

23  and it's three years after Sekisui buys it.

24  A.  I see that it says that there.  I haven't looked at this

25  audit to see what the scope of it was but it would certainly

E1HFSEK1                         Kuehn - cross

1    indicate that based on the summary.

2    Q.  And just in terms of fixing the date, it's not only three

3    years plus after Sekisui bought but it's only about nine months

4    before you first wrote your report, isn't that right?

5    A.  Approximately a year.

6    Q.  About a year.  So a year after they were found for the very

7    first time to be non-compliant you wrote your report saying I

8    find them non-compliant, is that correct?

9    A.  My report focused on the period, the relevant time period

10   in this matter, so I wasn't looking at the current state of

11   Sekisui Diagnostics.

12   Q.  I realize that, but you didn't have all the documents, you

13   had what you were given and we don't know what happened, none

14   of us knows what happened to those documents.  But when you

15   finally do your work this company is not in compliance.

16   A.  Based on a supplier/customer audit and their interpretation

17   of the findings they found them to be non-compliant.

18          MR. VELIE:  Your Honor, I have no further

19   cross-examination of this witness.

20          THE COURT:  All right.  Any redirect?

21          MS. HAGBERG:  Yes, your Honor.

22   REDIRECT EXAMINATION

23   BY MS. HAGBERG:

24   Q.  Let's just stay with this document a moment, DX U.  Have

25   you seen this document before?

E1HFSEK1                    Kuehn - redirect

1    A.  No, I have not.

2    Q.  Would problems that you identified in the 2006-2009 audit

3    continue to exist as of 2012?

4            THE COURT:  I'm sorry, what 2006 to 2009 --

5            MS. HAGBERG:  I'm sorry.

6    Q.  The 2006 to 2009 review that you did, the problems that you

7    identified in your report that existed in 2006 to 2009, would

8    those continue to exist in 2012, some of those?

9    A.  Unless they had been fully remediated, it's possible.

10   Q.  And Mr. Velie also showed you PTX 067.  Do you have that in

11   front of you, Ms. Kuehn?

12   A.  Yes, I do.

13   Q.  And he asked you if a product was research use only was it

14   required to comply with good manufacturing practices and 21 CFR

15   820, is that correct?

16   A.  That's correct.

17   Q.  Is it good practice if you are introducing a product to the

18   market that might become a 510(k) submission to maintain the

19   types of records that are required by the regulations?

20   A.  If the ultimate intent is to commercialize the IVD for

21   clinical diagnostic use then it must go through the design

22   control process if it is considered a class 2 medical device.

23   So even if it starts in the research lab, if it is determined

24   at some point that it could be used in the clinic and going to

25   be marketed commercially for that purpose it needs to go

E1HFSEK1                        Kuehn - redirect

1  through the design control process and those documents should

2  be kept, yes.

3  Q.  And if you hadn't done that from the beginning of an RUO

4  product would it be possible to go back and recreate that

5  record?

6  A.  If an RUO product that was intended to only be used for

7  research becomes a product that would be, would like to be used

8  clinically, then, yes, a retrospective design history file

9  should be generated and from the point at which that decision

10  is made a proactive maintenance of design history records

11  should be kept per the regulations.

12  Q.  Thank you.

13         You were also asked whether FDA is permitted to look

14  at management review minutes.  Do you remember that?

15  A.  Yes, I remember that.

16  Q.  And does the fact that the FDA doesn't have access to those

17  mean that a company doesn't have to comply with regulations

18  relating to management review minutes?

19  A.  No, it does not.

20  Q.  In fact, in many of the deficiencies that you identify in

21  the report, if you pass an FDA inspection or you pass an

22  Intertek audit is there still an obligation on a company to

23  comply with the regulations that apply to medical device

24  products?

25  A.  Yes.  Just to clarify, you don't really pass an FDA

E1HFSEK1                    Kuehn - redirect

1   inspection.

2   Q.  Sorry.

3   A.  That's okay.  But, yes, FDA makes it explicitly clear that

4   medical device manufacturers are responsible for compliance to

5   all applicable regulations.

6   Q.  So the fact that you have an inspection and the FDA doesn't

7   notice anything doesn't mean that you are fulfilling all of the

8   obligations of 21 CFR 820, is that correct?

9   A.  That's correct.  FDA inspections are designed to target

10  specific subsystems of the quality system regulations and thus

11  a company's quality management system.  The idea being that if

12  deficiencies are found in those systems they are indicative of

13  potential deficiencies throughout the quality management system

14  because the system is so integrated within itself, so that's

15  correct, just because FDA doesn't look at something does not

16  mean that the company is in compliance.

17  Q.  And do you have PTX 197 in your binder in front of you?

18  A.  Yes, I do.

19  Q.  Does the FDA tell companies that have been subject to a

20  warning letter just what you said?  Could I direct your

21  attention to SEK 524?

22          THE COURT:  Wait a minute, to what?  Is there an

23  exhibit number first?

24          MS. HAGBERG:  PTX 197.

25          THE COURT:  Yes, PTX 197, and then?

E1HFSEK1                        Kuehn - redirect

1          MS. HAGBERG:  Page 93524.

2          THE COURT:  Okay.

3          MS. HAGBERG:  And I'm referring to the next to the

4    last paragraph, the last full paragraph on this page.

5    Q.  Is this part of the language that FDA includes in warning

6    letters?

7    A.  Yes, it is.

8    Q.  And could you read the first two sentences of this?

9    A.  It states, "this letter is not intended to be an

10   all-inclusive list of deficiencies at your facility.  It is

11   your responsibility to ensure adherence to each applicable

12   requirement of the Act and FDA regulations."

13         Did you want me to continue?

14   Q.  Why don't you continue.  I think it's all relevant to what

15   you said.

16   A.  "The specific violations noted in this letter and in the

17   Form FDA 483 issued at the conclusion of the inspection may be

18   symptomatic of serious underlying problems in your

19   establishment's quality system.  You are responsible for

20   investigating and determining the causes of the violations

21   identified by the FDA.  You also must promptly initiate

22   permanent corrective and preventive action on your quality

23   system."

24   Q.  So the obligation remains on the company to be compliant.

25   It's not whether you get caught.  Is that how the regulations

1    work?

2    A.   That is exactly how the regulations are meant to work.

3    Q.   What about ISO audits?  Does ISO look at every aspect of a

4    company's business when it does an audit?

5    A.   ISO again follows an audit procedure that is intended to

6    address conformity with the ISO standard.  They are not looking

7    for compliance with the quality system regulations so how they

8    conduct their audit is not necessarily relevant to compliance

9    with the quality system regulation.

10   Q.   Mr. Velie also asked you about the fact that FDA did not

11   return to ADI after the 2005 closing of the prior inspection.

12   Is that significant to you?

13   A.   Not particularly.  They could have come back or they could

14   have not.  I don't know why they did not come back.

15   Q.   Does FDA make a decision between large companies and small

16   companies and have a resources issue that has to decide where

17   to focus its attention?

18            THE COURT:  I don't think she's familiar with internal

19   FDA decision making.  I said yesterday I wouldn't allow her to

20   comment on why the FDA does what it does or doesn't do.

21   Q.   Can you look at DX 5, Ms. Kuehn?

22   A.   I'm sorry, what was that?

23   Q.   Defendant's Exhibit V.  Sorry.  I read that as a 5.

24            THE COURT:  DX V?

25            MS. HAGBERG:  Yes.  I think it was one of the

E1HFSEK1                    Kuehn - redirect

 1   documents that Mr. Velie asked about yesterday.

 2              THE COURT:  That means it's going to take a while for

 3   me to go through the pile of exhibits.  I have it here, I've

 4   got it.  That's the response letter of Sekisui on July 7, 2011.

 5              MS. HAGBERG:  Yes, your Honor.

 6              THE COURT:  Went over the response in some detail.

 7              THE WITNESS:  I recall the exhibit.  I don't have it

 8   immediately in front of me but I recall the exhibit.  I can see

 9   it on the screen here.

10              MS. HAGBERG:  Okay.

11   Q.  Were you present for the testimony from Mr. Kevin

12   Morrissey?

13   A.  Yes, I was.

14   Q.  Do you recall Mr. Morrissey testifying that ADI wrote this

15   response because they wanted them to understand that ADI did

16   have some overarching documents and that ADI had significant

17   deficiencies in CAPA?

18   A.  I recall something along those lines, yes.

19   Q.  And could you please turn to the second page of this

20   document, SEK 899.

21              THE COURT:  I'm sorry, I don't really understand your

22   question because it was completely leading, then she said "I

23   recall something along those lines."  That makes your question

24   testimony and I don't understand it.  What it says -- I'm

25   reading back your question.  "Do you recall Mr. Morrissey

E1HFSEK1                    Kuehn - redirect

1     testifying that ADI wrote this response because they wanted

2     them" -- I'll stop there.  ADI wanted FDA?

3              MS. HAGBERG:  Yes.

4              THE COURT:  ADI wanted FDA to understand that ADI did

5     have some overarching documents?  What are overarching

6     documents?

7              MS. HAGBERG:  Documents that might deal on a very high

8     level, we looked at GEN 41.

9              THE COURT:  Overarching documents and that ADI had

10    significant deficiencies in CAPA?

11             MS. HAGBERG:  That was Mr. Morrissey's testimony.

12             THE COURT:  That ADI wanted FDA to know that ADI had

13    significant deficiencies in CAPA?

14             MS. HAGBERG:  That's correct, your Honor.  That's my

15    question.

16             THE COURT:  That's strange.  That's what you think

17    what Mr. Morrissey said?

18             MS. HAGBERG:  Yes, your Honor.  If you would look at

19    the first page of the document.

20             MR. VELIE:  Your Honor --

21             THE COURT:  Oh, you mean this cover --

22             MR. VELIE:  I have an objection.

23             THE COURT:  I'm sorry, not yet.  The cover letter of

24    V?

25             MS. HAGBERG:  Yes, your Honor, SEK 898.

1   Q.  Have you seen this letter before?  Is it okay if I ask

2   her --

3                THE COURT:  I have.  What part of the letter are you

4   pointing me to?

5                MS. HAGBERG:  I'm pointing to the second paragraph.

6                THE COURT:  On the first page.  "Please note that the

7   management team is new at ADI.  We've made many improvements to

8   the company over the past twelve months.  The inspection from

9   FDA highlights some areas where we need to make additional

10  improvements.  We were gratified the investigator acknowledged

11  many of the quality improvements that have been made."  Where

12  do you see the part about deficiencies in CAPAs?

13               MS. HAGBERG:  Your Honor, the next paragraph says --

14               THE COURT:  Okay.  "Attached you will find a plan and

15  status with regard to each of the items noted on the 483.  The

16  corrective action will be completed in the month of July 2011.

17  However, we will monitor effectiveness in both July and

18  August 2011 for observations three and four in order to verify

19  the actions were adequate."

20               MS. HAGBERG:  And one of the actions related to the

21  CAPA.

22  Q.  Did you hear Mr. Morrissey testify about what the purpose

23  of this communication was?

24  A.  I don't --

25               THE COURT:  Okay, this is a silly line of questioning.

E1HFSEK1                    Kuehn - redirect

1    I guess I can just reread Morrissey and so could you and so

2    could defense counsel.  There's no point in asking her what she

3    remembers him saying.

4    Q.  Was the purpose of FDA's inspection in 2011 to determine

5    the compliance of ADI in the prior years?

6    A.  I don't know what FDA's motivation was for the inspection

7    in 2011.

8            THE COURT:  I think that's the answer.  Thank you.

9    Q.  I think when you testified about this document, and there

10   was a plaintiff's exhibit --

11           THE COURT:  What does "this document" refer to?

12           MS. HAGBERG:  Just a moment, your Honor.

13   Q.  Could you please turn, again, I'm looking at DX V.  Could

14   you please turn to the second page, SEK 899 and read the last

15   sentence of observation 2?

16           THE COURT:  I'll do it.  "Corrective actions were

17   taken but were addressed in a decentralized manner using other

18   processes within the quality system."

19           MS. HAGBERG:  Actually, your Honor, I am looking at

20   page 899.

21           THE COURT:  So am I.

22           MS. HAGBERG:  Observation 2.

23           THE COURT:  So am I.  That was the last sentence on

24   the page 899.

25           MS. HAGBERG:  I am looking at the observation itself.

E1HFSEK1                              Kuehn - redirect

1    "Correction and prevention action activities and/or results

2    have not been adequately documented.  Specifically there is no

3    corrective and preventive action documentation available prior

4    to 7/23/10."

5               THE COURT:  Yes?  You asked that the last sentence on

6    the page be read.  It doesn't matter.  That's what the

7    observation was.  Go ahead.  That was the FDA's observation and

8    this is Sekisui's response.

9    Q.  And what does that mean to you, Ms. Kuehn?

10              THE COURT:  I do not need the answer to that.  This is

11   plain English.  I read it.  I will not have her interpret plain

12   English.  It's my native language.

13              MS. HAGBERG:  I believe that was a basis for her

14   testimony.

15              THE COURT:  I don't need her expert opinion -- experts

16   testify to assist the Court.  I have no trouble reading this

17   plain English written in my native language.

18   Q.  Could you look at DX AAA?

19              THE COURT:  That's one of the ones handed up?

20              MS. HAGBERG:  That was one of the ones handed up

21   yesterday.

22              THE COURT:  That takes a while to find.

23              MS. HAGBERG:  I'm sorry, your Honor.

24              THE COURT:  No, it's a whole pile here, may or may not

25   be handy.

E1HFSEK1                        Kuehn - redirect

1                THE WITNESS:  DX triple A?

2                MS. HAGBERG:  AAA.  It's the November 27, 2007 --

3                THE COURT:  It wasn't one of those signature ones, was

4      it?

5                THE WITNESS:  I don't think so.

6                THE COURT:  I have those in a separate place.  It

7      wasn't one of those.

8                THE WITNESS:  I'm sorry, I don't think I have it in

9      front of me.

10               MS. HAGBERG:  I don't need to ask you about that

11     document.

12               THE COURT:  I don't think I have it either.

13     Q.  Mr. Velie asked you about several documents that you did

14     not recall receiving during the testimony yesterday, is that

15     right?

16               THE COURT:  Ones with signatures, right?

17               MS. HAGBERG:  The ones with signatures -- there were

18     that whole group that had no signatures.

19     A.  I remember that.

20     Q.  In your opinion do the existence of those documents with

21     signatures affect all of the conclusions that you reached in

22     your report?

23     A.  Only to the extent that if there are other documents I did

24     not see they give me a certain level of uncertainty, but in and

25     of themselves those particular documents do not change my

E1HFSEK1                    Kuehn - redirect

1    opinions in my report, no.

2    Q.  And many of your opinions are not impacted by the absence

3    of documents or the fact that there might be additional

4    documents, isn't that right?

5    A.  That's correct.  Many of my opinions are based on the

6    documents themselves that I reviewed.

7                THE COURT:  But that's the whole point.  Your opinion

8    is based solely on documents, right?

9                THE WITNESS:  Yes, your Honor.

10               THE COURT:  Of course.  You didn't do interviews, you

11   weren't there at the time, you didn't inspect buildings or

12   laboratories, right?

13               THE WITNESS:  I did interview, I did speak to some of

14   the ADI employees who were employees but other than that,

15   you're correct, it was based on a document review.

16               THE COURT:  Who did you speak to?

17               THE WITNESS:  I spoke with Hugh Fryer, Bhavna Gaikwad,

18   Christine Silverstein and David Teicher.

19               THE COURT:  Not, for example, to Leigh Ayres.

20               THE WITNESS:  No.  I did not speak to Leigh Ayres.

21               THE COURT:  So the four.

22               THE WITNESS:  Just those four, that's correct.

23   Q.  But you relied on what you heard in your interviews with

24   those employees, is that right?

25   A.  Yes.  It was very helpful.  It confirmed what I believed I

1    was seeing in the documents themselves.  It was helpful to

2    confirm my interpretations of my findings.

3    Q.  And did you ask them where relevant documents might be

4    located at ADI?

5    A.  I did.

6    Q.  And did they give you additional documents when you asked

7    for additional information from them?

8    A.  Yes.  When I asked about design history files specifically

9    I was given access to the retrospective DHF's that Sekisui had,

10   post acquisition ADI, put together during the remediation.

11   Q.  And you heard the testimony of several witnesses, fact

12   witnesses on behalf of ADI this week, is that right?

13   A.  That's correct.

14   Q.  And did that testimony support the conclusions that you

15   reached --

16        THE COURT:  I don't need her to characterize the

17   testimony given at trial.  That would be inappropriate.

18   Credibility is for the Court to determine.  I don't care what

19   she thinks.

20        MS. HAGBERG:  I'm not asking about the credibility.

21        THE COURT:  You asked whether it supports her opinion.

22   I'm not going to allow that.  I'll decide that.  Let's say

23   Mr. Morrissey testified, let's say I don't find him credible.

24   It can't support anything so I'm not interested in her view of

25   any of the credibility of any of the witnesses she heard.  The

E1HFSEK1                        Kuehn - redirect

1    objection is sustained.  Please move on.  I assume you are

2    objecting, are you not?

3                MR. VELIE:  Absolutely.

4                THE COURT:  Absolutely and sustained.  Now, can we

5    have the next question?

6    Q.  Are there, with certain of your findings do they rely on

7    your review of specific documents that did not meet the

8    criteria of particular provisions of the CFR?

9                MR. VELIE:  Excuse me.  Objection.  That's been asked

10   and answered.

11               THE COURT:  Probably, but that's okay.

12   A.  I'm sorry, can you repeat that question?

13               MS. HAGBERG:  Could you read it back to her please.

14               (Record read)

15   A.  That's correct.

16   Q.  For example, management responsibility was one of the

17   issues you addressed in Section 4.1?

18   A.  That's correct.

19   Q.  And wasn't your testimony yesterday based on the

20   insufficiency of management review meetings?

21   A.  That's correct.

22   Q.  And additional documents wouldn't change that, would they?

23   A.  No, that would not.

24   Q.  And what about internal audits, one of the bases for your

25   opinions was that individuals were auditing their own area, is

E1HFSEK1                          Kuehn - redirect

1    that correct?

2    A.   That's correct.

3    Q.   And additional documents, even if they hadn't audited their

4    own area, wouldn't change your findings on that point, would

5    it?

6    A.   That's correct.

7    Q.   And what about design control?  You talked about deficiency

8    in GEN 41 and the design control SOP and you pointed to

9    specific incidences.  Your opinion on that wouldn't change if

10   you were shown another SOP that didn't have those problems,

11   would it?

12   A.   That's correct.

13   Q.   And your opinion on manufacturing and in process control

14   and that certain flow documents did not meet the definition of

15   device master record, you were looking at specific documents to

16   support that, isn't that correct?

17   A.   That's correct.

18   Q.   And that opinion would not change if you saw another

19   document that maybe did meet that criteria, is that correct?

20   A.   If a device master record meeting the criteria appeared,

21   then, yes, it would change my opinion.

22   Q.   But you didn't see any device master record and Mr. Velie

23   didn't show you any device master record, is that correct?

24   A.   That's correct.

25   Q.   And what about acceptance activities?  You relied on batch

E1HFSEK1                      Kuehn - redirect

1    records showing changing specifications without rationale, is

2    that correct?

3    A.   That's correct.

4    Q.   So your opinion on acceptance activities wouldn't change

5    based on seeing additional documents where they might have

6    gotten it right, is that right?

7    A.   That's correct.

8    Q.   And what about non-conforming product and CAPAs?  You

9    talked about NCR's showing the use of expired materials and

10   changing specifications.  If you saw other ones where that

11   didn't happen that's not going to change the opinion you made

12   on non-conforming product, would it?

13   A.   That's correct.

14   Q.   What about complaint handling?  You mentioned product

15   incident reports that lacked a root cause of the analysis.  If

16   you saw another one that happened to have that, that wouldn't

17   change the opinion that you made, is that right?

18   A.   That is correct.

19   Q.   And I believe that you said several times in your testimony

20   that the regulations require compliance every time with every

21   product.  Is that statement still consistent and does that

22   uphold the opinions that you included in your report that you

23   just discussed?

24   A.   That's correct.  Compliance is required for all products

25   every time without exception.

E1HFSEK1                    Kuehn – redirect

1  Q.  And, again, it doesn't matter if you pass an audit or

2  inspection, it's whether you comply, is that what laws require?

3  A.  That's correct.

4          MS. HAGBERG:  I have no furthers questions, your

5  Honor.

6          MR. VELIE:  Just a housekeeping detail and a very

7  quick question.

8  RECROSS EXAMINATION

9  BY MR. VELIE:

10  Q.  Ms. Kuehn, if you saw subsequent documents to documents

11  that had faults in them correcting CAPAs or giving directions

12  not to use a particular product, that might change your opinion

13  with respect to those individual instances, is that correct?

14  A.  It would depend on the content and I would take it into

15  consideration, certainly.

16  Q.  So context is all here, is that correct?

17  A.  Because these systems are all integrated so heavily, yes, I

18  mean, context would be very important.

19          MR. VELIE:  Your Honor, the housekeeping detail, I

20  would like to -- Ms. Kuehn and I shortened this morning's

21  exercise quite a bit by my asking in bulk with respect to 13

22  audits, actually 14.  The last one I put in I'm going to offer

23  in evidence.

24          THE COURT:  Audits and inspections.

25          MR. VELIE:  Yes.  I just want to offer them and give

E1HFSEK1                    Kuehn - recross

1    her a chance to say, yes, that's what you and I were talking

2    about.

3              MS. HAGBERG:  Your Honor, I don't object to the

4    documents coming in, but I don't know if he asked her about 13

5    or 14 different audits in her testimony.

6              MR. VELIE:  If I have the number wrong that's okay.

7    If there's no objection to the documents coming in we'll read

8    it after the witness is off the stand and complete the record.

9    Is that okay?

10             THE COURT:  There's no objection to the actual audits

11   and inspections coming in.

12             MR. VELIE:  Exactly.  I'd like to then read into the

13   record what they are.

14             THE COURT:  Yes.  All Ms. Hagberg was saying she

15   doesn't think we went over each of the 13 or 14 with the

16   witness.  That's what Ms. Hagberg said.

17             MR. VELIE:  But I went over with the witness all of

18   them in bulk I asked her with respect to all of the audits and

19   inspections did you, and I'm not going to try to recreate the

20   question --

21             THE COURT:  She's saying you did not go over each one

22   individually.  You went over them collectively.

23             MR. VELIE:  I did.  I can have the witness say these

24   are the ones she had in mind.

25             THE COURT:  Well, you had in mind all of the audits

E1HFSEK1                          Kuehn - recross

 1   and inspections from '04 to '12.

 2            THE WITNESS:  To the extent they're the ones I

 3   reviewed for my report, yes.

 4            MR. VELIE:  Okay.

 5            THE COURT:  So the witness is done?

 6            MR. VELIE:  Yes.

 7            THE COURT:  Thank you.

 8            (Witness excused)

 9            THE COURT:  Do you want to identify those now or

10   later?

11            MR. VELIE:  Yes.  May we?

12            MS. BRILEY:  DX 0, DX P --

13            THE COURT:  Wait a minute, what is DX O?

14            MS. BRILEY:  DX O is the Intertek report of the ISO

15   certification in April, 2008.

16            DX P, the Intertek report of the ISO certification in

17   April 2009.

18            DX N the Intertek report of the ISO certification in

19   2007.

20            DX L, the report from Intertek's document review of

21   all of ADI's quality management system documents.

22            DX Q, the Intertek report of the ISO certification in

23   June 2010.

24            DX R, the Intertek report of the ISO certification in

25   March 2011.

E1HFSEK1                    Trial

1          THE COURT:  Can I ask you to back up for a minute?

2     You didn't give a date for DX L.  You said DX L, the report of

3     Intertek's document review of all of ADI's quality management

4     system documents.  That's of interest to me.  What year was

5     that?

6          MS. BRILEY:  That was on March 24, 2006.  It occurred

7     prior to their first visit to ADI's actual facility.

8          THE COURT:  Okay.  Thank you.

9          MS. BRILEY:  And DX T, the report of quality systems

10    supplier audit by Seimans and that was on December 10, 2007.

11         THE COURT:  Okay.

12         MS. BRILEY:  Thank you.

13         THE COURT:  Thank you.

14         MR. WHITNEY:  Your Honor, just since we're doing some

15    housekeeping matters, there have been several exhibits of prior

16    witnesses that haven't been read into the record and I'd like

17    to do that now.

18         THE COURT:  Okay.

19         MR. WHITNEY:  PTX 31, PTX 93, PTX 24, PTX 178, PTX

20    187, PTX 201, PTX 22, PTX 23, PTX 24, PTX 25, PTX 26, PTX 27,

21    PTX 28, PTX 29, PTX 30, PTX 42, PTX 39, PTX 32, PTX 36, PTX 38,

22    PTX 40.  This is from the Ellis direct.  PTX 240, PTX 241, PTX

23    242, PTX 243, PTX 244, PTX 245, PTX 246, PTX 247, PTX 248, PTX

24    249, PTX 250, PTX 251, PTX 253, PTX 273, PTX 7, PTX 8, PTX 56,

25    PTX 67, PTX 236, PTX 60, PTX 71, PTX 74, PTX 73, PTX 72, PTX

E1HFSEK1                          Trial

1   76, PTX 77, PTX 81, PTX 17, PTX 18, PTX 19, PTX 54 and PTX 78.

2            THE COURT:  All right.  All of those are received as

3   well as the entire list that was read by Ms. Briley.

4            (Defendant's Exhibits O, P, N, L, P, R and T received

5   in evidence)

6            (Plaintiff's Exhibits 31, 93, 24, 178, 187, 201, 22,

7   23, 24, 25, 26, 27, 28, 29, 30, 42, 39, 32, 36, 38, and 40

8   received in evidence)

9            (Plaintiff's Exhibits 240, 241, 242, 243, 244, 245,

10  246, 247, 248, 249, 250, 251, 253, 273, 7, 8, and 56 received

11  in evidence)

12           (Plaintiff's Exhibits 67, 236, 60, 71, 74, 73, 72, 76,

13  77, 81, 17, 18, 19, 54 and 78 received in evidence)

14           MR. WHITNEY:  Thank you, your Honor.

15           THE COURT:  So are we ready for the final plaintiff's

16  witness?

17           MR. WHITNEY:  Yes.  Plaintiffs call Guy Erb to the

18  stand.

19   GUY ERB,

20       called as a witness by the Plaintiff,

21       having been duly sworn, testified as follows:

22           THE COURT:  Please be seated.  When you're seated

23  please state your full name, first and last spelling both for

24  the record.

25           THE WITNESS:  Guy, Guy-u-y, Erb, E-r-b.

E1HFSEK1                    Trial

1           THE COURT:  Thank you.

2           MR. WHITNEY:  I apologize for the weight of the

3   binder, your Honor, this is financial documents for a damages

4   expert.  They're just bulky.

5   DIRECT EXAMINATION

6   BY MR. WHITNEY:

7   Q.  Mr. Erb, what is your educational background?

8   A.  I have a Bachelor's in economics, bachelors degree in

9   economics from University of California at Berkeley and a

10  certificate of a year spent under the auspices of NYU at the

11  University of Madrid and a Master's in economics from the

12  London School of Economics and Political Science.

13  Q.  When did you graduate from the London School of Economics?

14  A.  1963.

15  Q.  What did you do after graduate school?

16  A.  I joined the U.S. Foreign Service and spent roughly two

17  years in Washington as a Foreign Service officer and then I

18  left that employment to become a member of the United Nations

19  Secretariat where I spent the next seven years working on

20  economic and financial issues for the United Nations.  After

21  that, I -- that included a year as a financial advisor to

22  Central American Common Market and another financial assignment

23  in southeast Asia.

24          I then joined a think tank in Washington, the Overseas

25  Development Council, where I worked on trade and investment

1   issues for roughly five years and then joined the White House

2   staff as a member of the National Security Council staff under

3   Dr. Brzezinski.  Prior to that I became deputy director of an

4   independent agency, the U.S. International Development

5   Cooperation Agency.  I left that employment in 1981 and became

6   a consultant and eventually formed a niche broker dealer called

7   Lafayette Capital Corporation towards the end of the 1980's,

8   where I worked until I received an assignment from Goldman

9   Sachs.  I worked on that issue for -- or those issues during

10  1990 and joined Goldman Sachs in late 1990, worked at Goldman

11  in New York for four years and then in Mexico for four years,

12  roughly five years, and then formed a company called Rapid

13  Money Corporation in 2000 and worked in that company until 2005

14  when I went back to New York and began work at an expert

15  services firm.

16  Q.  What were your job responsibilities while you were at

17  Lafayette Capital?

18  A.  Mergers and acquisitions.  We provided merger and

19  acquisition services to corporations in the United States

20  looking to invest or divest in Mexico and other Latin American

21  countries and I occasionally worked for local clients as well

22  on sell side assignments.

23  Q.  What were your job responsibilities at Goldman Sachs?

24  A.  Broad investment banking responsibilities including mergers

25  and acquisitions, valuation of companies and investments by

E1HFSEK1                          Erb - direct

1    Goldman's private equity arm and working with a lot of Mexican

2    companies as potential candidates for equity debt or merger and

3    acquisition transactions.

4    Q.  Did you conduct any corporate valuations?

5    A.  Yes.  They were an integral part of what we did, even

6    beginning very early on we advised the government on the value

7    of companies they were privatizing such as the national phone

8    company and major banks.

9    Q.  After Goldman Sachs you said you went to Rapid Money

10   Corporation.  What were your job responsibilities there?

11   A.  I was the co-founder, president and chief executive --

12   chairman and chief executive officer and had responsibilities

13   that covered the entire scope of the company's operations.  It

14   was a regulated money service business.

15   Q.  Did you have any opportunity to do corporate valuations

16   with that position?

17   A.  Yes.  We valued our own company and were subjected to

18   inquiries from companies interested in acquiring Rapid Money.

19   We also looked occasionally at companies that we might acquire.

20   In that process I became familiar -- of course I had worked on

21   data rooms at Goldman but we had to prepare our own data room

22   with regard to Rapid Money, and discuss letters of intent,

23   possible purchase price for the acquisition of the company on a

24   number of occasions.

25              (Continued next page)

E1hzsek2                          Erb – direct

1    BY MR. WHITNEY:

2    Q.  Do you have any other work experience related to M&A in

3    company evaluation?

4    A.  Yes.  I've worked on valuations as an expert assisting

5    companies in the valuation of major corporate assets prior to

6    allocation among different family interests or the sale of

7    those assets.

8    Q.  And I should have asked, did your work at Goldman Sachs

9    include mergers and acquisitions as well?

10   A.  Yes, of course.

11   Q.  Where do you currently work?

12   A.  At Berkley Research Group LLC.

13   Q.  In what capacity?

14   A.  I'm the director of the firm, and I provide expert and

15   advisory services.

16   Q.  And have you ever been retained as an expert witness

17   before?

18   A.  Yes.  10 or 15 times.

19   Q.  In what fields?

20   A.  Finance securities, international project financings and

21   valuations.

22   Q.  Has any tribunal ever determined that you were unqualified

23   to be an expert witness?

24   A.  No.

25   Q.  What were you asked to do in this case?

E1hzsek2                          Erb - direct

1    A.  I was asked to calculate damages related to the difference

2    between the value of ADI as warranted and the value as

3    delivered.  I was asked to take this -- undertake this

4    valuation from the prospective of a knowledgable investor who

5    was aware of the breaches.

6    Q.  And did you provide a report of your opinion?

7    A.  I did.

8            MR. WHITNEY:  Your Honor, I'd like to offer Mr. Erb as

9    an expert in finance and economic analysis of mergers and

10   acquisitions, including company valuation.

11           MR. KORTMANSKY:  No objection to that, your Honor.

12           THE COURT:  All right.

13           MR. WHITNEY:  Your Honor, given that this is a damages

14   expert, I thought some slides might help walk through some of

15   the figures Mr. Erb used.

16           Could we have slide one, please?

17   Q.  Mr. Erb, what methodology did you use to calculate damages

18   in this case?

19   A.  I used what's described as a benefit of the bargain value

20   of ADI as delivered, as warranted compared to a value of ADI as

21   delivered.  The difference is the over pavement of the purchase

22   price or the damages.

23   Q.  And what do you mean by "value of ADI as warranted?"

24   A.  That's the value that was established in the stock purchase

25   agreement by the buyer and the seller, $25.5 million.

E1hzsek2                          Erb - direct

1    Q.  And assuming that the representations and warranties and

2    agreement are true?

3    A.  Yes.

4    Q.  And what do you mean by "the value of ADI as delivered?"

5    A.  That was the value that we calculated not knowledgable

6    investor would reach with an understanding of what the breaches

7    were.

8    Q.  And the difference you say is the overpayment of purchase

9    price, is that correct?

10   A.  Yes.

11   Q.  And you consider that to be the benefit of the bargain?

12   A.  Yes, I do.

13   Q.  What did you understand the representations and warranty

14   breaches in this case to be in your analysis?

15   A.  Generally, that the company had warranted that it was fully

16   compliant with FDA regulations, and that it had maintained

17   under FDA standards all the material necessary to support the

18   510(k) application for Femtelle.

19   Q.  And why did you look at the representations and warranties?

20   A.  Well, they're the starting point of a buyer's assessment of

21   the company.  They provide a description of what he or she is

22   buying, and they also provide a starting point for the planned

23   operation of the company.  In effect, they're an allocation of

24   risk, the maker of the representation bears the risk of any

25   inaccuracy.

E1hzsek2                          Erb - direct

1   Q.  And why did you use the methodology you just identified?

2   A.  I believed it was the appropriate way to calculate the

3   damages in this case.  It's bounded by the purchase price.

4   Q.  How did you determine the value of ADI as warranted?

5   A.  Again, we looked at the stock purchase agreement, that's

6   the value in the stock purchase agreement.

7   Q.  Let me turn to slide two, please.

8           This is a little more granular breakdown of your

9   analysis.  In general, how did you determine the difference

10  between the value of ADI's warranted and the value as

11  delivered?

12  A.  Yes, top line really summarizes that statement.  The next

13  is redone -- we undertook three steps.  First, we looked at the

14  product Femtelle and the value of Femtelle had been allocated

15  within a purchase price allocation provided by KPMG, and we --

16          THE COURT:  When was that?

17          THE WITNESS:  That was provided as of -- it was a

18  document that calculated the value of Femtelle and other

19  components of the transaction as of the transaction date.

20          THE COURT:  So what was the date of the KPMG

21  allocation document?

22          THE WITNESS:  October 1st.

23          THE COURT:  Of 2000?

24          THE WITNESS:  2009.

25          THE COURT:  And the closing here was?

E1hzsek2                          Erb - direct

1              THE WITNESS:  April 20th.

2              THE COURT:  What year?

3              THE WITNESS:  2009.

4              THE COURT:  I'm sorry.  So the KPMG allocation

5    document was six months later?

6              THE WITNESS:  It was, but it was prepared as of the

7    acquisition date.

8              THE COURT:  What does that mean, prepared as of the

9    acquisition date -- it was retrospective?

10             THE WITNESS:  No.  It took only -- all the dated

11   documents in the PPA are dated prior to the transaction date.

12   So the nature of any calculation of any allocation of this

13   nature, it's done after the transaction.  But only material

14   that is about the company which is relevant to the period prior

15   to the acquisition date is used.

16             THE COURT:  Okay.  But I am a little confused.  So

17   KPMG six months later says, I'm looking at documents that were

18   before the closing.

19             THE WITNESS:  Yes.

20             THE COURT:  Based on that, I am determining --

21             THE WITNESS:  That's right.

22             THE COURT:  -- the allocation to Femtelle was X

23   minimum.

24             THE WITNESS:  That's right.

25             THE COURT:  But it didn't do that before the closing.

E1hzsek2                          Erb - direct

1              THE WITNESS:  It couldn't.

2              THE COURT:  Well, it didn't.

3              THE WITNESS:  That's right.

4              THE COURT:  And, therefore, nobody relied on KPMG's

5     opinion then.

6              THE WITNESS:  No, but --

7              THE COURT:  No.

8              THE WITNESS:  -- that's true.

9              THE COURT:  So it looks back at, analyzes preclosing

10    documents and it attributes that dollar figure.

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.

13             THE WITNESS:  Allocates the total --

14             THE COURT:  Yeah, I understand.  Does it six months

15    later based on preclosing documents.  But it didn't do it

16    preclosing, hand it to the parties and say rely on this, rely

17    on our allocation.

18             THE WITNESS:  That's right.

19             THE COURT:  Okay.  Go ahead.

20    A.  So that was the starting point for step one, recalculated

21    the value of Femtelle as delivered by examining what KPMG had

22    done altering those, that work, and that gives us the --

23             MR. KORTMANSKY:  Your Honor, may I just ask Mr. Erb to

24    speak up a little bit?

25             THE COURT:  Sure.

E1hzsek2                        Erb – direct

1              MR. KORTMANSKY:  Thank you.

2              THE COURT:  Try to use the mic.

3              THE WITNESS:  I'll use the mic and defer with the

4     pointer here.

5              THE COURT:  Yes.

6              THE WITNESS:  Step one, the net value of Femtelle is

7     calculated in the purchase price, purchase price allocation

8     minus our recalculation of the value of Femtelle, give us the

9     over payment for Femtelle.

10             In step two we looked at the net value -- the value of

11    current products in the purchase price allocation, recalculated

12    value for current products as delivered.  The difference is the

13    over payment of current products.  Those two steps were the

14    first two parts to the analysis.

15             We then calculated the expected cost of remediation of

16    the breaches and added that number to the recalculation of the,

17    or the calculation of overpayment for Femtelle and the

18    overpayment for current products.

19    Q.  And you've been referring to the PPA as part of your

20    testimony here.  I'd like to put up exhibit PTX 48.

21    A.  Could I have the book?

22    Q.  Oh, yeah.  Do you have a --

23    A.  This is --

24    Q.  -- exhibit binder?

25    A.  This is Ms. Kuehn's binder.

E1hzsek2                          Erb - direct

1    Q.  I'm sorry, could we get the witness an exhibit binder?

2              MR. WHITNEY:  May I approach, your Honor?

3              THE COURT:  Yes.

4    A.  Yes, I have that.

5    Q.  Is exhibit 48 the PPA you're referring to?

6    A.  Yes, it is.

7    Q.  And what is the purpose of the PPA?

8    A.  This is a document prepared in the ordinary course of

9    business by an accounting firm for accounting reporting and tax

10   reporting by the buyer.

11             THE COURT:  It says, we understand that Sekisui

12   management would use our report for financial and tax reporting

13   purposes.

14             THE WITNESS:  Yes.

15             THE COURT:  Okay.  So that's the purpose.

16             THE WITNESS:  Yes.

17   Q.  It's not created for the purpose of litigation, is that

18   correct?

19   A.  That's correct.

20   Q.  On what information is the valuation in the PPA based?

21   A.  They had financial data on the company.  They had other

22   financial information on ADI.  They had results of

23   consultations with ADI management and with Sekisui management

24   as well, and they used other materials in their calculations,

25   material available as of the time of transaction on publicly

E1hzsek2                        Erb - direct

1    traded companies.

2    Q.  And how do you know this?

3    A.  It's stated in the PPA and the letter and elsewhere in the

4    document.

5    Q.  Can we look at SEK-341?

6    A.  Yes.  The scope of the analysis section 1.4.3 goes through

7    the, in more detail what I just said.  Part of it historical

8    financial statements analysis of unaudited financial statements

9    and other operational data and stock purchase agreement of

10   course is the basis for the entire document.  It takes the --

11   that gives them the acquisition price.  And all these, this

12   information is used in the preparation of the allocation of the

13   fair values.

14   Q.  And was the, were the projections used in the allocation in

15   the PPA taken from pre-acquisition ADI management?

16   A.  Yes, that's true.  All the projections were based on

17   material received from ADI.

18   Q.  And ADI, you're referring to pre --

19   A.  Pre-acquisition.

20   Q.  Pre-acquisition?

21   A.  Pre-acquisition management, yes.  These were documents that

22   had been prepared in 2008 in consultation with Crosstree, their

23   financial advisor.  And with some minor alterations, they're

24   the same data that formed the basis of the initial period that

25   was projected forward.

E1hzsek2                         Erb - direct

1    Q.  And subsequently, was KPMG provided with this information

2    after the transaction?

3    A.  Yes, after the transaction, but the data was basically the

4    same as had been prepared before the transaction.

5    Q.  And how do you know this?

6    A.  I've seen the record, and there is an e-mail that describes

7    this process.

8              MR. WHITNEY:  I'd like to bring up PTX-8, please?

9    Q.  Is this the e-mail to which you're just referring to?

10   A.  Yes.

11   Q.  And could you flip to --

12             MR. WHITNEY:  It's not Bates numbered, your Honor,

13   because it was provided by Crosstree Capital, and they did not

14   Bates number their documents.

15   Q.  But I'd ask to turn to page two?

16   A.  Yes.

17   Q.  And this is an e-mail from Hideharu Kojima.  You see that?

18   A.  Yes, I do.

19   Q.  Do you know who that is?

20   A.  Yes.  He is an employee of KPMG.

21   Q.  And that e-mail states it's written to Jeff Ellis.  Do you

22   see that?

23   A.  I do.

24   Q.  And as we know from prior testimony, Jeff Ellis is the

25   managing director of Crosstree Capital Partners, the

E1hzsek2                         Erb - direct

1    pre-acquisition ADI management's financial advisors?

2    A.  Yes.

3    Q.  It says, "We are currently working on a purchase price

4    allocation assignment for Sekisui and as part of that we would

5    like to understand some more detail of the basis for ADI

6    projection numbers in the offering memorandum."

7    A.  Yes.

8    Q.  "We understand Crosstree helped ADI put that together.  If

9    it is okay, Takefumi Semba from a valuation practice copied

10   here, would like to talk to you.  Let me know if you can do

11   that."

12   A.  Yes.

13   Q.  You see that?

14          Then if we go onto the later e-mails on the first

15   page.

16   A.  Sorry.

17   Q.  You see that Mr. Semba writes to Mr. Ellis, "Hi, Jeff.  I

18   am Takefumi Semba at KPMG economic and valuation services.  I

19   asked Jose, let me know the contact information of Crosstree

20   Capital.  We are now engaging in the purchase price application

21   of ADI for Sekisui.  In our analysis, we need detailed

22   projection of ADI.  I found the information memorandum of ADI

23   showed the five year projections, including the projections by

24   each product category.  We are wondering if projections

25   provided by ADI's management are prepared by Crosstree's

E1hzsek2                          Erb - direct

1    people."

2    A.  I see that, yes.

3    Q.  Okay.  And it goes on -- you can see the document.

4    Mr. Ellis responds "Hi, Takefumi.  Thank you for your e-mail.

5    The projections were a collaborative effort.  Crosstree

6    compiled and analyzed historical unit volume, pricing and

7    margins, and built a forecast model to project based upon these

8    metrics.  ADI then provided the assumptions for growth in each

9    product line.  We performed this exercise primarily with the

10   company's former CFO, who has since left ADI, and with input

11   from Richard Hart, CEO."

12   A.  Yes.

13   Q.  And then it concludes with an e-mail from Mr. Semba to

14   Mr. Ellis that states, Hi, Jeff, thank you for your reply.  I

15   understand how the projections were built.  As you mentioned,

16   no current staff knows the projections and the assumptions, so

17   we have had a little difficulty going forward with this work.

18   However, we will have an opportunity to discuss this with

19   Richard soon and he may be able to receive more detailed

20   information."  You see that?

21   A.  Yes, I do.

22   Q.  What did you rely on this correspondence?

23   A.  Well, this shows two things about the preparation of the

24   PPA.  One, the consultations with preacquisition management

25   and, two, that management had basically provided the material

E1hzsek2                        Erb - direct

1    for the projection going forward.

2    Q.  And --

3            MR. KORTMANSKY:  Your Honor, there is no evidence.

4    The document speaks for itself.

5            THE COURT:  It does.

6            MR. KORTMANSKY:  Thank you.

7    Q.  And did you compare the projections in the PPA with the

8    preacquisition management's projections?

9    A.  I did.

10   Q.  And what did if you determine?

11   A.  They are basically the same for Femtelle, and only slightly

12   different with regard to the current products.

13   Q.  And were you in the courtroom for the testimony of Mr.

14   Takemura?

15   A.  Yes, I was.

16   Q.  And you recall any testimony regarding who provided those

17   projections to KPMG?

18   A.  Yes.  He confirmed that --

19           MR. VELIE:  Objection, your Honor.  The testimony is

20   the testimony.

21           THE COURT:  Yes, it is, but it was several days ago.

22   If he recalls it, I'll listen.  If you think it is inaccurate,

23   he'll tell me.  Go ahead.

24   A.  Yes.  He confirmed that the Femtelle projections had been

25   provided by Mr. Hart and that they had consulted on the current

E1hzsek2                         Erb - direct

1    product as well.

2              MR. KORTMANSKY:  I just object to --

3              THE COURT:  Pardon me?

4              MR. KORTMANSKY:  I withdraw it.

5              THE COURT:  All right.

6    Q.  And why did you rely on the PPA for your determination of

7    the value of ADI as warranted?

8    A.  PPA was a roughly contemporaneous document to the

9    transaction.  It relied on data from ADI financial, from ADI

10   financial data prior to transaction date.  It relied on

11   consultations with both management of ADI, preacquisition

12   management of ADI and Sekisui.  It was prepared by a respected

13   accounting firm and was an unbiased third-party assessment of

14   the allocation, appropriate allocation of the assets acquired

15   by the company, and it gives us a fair value for each of those,

16   each of those components.

17   Q.  What do you mean by "fair value?"

18   A.  Fair value is a term that refers to the value set by a

19   willing buyer and a willing seller.

20   Q.  And where in the PPA does it include the figures regarding

21   the value of ADI's assets?

22   A.  There is a table in the letter that does that.

23   Q.  Would you point us to that, Mr. Erb?  You have your binder

24   as well if you like to --

25              THE COURT:  It's on 334.

E1hzsek2                          Erb - direct

1              THE WITNESS:  Yeah, it's on 334.

2              THE COURT:  I see it.  It says, current products.  It

3    says in process R&D.  Under process R & D it says Femtelle, it

4    gives a number.

5              THE WITNESS:  That's right.

6              THE COURT:  Right.

7    Q.  So, generally speaking, how did you use this data?

8    A.  Well, this was the basis of our calculations of the value

9    as warranted.

10             And if I could point out a few of the important

11   numbers on this document.  First, the purchase price --

12             THE COURT:  Anyway, I see it, 25.5 million.

13   Q.  Go through the numbers that you relied on Mr --

14   A.  The next number I would call your attention to, your Honor,

15   is the present value of the earn out payments.  That includes

16   the milestone payment of 4,560,000.  The next number I would

17   call your attention to is total current product allocation,

18   9,900,000 and, as you just said, your Honor, the Femtelle value

19   of $12,213,000.  These are all their estimated fair values as

20   of the time of the transaction.

21             I would gave an illustration of how we used this

22   table.  If you look at the present value of the earn out

23   payments, the second line, and the in process R&D value for

24   Femtelle, looking at the second number 12,213,000, is the

25   present value of the fair -- of the stream of payments related

E1hzsek2                          Erb – direct

1  to Femtelle.  However, those earnings and those cash flows

2  generate an obligation that contingent liability on the part of

3  the buyer to pay the seller, the present value of 4,560,000.

4  So if you subtract that obligation of the seller from the value

5  of the stream of payments, you get the value of Femtelle as

6  warranted, which is $7,563,000.

7  Q.  And again this valuation is bounded by the purchase price,

8  correct?

9  A.  That's correct.  We started with the SPA's purchase price.

10  Q.  Bounded by the value of the company as agreed upon by the

11  parties?

12  A.  That's correct, in the SPA.

13  Q.  Generally speaking, Mr. Erb, how did you determine the

14  value of ADI as delivered at the time of the closing, assuming

15  breaches of the applicable representation and warranties?

16  A.  I took the perspective of a knowledgable investor who was

17  aware of the breaches and who was valuing the company as of the

18  transaction date looking forward, but not using hindsight to --

19  not using any subsequent events following the transaction date.

20  Q.  On what information did you base your determination of the

21  actual value?

22  A.  Well, we started with the -- as warranted you mean?

23  Q.  No, as delivered.

24  A.  Oh, as delivered.  We based our information on ADI

25  financial information and business records.  We consulted with

E1hzsek2                         Erb - direct

1   the employees of the company.  We looked at, of course, the PPA

2   as a starting point, and we reviewed other material in the case

3   record.

4   Q.  Did you consult with any experts?

5   A.  Of course.  We looked at -- the knowledgable investor was a

6   person who would have either knowledge of the relevant sector

7   or be familiar with the process of consulting experts where

8   there were gaps in his or her knowledge.  This is the process

9   I --

10            THE COURT:  Why do you use a hypothetical, not

11   reasonable investor instead of Sekisui?

12            THE WITNESS:  Well, Sekisui's value was as warranted.

13            THE COURT:  No, I don't mean that.  You could have

14   said what would it have been worth to Sekisui if they had

15   known.

16            THE WITNESS:  We did ask -- sorry.

17            THE COURT:  As opposed to a reasonable hypothetical

18   investor.

19            THE WITNESS:  Yes.  We did ask Sekisui what they would

20   have concluded had they not been aware of the breaches.  But it

21   was my understanding that the use of the knowledge of investor

22   construct instrument was consistent with Second Circuit law.

23            THE COURT:  Oh, okay.  That's why you chose it.

24            THE WITNESS:  On advice of counsel, yes.

25            THE COURT:  Oh, okay.

E1hzsek2                        Erb - direct

 1              MR. KORTMANSKY:  Your Honor, we object to the extent

 2     that he's relying on statements from witnesses that testified

 3     here and for which they didn't provide any testimony related

 4     to --

 5              THE COURT:  I'm sorry, you are going so fast, I don't

 6     understand you.

 7              MR. KORTMANSKY:  I apologize.

 8              THE COURT:  Say it again.

 9              MR. KORTMANSKY:  We object to the extent that he is

10     relying on information received from witnesses that testified

11     here, and that did not testify regarding the areas on which he

12     provides his basis.

13              THE COURT:  I don't understand anything you just said.

14     I really tried, but it was incomprehensible.

15              MR. KORTMANSKY:  I can give you an example.  Mr.

16     Takemura was here.

17              THE COURT:  Okay.

18              MR. KORTMANSKY:  Mr. Takemura when he testified, for

19     example, I don't want to interrupt Mr. Whitney's

20     representation.

21              THE COURT:  You are interrupting.  That's okay.

22              MR. KORTMANSKY:  But he testified regarding the then

23     current products, which is a portion of Mr. Erb's report, and

24     he said -- he gave his reasons why he thought the company lost

25     money, and those reasons were all prospective reasons.  We

E1hzsek2                         Erb - direct

 1  discovered the breach.  We realized that we wound up having to
 2  pay money to remediate.  We suffered reputational harm.  We
 3  actually had to pull products, and as a result based on what
 4  was estimated in the PPA, we lost $15 million.  That's a
 5  prospective look, and that actually is the specific report that
 6  Mr. Erb originally issued, prospective look which he withdrew.
 7  This look is going backwards.  He's saying what would an
 8  investor had done at the time.  Mr. Takemura didn't testify
 9  about that at all.
10          THE COURT:  Okay.
11          MR. KORTMANSKY:  So to the extent that Mr. Erb relies
12  on Mr. Takemura telling him what they would have done, that's
13  all hearsay, that's all improper under Rule 703 to testify
14  about it now.
15          THE COURT:  Hearsay?  I don't know what you're talking
16  about.  What's it got to do with hearsay?
17          MR. KORTMANSKY:  Well, Mr. Erb is relying on
18  statements from Mr. Takemura which are out of court so they're
19  hearsay and he's using them to rely --
20          THE COURT:  Wait.  What out of the court?  I thought
21  you said testified here.
22          MR. KORTMANSKY:  He testified here regarding one set
23  of reasons why he thought they actually lost money.
24          THE COURT:  Prospective reasons.
25          MR. KORTMANSKY:  Prospective reasons.  But Mr. Erb I

E1hzsek2                           Erb - direct

1    understand is saying that he talked to Mr. Takemura regarding

2    what he would have thought.

3           THE COURT:  But if that's in his report, an expert

4    does research and reviews documents and interviews people and

5    forms an opinion.  As long as you know the bases of the

6    opinion, that's okay.  He's not summarizing their statements

7    per se.  But he's saying the basis for my opinion included

8    those who I interviewed, just like the previous expert said I

9    interviewed four people of the company.  I didn't hear any

10   objection.  She named which four she spoke to and it was part

11   of the basis of her opinion.  Most of it was based on documents

12   to be sure, but she also interviewed four people.  So he says

13   my opinion was based on not only all the records I reviewed,

14   but I spoke to certain executives or employees of the company.

15          MR. KORTMANSKY:  The difference, your Honor --

16          THE COURT:  No surprise so you, it's no surprise to

17   you.  You must have known in the report that he spoke to

18   people.

19          MR. KORTMANSKY:  Of course he can speak to people, and

20   of course he relied on those out-of-court statements for

21   preparation of the report.  The issue is whether under Rule 703

22   he can testify to what those statements actually were.

23          THE COURT:  But he didn't testify to the actual

24   statements.  I thought he just said that that's one of the

25   things that supports his conclusion.  I don't think he

E1hzsek2                          Erb - direct

1    testified here chapter and verse as to what Mr. so and so said.

2              MR. WHITNEY:  He didn't, your Honor.  And of course as

3    your Honor's I'm sure aware, Rule 703, an expert's perfectly

4    allowed to rely on --

5              THE COURT:  Do I need an echo?  I said --

6              MR. WHITNEY:  I'm sorry.

7              THE COURT:  I said he interviewed people, he relied on

8    that, as well as documents he reviewed.  What he couldn't do is

9    say, and I'm here to tell you everything -- is it Mr. Takemura?

10   Here's what he said to me, I tape recorded what he said, he

11   said X Y and Z.  He can't do that, but he's not doing that.

12             MR. KORTMANSKY:  With that, your Honor.  Thank you.

13             THE COURT:  Yes.

14             MR. WHITNEY:  And, your Honor, I would just say that

15   there are allowances for -- not that necessarily needs to

16   happen here, but there are allowances for an expert to

17   disclosing the data even if it is hearsay as long as the

18   probative value outweighs the prejudicial effect.  So it's not

19   per se excluded from testifying about that.

20   Q.  Okay.  I'm sorry, Mr. Erb, you were talking about the basis

21   for your analysis.  Did you -- first of all, you're saying we.

22   Did you have a team as well?

23   A.  I did.  But I approached this task of course as an expert

24   in mergers and accusations, so I relied on what I learned over

25   the years in my education and training and my experience in

E1hzsek2                          Erb - direct

1    mergers and acquisitions and formed my conversations with

2    people and my analysis of the data.

3    Q.  If we can turn to slide three, please.

4            What did you conclude were the damages to Sekisui for

5    the representation and warranty breaches?

6    A.  The damages were $12.18 million.

7    Q.  And could you walk us through this chart?

8    A.  Yes.  Let me start, your Honor, by pointing out the top

9    number, 25.36, that's slightly different than the 25.5 because

10   there was some cash in the company which reduced that amount.

11   So we start with a net value there.  We removed the value of

12   the cash.

13           THE COURT:  I'm already confused.  I'm already

14   confused.  It says "as warranted" is the name of that column,

15   right?

16           THE WITNESS:  Yes, that's right.

17           THE COURT:  Where did Sekisui warrant that Femtelle

18   had a value of 12.2 million, where did it warrant that?

19           THE WITNESS:  Sekisui --

20           THE COURT:  I'm sorry, did I say Sekisui?  ADI.

21           THE WITNESS:  No, they did not.

22           THE COURT:  Oh.

23           THE WITNESS:  This is the result of the analysis in

24   the purchase price allocation that gives a contemporaneous

25   estimate of the allocation.

E1hzsek2                         Erb - direct

1             THE COURT:  Oh, so it's not as warranted by ADI.

2             THE WITNESS:  Well --

3             THE COURT:  It's your valuation based on all your

4    records you reviewed, that that's the allocation that you think

5    was made at the time, but it's not warranted.

6             THE WITNESS:  Well, we understood the purchase price

7    to be starting point, and the value of the company as

8    warranted, the purchase price.

9             THE COURT:  I understand the purchase price for sure

10   is 25.36 million.  All I'm quarreling with you about is I don't

11   know there was a warranty as to the value of Femtelle.

12            THE WITNESS:  The individual components, I don't

13   believe there was.

14            THE COURT:  Right.  I think to the contrary, I think

15   there's careful language, I think in the SPA that says

16   something about you can't promise you anything as to what

17   individual things are worth, something like that.

18            THE WITNESS:  That was --

19            THE COURT:  I may have it wrong, but.

20            THE WITNESS:  Regarding projections, yes, that's

21   right.

22            THE COURT:  What is it?

23            THE WITNESS:  The projections in -- I think there's a

24   joinder that ruled out any information prior to the SPA.

25            THE COURT:  I don't know.  I'm sure it will come out.

E1hzsek2                          Erb - direct

1    I just wanted to quarrel with the word as warranted.  It

2    certainly wasn't warranted by the seller, ADI, that Femtelle

3    had a value of 12 million, right?  That's not warranted by the

4    seller.

5              THE WITNESS:  Correct.

6              THE COURT:  Okay.

7              Okay, so I understand now this is the breakdown of the

8    purchase price based on your analysis and primarily relying on

9    KPMG's allocation.

10             THE WITNESS:  That's right.

11             THE COURT:  Okay.

12             THE WITNESS:  So first bar is the value allocated to

13   Femtelle.  And as I explained, that's the difference between

14   the --

15             THE COURT:  Yeah, I got this.

16             THE WITNESS:  Okay, fine.  This is the value.

17             THE COURT:  Allocation minus the stream of income, I

18   understand.

19             THE WITNESS:  Okay.

20             THE COURT:  On the earn out.

21             THE WITNESS:  The current products, as I stated, the

22   bottom bar is everything else in the company assets inventory

23   that doesn't change in our analysis.  We're only looking at the

24   first two components of that bar.

25             I then show you the results of step one and step two

E1hzsek2                        Erb - direct

1   where we value Femtelle as delivered at $625,000 and value the

2   current products at $6,230,000 value that results of the

3   company from step one.  And step two is $14.57 million.  And we

4   then added the calculation made of the remediation expenses of,

5   expected remediation expenses of $1.4 million bringing the

6   value of the company as delivered to $13.17 million and the

7   overpayment, as I mentioned before, $12.18 million.

8   Q.  And when you say the value is warranted just to clarify,

9   you're referring to the components, the relative value as the

10  company was warranted in the SPA, is that correct?

11  A.  That's correct.

12  Q.  Turn to the next slide, please?  Let's look at the analysis

13  step by step.

14  A.  Well, this repeats what I said, and I believe --

15          THE COURT:  It does, and I fully understand it.

16  A.  Okay, that's fine.

17  Q.  So now let's talk about how you derived some of these

18  numbers.  I believe you testified about --

19          THE COURT:  I don't need any more on this slide.  That

20  would be a waste of time.  I got that slide.

21          MR. WHITNEY:  Well, your Honor --

22          THE COURT:  He testified to every word on that slide.

23  Please, I don't have time to waste.

24          MR. WHITNEY:  Okay.

25          THE COURT:  That slide was fully covered.  He

E1hzsek2                        Erb - direct

1    explained it.  Don't you think you did?

2              THE WITNESS:  Yes.

3              THE COURT:  I do too.  Okay.

4    Q.  You testified that you valued the Femtelle as delivered at

5    $625,000?

6              THE COURT:  Mr. Whitney --

7              MR. WHITNEY:  I'm just going to ask him how he

8    derived, he got that number?

9              THE COURT:  How he got the 625?

10             MR. WHITNEY:  Yes.

11             THE COURT:  All right.

12             MR. WHITNEY:  I thought you'd want to know that.

13   Q.  How did you determine the $625,000 figure?

14   A.  At the time of the transaction, there were historical

15   Femtelle sales.  These were sales by ADI U.S. and sales through

16   the company's German subsidiary.

17   Q.  And why did you rely solely on existing Femtelle sales?

18   A.  Well, they were a fact, they were historical sales that I

19   believe should be taken into account.

20   Q.  And why did you not value any IVD sales for Femtelle in the

21   U.S.?

22   A.  IVD sales, that is with FDA approval, the knowledgable

23   investor considering everything that he knew with knowledge of

24   the breaches, could not reasonably conclude that there would be

25   Femtelle sales; and specifically that that judgment is based on

E1hzsek2                        Erb - direct

1    my consultation with an expert in the field, Mr. Ulatowski, who

2    is the sort of expert, industry expert or subject matter expert

3    that a knowledgeable investor would consult.

4           Also with awareness of the breaches, I would say that

5    the knowledgable investor knew of the failure of the 2007

6    application to get approval from the FDA, and he would have Mr.

7    Ulatowski's view that the 2009 application, which was pending

8    at the time of the transaction date, would also fail; therefore

9    a reasonable conclusion that I would draw of the knowledgable

10   investor is is that the only sales that I could rely on were

11   those that historically were in the company's books and

12   records.

13   Q.  Did you look at any other information for your

14   determination other than what you just testified to?

15   A.  Yes, there were e-mails that I reviewed.

16   Q.  I'd like to call up PTX-11?

17   A.  Can you expand that a little bit.

18   Q.  You also have it in your binder, Mr. Erb.

19   A.  I do, yes, but it's small there too, yes.

20   Q.  Okay, sorry.  Is this one of the e-mails on which you

21   relied?

22   A.  Yes, it is.

23          THE COURT:  I'm sorry, who is Lum Shapiro?

24   Q.  I'm?

25          MR. WHITNEY:  Sorry, your Honor.  We're on PTX-11?

E1hzsek2                        Erb - direct

1           THE COURT:  I think I am.

2   A.  Yes, this is an e-mail from Marie Louise --

3   Q.  I'm sorry, you're right.

4           THE COURT:  I still said, who is Lum Shapiro?

5           THE WITNESS:  I have no idea, your Honor,

6   correspondent of Mrs. Hart.  The e-mail address she's replying

7   to a message from Mrs. Hart.  It's from one --

8           THE COURT:  I know.  I don't know why I should --

9           THE WITNESS:  We have --

10          THE COURT:  -- be interested in Wanda Toff's

11  statement.  I don't know who she is.

12          THE WITNESS:  We're not, your Honor.  We're interested

13  in the message from Mrs. Trudel-Hart.

14  Q.  What specifically --

15          THE COURT:  So what -- wait, wait, wait.  Slow down.

16  So I guess I'm just going to eliminate the -- I would if the

17  pen worked --

18          THE WITNESS:  Here.

19          THE COURT:  That's okay, I got lots of them.  I'll

20  find one that works.  You know the government, half the pens

21  don't work.

22          So, in any event, let's get rid of that e-mail.

23          So you want the one that starts with, Dear Wanda?

24          THE WITNESS:  Yes.

25          THE COURT:  It ends with thanks, Louise?

E1hzsek2                         Erb - direct

1              THE WITNESS:  Yes.  I'm looking at specifically the

2     second paragraph.

3              THE COURT:  Okay.  Luckily?

4              THE WITNESS:  The second sentence.  We have, in 20

5     years not been able --

6              THE COURT:  I don't have it -- oh, yes.  We have in 20

7     years not been able, not having the funds and resources to get

8     it through the FDA.  They indicated they wish to come back and

9     visit and talk and who knows, the Japanese are very hard to

10    reach read.

11             THE WITNESS:  I'm referring merely to the second

12    sentence, your Honor.

13             MR. WHITNEY:  I believe the full paragraph actually

14    would give that sentence context.

15             THE COURT:  I think so too.  Luckily, a Japanese

16    company is now looking into a marketing agreement for one of

17    our products, Femtelle.  We have in 20 years not been able, not

18    having the fund resources to get it through the FDA.

19    Q.  Why did you rely on this e-mail?

20    A.  This is a statement by one of the owners of the company,

21    and it appears to be a judgment that they have not succeeded in

22    getting approval for Femtelle.

23    Q.  Okay, I'd like to turn your attention to PTX 195, please?

24             THE COURT:  Of course, a purchaser knew there had not

25    been approval for Femtelle, right?

E1hzsek2                        Erb - direct

1              THE WITNESS:  Yes.  But my point is that it has a long

2     history.

3              THE COURT:  The purchaser certainly knew it had not

4     yet been approved.  There are always risks prior to approval.

5              THE WITNESS:  That's true.

6              THE COURT:  Now what do you want turn to now?

7              MR. WHITNEY:  PTX-195.

8              THE COURT: 195.  Okay, one minute.  There is a lot of

9     paper flipping.  All right.

10             THE WITNESS:  I would comment on the paragraph after

11    the list of regions begins since 1990.

12             THE COURT:  Wait a minute.  This is from Mr. Hart.

13             THE WITNESS:  Yes, this is from Mr. Hart.

14             THE COURT:  Okay.

15             THE WITNESS:  On --

16             THE COURT:  On February 11th, 2009 right.

17             THE WITNESS:  Preacquisition.

18             THE COURT:  Right.  And he says, since 1990, ADI has

19    invested between four to $5 million into Femtelle.  So I

20    consider that when possible in a licensing agreement for

21    Femtelle and the trademark, we should seek some immediate

22    return on capital investment, for example, a one time licensing

23    fee for example.

24    A.  Yes.  We have two points here; that the investment in

25    Femtelle has been considerable without success and he's seeking

E1hzsek2                          Erb - direct

1   immediate return on that capital investment.

2   Q.  And this would also be bounded by the knowledge that you

3   discussed with Mr. Ulatowski, is that correct, of the --

4   A.  Background, yes, that's right.

5            THE COURT:  Again, would you remind me what that was

6   again?

7            THE WITNESS:  Well, Mr. Ulatowski's judgment was that

8   the pending application would fail.

9            THE COURT:  Right.  Okay.

10  Q.  And if we look at PTX-12?

11           THE COURT:  Oh, dear.  That means flipping --

12           MR. WHITNEY:  Oh, sorry.

13           THE COURT:  -- through the book.  All right.

14  A.  Here we want to look at the second message from

15  Mrs. Trudel-Hart beginning, hello Chantal, and we look at the

16  second sentence, latter part of it.  Our Femtelle is still not

17  approved by FDA and we need more clinical studies which we can

18  not afford.  The date of this is January 25th, 2009.

19  Q.  Why did you rely on this, Mr. Erb?

20  A.  Well, here we have an indication that more clinical studies

21  are needed, which would be consistent with Mr. Ulatowski's

22  view.

23  Q.  All right.  You can take this down this e-mail.

24           THE COURT:  I'm sorry.

25           MR. WHITNEY:  I was about to ask a question.  I'm

E1hzsek2                         Erb - direct

1    sorry.  I was just checking my notes.

2                THE COURT:  Oh.

3    Q.  Did you rely on anything else in making your determination?

4    A.  I'm not sure I follow the question.

5    Q.  I'll withdraw the question.

6                Why did you consider the information that you did?

7    A.  Well, the information in the PPA and the e-mails you mean,

8    is that --

9                THE COURT:  That's right, that's his question.

10   Q.  Yes.

11   A.  Yes.  Well, I had to form a judgment as to what a

12   knowledgable investor would conclude about the prospect for

13   Femtelle.  And having reviewed this and the information from

14   Mr. Ulatowski, the history of the Femtelle 2007 application and

15   the judgment that clinical trials were still needed, and that

16   the 2009 application would fail, I concluded that a reasonable

17   investor could not have any basis for conclusion, other than

18   that the Femtelle sales would be zero going forward, the IVD

19   sales would be zero going forward.

20   Q.  Yet you still valued Femtelle at $625,000, is that correct?

21   A.  That's correct.

22   Q.  Why is that so?

23   A.  Because there were historical sales of Femtelle, and we

24   felt that we could project those forward and calculate a

25   present value of those sales.

E1hzsek2                        Erb - direct

1   Q.  How did you do that?

2   A.  We looked at financial data on company records that showed

3   the sales of Femtelle and undertook several calculations to

4   reach an estimate of what Femtelle, total Femtelle historical

5   sales were prior to the acquisition.

6   Q.  And did you discount those sales to the present value?

7   A.  We did.  We -- any -- that's following the procedures in

8   the PPA which had done the same thing, projecting forward and

9   then discounting them back to the transaction date using a

10  discount rate.

11  Q.  What is a discount rate?

12  A.  A discount rate is a rate that embodies the time value of

13  money and risk.  Time value money referring to the fact that a

14  dollar tomorrow is worth less than a dollar today, and the PPA

15  calculation included discount rate for current products of

16  17.4 percent, and we used that because these were historical

17  sales, not a product in research and development.  And we used

18  that same discount rate of 17.4 percent which has been

19  calculated in the PPA.

20  Q.  Do you know why KPMG chose that discount rate in the PPA?

21  A.  They explained their procedures.  They calculated the

22  weighted average cost of capital and the internal return, rate

23  of return, and added a risk factor to get to 17.4.  It's all

24  laid out in PPA.

25  Q.  And what information did you rely on for the historical

E1hzsek2                        Erb - direct

1  Femtelle sales data?

2  A.  We had company records.

3  Q.  I'm going to identify the company records -- well, let's

4  turn to PTX-196.  Actually, let's -- all right.  Well,

5  unfortunately, the order of doing this requires flipping

6  through the bulky documents, your Honor.  I apologize, but

7  let's turn to PTX-196?

8  A.  Yes.  This is sales by product by ADI for fiscal years 2005

9  through 2008 with a trailing 12 month figure that runs through

10  September 30th, 2008.

11        If you scroll down, you'll find a category saying

12  oncology.  And there we have the historical sales by ADI U.S.

13  in the period prior to transaction.  These show stability of

14  sales, roughly $250,000, your Honor, and they give us the basis

15  for the ongoing calculations.  These sales are sales by the

16  U.S. company which include sales at a wholesale level to the

17  German subsidiary.  They have to take a couple of other steps

18  to get to the total Femtelle sales.

19  Q.  Okay.  What were those other steps?

20  A.  Well, because these are wholesale transactions, the part

21  that went to ADG, we have to separate those out and come back

22  to ADG's retail sales.

23  Q.  Can we look at PTX-51, the bulky document?

24        What is this document?

25  A.  This is invoice-based data, which includes data prior to

E1hzsek2                      Erb - direct

1  the transaction, and allows us to separate out the sales by

2  U.S. or ADI U.S. I should say, to the German subsidiary which

3  we did.

4  Q.  Can you just summarize for the record ho used this data?

5  A.  We had invoices for the individual sales by ADI U.S. prior

6  to the transaction for a period I think it's January 2008

7  through the transaction date, and that allows us to take that

8  invoice data as the wholesale sales and remove it from the

9  first table we looked at -- I'm sorry -- and we add up the

10 sales, that's not correct, we add the sales on this table to

11 get the monthly data by U.S. ADI, only within the United

12 States, not non U.S. sales.

13 Q.  Data for Femtelle?

14 A.  Data for Femtelle.

15 Q.  And did you did you do any other steps in your calculation?

16 A.  One more.  We had to calculate the sales at retail level by

17 ADG.

18 Q.  And could we turn to exhibit 214, PTX-214?  What is this

19 document?

20 A.  This is sales monthly in euros by ADG, which allowed us to

21 get the retail sales, which we then added to the figure for

22 U.S. sales only, after a conversion from euros to dollars.

23 Q.  Do you have any other steps in your calculation, or is that

24 it?

25 A.  Those were the -- that's it -- for the Femtelle historical

E1hzsek2                         Erb - direct

1   value.

2            Well, what we then did, having these monthly numbers,

3   we took the highest 12 month figure prior to the transaction,

4   used that as the basis for the transaction.  That number was

5   $408,000, including the retail sales, and we projected that

6   forward and then discounted it back as described.

7   Q.  And was all of this information available prior to the

8   transaction?

9   A.  Yes.

10  Q.  And as a result, you made your determination of a $625,000

11  valuation for Femtelle as delivered, is that correct?

12  A.  The present value of the cash flows as we calculated was

13  $625,000.

14  Q.  Okay.  So now let's look at step two of your analysis, if

15  we can, slide five.

16  A.  This refers to current products, your Honor, and it repeats

17  the number that I mentioned earlier, the over payment of

18  repurchase price, $3,758,000.

19  Q.  And you testified that the 9.99 million was from the PPA,

20  correct?

21  A.  Yes that's right.

22  Q.  How did you determine the value of as delivered by -- well

23  actually I should step back.  What are current products?

24  A.  Everything except Femtelle that's sold by the company.

25  Q.  And how did you determine the value as delivered of current

E1hzsek2                        Erb - direct

1    products?

2    A.  Here, again, a knowledgable investor with awareness of the

3    breaches and their likely impact on total sales.  Taking that

4    into account, I concluded that the knowledgable investor would

5    give the company credit for the sales levels achieved prior to

6    the transaction and would be able to maintain those sales going

7    forward for the period 2009-2013.  And that's what we did.

8            We calculated the sales of current products prior to

9    the transaction on a trailing 12 month basis, picked the

10   highest number of those figures, which was 10,153,000 for

11   current product sales.  We then kept that number constant

12   through 2013, and from that point on reverted to the growth

13   rates projected by KPMG.  And this, this number when brought

14   back to a present value using the discount rate of 17.4 gives

15   us the value as delivered of 6,232,000.

16   Q.  Why did you keep the sales levels constant for current

17   products through 2013?

18   A.  That was my judgment, it could be supported by an awareness

19   of the breaches and awareness of potential sales of the

20   company, faced with the impact of the breaches on the company

21   sales.

22   Q.  And what information did you base that opinion on?

23   A.  Well, I asked Mr. Takemura what he would have expected

24   those sales to be with knowledge of the breaches, and I

25   consulted --

E1hzsek2                          Erb – direct

1             MR. KORTMANSKY:  Your Honor, this is precisely my

2        objection I was making earlier.

3             MR. WHITNEY:  He's stating the basis for his opinion,

4        your Honor.

5             THE COURT:  Yes, I realize that.

6   A.   And I also consulted an expert in the field as to the scope

7        of the breaches of the reps and warranties regarding the

8        operation of the company and how they would affect, how they

9        could affect sales going forward from the transaction date,

10       that was Ms. Kuehn, who was subject matter expert of the sort

11       that a knowledgable investor would consult.  And with that

12       explanation in hand, I reached the conclusion that a reasonable

13       investor could look at the sales achieved and maintain that

14       level until growth was restored.

15            THE COURT:  Okay, I just want to read the answer to

16       myself.

17            (Pause)

18            THE COURT:  Okay.

19            MR. WHITNEY:  And we don't have to do this, because I

20       know it would draw an objection, but if your Honor would like

21       to hear, if your Honor find it probative, I could ask Mr. Erb

22       the substance of his conversations with Mr. Takemura.  I know

23       it will raise an objection from counsel.  We don't have to do

24       it, make the a little record a little more robust, or we could

25       just rely on the fact he discussed it?

E1hzsek2                         Erb - direct

1            THE COURT:  That's fine.  I mean, there is no need to

2    do it.

3            MR. WHITNEY:  Okay, that's fine.

4    Q.  Did you see any evidence in the record about the content of

5    the customer base for the company?

6    A.  Yes.  In one of the aspects, which was highlighted in the

7    preacquisition consideration of this company, was the fact that

8    90 percent of its customers were repeat customers, and this

9    makes more dramatic as it were the possible impact on customers

10   of the breaches of reps and warranties, loss of customers could

11   be reasonably anticipated as a result of the breaches.

12   Q.  Why did you rely on this information in making your

13   determination of the value of current products as delivered?

14   A.  Well, I believed it was the reasonable conclusion that a

15   knowledgable investor with knowledge of the breaches would come

16   to.

17   Q.  And what financial information did you use to calculate the

18   value of current products as delivered?

19   A.  Well, the first step which we did for both Femtelle and

20   current products was to replicate the KPMG analysis in the PPA,

21   so we knew we were on all fours with their model.

22           We then recalculated the model as developed by KPMG to

23   reach the flow of, cash flows -- future cash flows and

24   discounted those backward.

25   Q.  Call up exhibit PTX-50, please?

E1hzsek2                        Erb - direct

1                What is this document?

2    A.  This is example of the business records that we used to

3    support our calculations of current products 12 month basis.

4    These are consolidating income statements from the company.

5    Q.  For what year?

6    A.  This is year the period ending June 2008.  There are

7    monthly data behind this page.

8    Q.  Did you rely on this information to your calculation?

9    A.  I did, yes.

10   Q.  And did you rely on any other financial data?

11   A.  We had some more financial data.  There's an exhibit which

12   illustrates that.

13   Q.  Can we call up PTX-234, please?

14            MR. WHITNEY:  Your Honor, it's essentially the same.

15   A.  Well, different time period.

16   Q.  I know, I was avoiding having to turn the binder if

17   necessary.

18            What is this document, Mr. Erb?

19   A.  Again, these are preliminary consolidating income

20   statements on a monthly basis which allow us to calculate

21   through March of 2009, and we also used it to calculate the ten

22   days after the transaction date.

23   Q.  What did you do with this data, how did you make your

24   calculation?

25   A.  Well, we have total sales here and we subtracted from the

E1hzsek2                          Erb - direct

1  total sales the Femtelle sales that I just mentioned.

2  Q.  And then you discounted the values back?

3  A.  That's right.  Same procedure, same methodology.  We just

4  maintain consistency with the PPA.

5  Q.  And that's how you derived your figure, the value of

6  current products as delivered?

7  A.  Yes.

8  Q.  Let's turn to slide six?  This is step three.  What is step

9  three?

10  A.  We have, we now have the calculation of the overpayment for

11  Femtelle and current products, 10.783 million, and we

12  calculated the expected remediation costs of 1.4 million to

13  reach our total overpayment.

14  Q.  Why is it not double counting to --

15          MR. KORTMANSKY:  Could we have the basis for that last

16  cost -- he's provided the basis for all his other --

17          THE COURT:  1.4 million?

18          MR. KORTMANSKY:  Yes, your Honor.

19          MR. WHITNEY:  We are getting to that, your Honor.

20  Q.  Why isn't the 1.4, inclusion of expected remediation cost,

21  not double counting with your prior analysis?

22  A.  Well, there are two separate issues.  One is the effect of

23  the breaches and one is the expected cost of remediating the

24  breaches.

25  Q.  And what did you base that expected remediation cost of

E1hzsek2                        Erb - direct

```
 1   $1.4 million on?
 2   A.  Again, I consulted Ms. Kuehn whose report had indicated
 3   that the cost of remediation would be lengthy and protected I
 4   think was the phrase she used, and I asked her to explain that
 5   and she told me that in her estimate it would be roughly two to
 6   $3 million over two to three years.
 7               MR. KORTMANSKY:  Your Honor, this is precisely the
 8   information that was excluded yesterday, from Ms. Kuhen's
 9   testimony.  She was not permitted, it was not in her report.
10               THE COURT:  That's true.
11               MR. WHITNEY:  It was in Mr. Erb's report, your Honor.
12               MR. KORTMANSKY:  I understand it was in Mr. Erb's
13   report, but that's hearsay statement.  And this is Mr. Erb now
14   trying to put forth Ms. Kuehn's expert opinion through Mr. Erb?
15               MR. WHITNEY:  Basis for his analysis, your Honor, in
16   his report.
17               THE COURT:  I think the bottom line of the case law is
18   he can do that, but if the information he relies on is not
19   credible, neither is his opinion.  So the real attack is on Ms.
20   Kuehn's ability to make this projection.
21               MR. KORTMANSKY:  Thank you, your Honor.
22   Q.  Okay.  But this is what you relied on, Mr. Erb, is that
23   correct?
24   A.  That's correct.
25   Q.  Okay.  And is there any other testimony that you heard that
```

E1hzsek2                          Erb - direct

1    has confirmed that view?

2    A.   Well, Mr. Morrissey had a similar estimate in his

3    testimony, and Mr. Takemura testified that remediation had gone

4    on for two years and in fact was still continuing.   So

5    reasonable basis to conclude there were costs of remediation

6    although he didn't specify.

7    Q.   And how did you use this information?

8    A.   Well, here we took that estimate and applied it within our

9    model, we applied $1 million of the estimate to 2010, 1 million

10   to 2011, and 1 million to -- excuse me -- 500,000 to 2012.

11   That was part of our model.   So those numbers were also

12   discounted along with all the other discounting of the cash

13   flows.   So that's why we say 1.4 million rather than 2.5.

14   Q.   Why did you discount it?

15   A.   Because there are future expenses, and to maintain

16   consistency the model and our approach that a knowledgable

17   investor would take, and because in any estimate like that

18   there are uncertainties.   And so the discount rate allows for

19   the risks that expenses might be less.

20   Q.   And what discount rate did you use?

21   A.   Same as we did before, the 17.4.

22   Q.   Why did you do use that rate?

23   A.   Consistency with the PPA, and seemed to be a reasonable

24   rate, lower rate would result in higher damages.

25   Q.   And if we can turn to slide seven, I believe this

E1hzsek2                        Erb - direct

1   summarizes your testimony here today?

2   A.  That's correct.  We reviewed this before number are the

3   overpayment for Femtelle of roughly seven million, overpayment

4   for current products of 3.758, and the 1.4 million add up to

5   12.183.

6   Q.  Does this damages analysis include a calculation of

7   prejudgment interest?

8   A.  No, it does not.

9   Q.  Does it include a calculation of attorneys fees?

10  A.  No.

11          MR. WHITNEY:  No further questions, your Honor.  Would

12  you like me to read into the record the exhibits we just

13  discussed?

14          MR. VELIE:  Your Honor, may I take a brief break while

15  that's happening.

16          THE COURT:  Sure, I think we all will, before the

17  cross-examination anyway.  So if you want to wait for this

18  witness exhibits, that's fine or you can start.

19          MR. VELIE:  Thank you.

20          MR. WHITNEY:  You know what, your Honor, let me take

21  the break to make sure I have all the exhibits.  I'll do it

22  after the break.

23          THE COURT:  Okay.

24          MR. WHITNEY:  Thank you, your Honor.

25          THE COURT:  All right, so let's reconvene at ten

E1hzsek2                          Erb – direct

1    minutes ten after 12:00.

2              (Recess)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E1HFSEK3                          Erb - cross

1              MR. WHITNEY:  Your Honor, I'm going to read the

2     exhibits into the record?

3              THE COURT:  Sure.

4              MR. WHITNEY:  PTX 8, PTX 11, PTX 12, PTX 48, PTX 50,

5     PTX 51, PTX 195, PTX 196, PTX 214 and PTX 234.  I think they're

6     already in the record but PTX 3 and PTX 5 as well.

7              THE COURT:  They're all received.

8              (Plaintiff's Exhibits 8,  11, 12, 48, 50, 51, 195,

9     196, 214, 234, 3 and 5 received in evidence)

10             MR. WHITNEY:  Your Honor, we've marked a copy of these

11    slides as PTX 278.

12             THE COURT:  That's just for demonstrative.  It's not

13    evidence in itself, but as a demonstrative exhibit.  I'll take

14    a copy of the slides.  All right, Mr. Kortmansky?

15             MR. KORTMANSKY:  Thank you, your Honor.

16    CROSS-EXAMINATION

17    BY MR. KORTMANSKY:

18    Q.  Mr. Erb, the stock purchase agreement, it did not assign

19    specific values to individual assets, did it?

20    A.  No.

21    Q.  But your methodology was to assign a portion of the

22    purchase price in each asset that was acquired, is that

23    correct?

24    A.  That's the PPA information, yes.

25    Q.  But that's also what you did?

E1HFSEK3                      Erb - cross

1    A.  I didn't assign them.  I took values as calculated by KPMG.

2              THE COURT:  Right, but he's saying you used those

3    numbers to do your calculations.

4              THE WITNESS:  That's correct.

5              THE COURT:  So you, too, assigned in that sense.

6              THE WITNESS:  Yes.

7              THE COURT:  The work was done by somebody else but you

8    accept it.

9              THE WITNESS:  That's right.

10   Q.  And you used the KPMG report because you believed that

11   document provided an independent third party valuation,

12   correct?

13   A.  Yes.

14             MR. KORTMANSKY:  Can we actually turn to that?  I

15   believe it's Exhibit 48.

16             THE COURT:  Yes, he knows.  Page 2.  It says, "We

17   understand that Sekisui management will use our report for

18   financial and tax reporting purposes."  He knows that.

19             MR. KORTMANSKY:  And I'm sure he also knows on page 45

20   of PTX 0048-45, page 45 of the exhibit.

21   Q.  Mr. Erb, you're also aware of the nature of opinion that we

22   discussed with Mr. Takemura on Monday?

23   A.  I'm sorry, I need the page number you're talking about.

24   Q.  Sure.  It's the last three digits of the page is 376.

25   A.  Yes, I'm there.

E1HFSEK3                          Erb - cross

1    Q.  And you'll see that there are Arabic numbers 1, 2, 3, 4.

2    I'm referring to the first number, nature of the opinion.

3    A.  Yes.

4    Q.  And you were aware of this, correct?

5    A.  Yes.

6    Q.  Thank you.  I'm not going to read it into the record, your

7    Honor.  If you'd like me to, I will, but this is the same

8    information that was already read in the record.

9             THE COURT:  It actually may be a good time to do it.

10   It says, "Neither our opinion nor our report are to be

11   construed as a fairness opinion as to the fairness of an actual

12   or proposed transaction, the solvency opinion or investment

13   recommendation but instead are the expression of our

14   determination of the fair market value of the subject assets

15   between a hypothetical willing buyer and a hypothetical willing

16   seller in the assumed transaction on an assumed valuation date.

17   For various reasons the price at which the subject assets might

18   be sold in a specific transaction between specific parties on a

19   specific date might be significantly different from the fair

20   market value expressed in our report."

21            So I read that to refresh my own recollection and now

22   you've heard it, too.

23            THE WITNESS:  Thank you, your Honor.

24            MR. KORTMANSKY:  Thank you, your Honor.

25   Q.  So, Mr. Erb, you were aware that the KPMG report was not

1    intended as a fairness opinion as to the value of the

2    transaction, correct?

3    A.  Yes, the fairness opinion is a separate document.

4    Q.  And you're also aware that this report was based on

5    hypothetical buyer, hypothetical seller and a hypothetical,

6    it's an actual transaction but a hypothetical buyer, a

7    hypothetical seller, and in fact based on an assumed valuation

8    date, correct?

9    A.  That's what it says, yes.

10   Q.  And you're also aware that the report says that the actual

11   transaction may be very different.

12   A.  They're referring to the subject assets, yes.

13   Q.  I understand that, but you were referring to the subject

14   assets, too, in your report, weren't you?

15   A.  That's correct, yes.

16   Q.  And it says that the actual transaction may be very

17   different.  You were aware of that as well, correct?

18   A.  Yes.

19   Q.  And yet you thought it was appropriate to rely on this

20   report as the basis or the starting point for your opinion,

21   correct?

22   A.  Yes.

23   Q.  Now, you understand that the KPMG report actually relied on

24   what has been referred to as the confidential memorandum, it's

25   Plaintiff's Exhibit 7?

E1HFSEK3                      Erb - cross

1    A.  No, I don't think it relied on that memorandum for more

2    than -- let me back up a minute.  The confidential memorandum

3    was prepared by preacquisition management.  After the

4    assignment was given to KPMG to do the purchase price

5    allocation they again consulted, as we saw in that e-mail

6    exchange, with both Sekisui and its advisers -- excuse me, ADI

7    and its advisers and Sekisui, and the numbers that they used as

8    the basis for their long-term projections were provided by

9    Mr. Hart in connection with consultations with Sekisui.

10   Q.  Well, you recall testifying at a deposition, correct?

11   A.  Yes.

12   Q.  And when you did that you were being truthful at the time,

13   correct?

14   A.  Yes.  Yes.

15          MR. KORTMANSKY:  Your Honor, I'm going to read from

16   Mr. Erb's deposition transcript.  It's page 22 of Mr. Erb's

17   deposition transcript.  Do we have a copy for the judge?

18          THE COURT:  I don't need it.  Just in case your

19   adversary wanted to follow it's page 22.  Okay.  Go ahead.

20   "Q.  What did you do?

21   "A.  We took the KPMG report as a starting point which in turn

22   had used the confidential memorandum projections."

23          Do you recall testifying to that?

24   A.  Yes.  I think I just provided a more complete answer to

25   that same question.

```
 1            MR. WHITNEY:  Your Honor, if he's going to keep
 2   reading from the transcript I would like him to provide me with
 3   a copy.
 4            THE COURT:  Don't you have the deposition of your own
 5   witness?
 6            MR. WHITNEY:  Not in front of me, your Honor.  Now I
 7   have it.
 8            THE COURT:  You should have.  It's elementary.  You
 9   should have had it.
10   Q.  Can we turn to what has been previously marked as
11   Plaintiff's Exhibit 7?  That's the confidential memorandum.
12   A.  I need that exhibit.  It's not in the binder.
13            THE COURT:  Does he have the electronic disk that I
14   have?
15            MR. KORTMANSKY:  We'll provide a copy.
16            THE COURT:  I don't need it, I have it electronically.
17            THE WITNESS:  Here it is, I have it right now.
18            THE COURT:  All right, he has it.  I have it on the
19   screen.
20   Q.  Okay.  Now, Mr. Erb, I'm just going to ask you to turn to
21   what is Bates range number 979 which is also numbered page 5 in
22   the document and the caption at the top is "confidentiality and
23   disclaimer."
24   A.  Yes.
25   Q.  I want you to count down with me four paragraphs.
```

E1HFSEK3                        Erb – cross

1    A.  "The changes."

2    Q.  "The changes involved," correct.

3    A.  Yes.

4            MR. KORTMANSKY:  And so I don't get accused of

5    speaking way too fast from my colleagues, I'm going to ask your

6    Honor if you could read in the sentence that starts, the second

7    sentence, "This confidential memorandum also includes" and read

8    it all the way through to the penultimate sentence.

9            THE COURT:  Okay.  "This confidential memorandum also

10   includes certain statements, estimates, projections, including

11   pro forma income statements and certain forward-looking

12   statements within the meaning of the Private Securities

13   Litigation Reform Act of 1995.  Such statements, estimates,

14   information and projections reflect significant assumptions and

15   subjective judgments by the company's management concerning

16   anticipated results.  Such statements are subject to certain

17   risks and uncertainties.  The company cautions suitors not to

18   place undue reliance on forward-looking statements which speak

19   only as to management's expectations on the data herein.  These

20   assumptions and judgments may or may not prove to be correct

21   and there can be no assurance that any projected results are

22   obtained or will be realized."

23   Q.  And you understood that at the time you prepared your

24   report, correct?

25   A.  Yes.

E1HFSEK3                         Erb - cross

1    Q.  And yet you relied on the information in this confidential

2    memorandum because you also relied on the KPMG report which

3    incorporated these particular objections?

4    A.  Excuse me, the last sentence again?

5    Q.  Which incorporated these projections.

6    A.  Yes.  And on the consultations by KPMG with the

7    preacquisition management and Sekisui regarding these

8    projections.

9    Q.  We'll get to that in a moment, sir.

10             Could you please turn to the stock purchase agreement.

11   PTX 3?

12   A.  Yes.

13             THE COURT:  It will be on the screen in no time, I'm

14   sure.

15             MS. BRILEY:  Do you have a copy, Mr. Erb?

16             THE WITNESS:  Yes.

17             THE COURT:  What Bates page would you like me to go

18   to?

19             MR. KORTMANSKY:  I'm getting there, your Honor.  It's

20   Section 4.29, which is page 41 of the stock purchase agreement

21   and its last two digits of the Bates range is 88.

22             THE COURT:  88?

23             MR. KORTMANSKY:  88, in my copy.  Oh, I'm in DX A.

24   It's still page 41.

25             THE COURT:  And it is 88.  All right, which paragraph

1    number?

2              MR. KORTMANSKY:  It's 4.29 and again if your Honor

3    could read it.

4              THE COURT:  Okay.  It's called disclaimer of other

5    representations and warranties.  It says, "Except as otherwise

6    expressly set forth in this Article IV including the schedules

7    attached hereto, neither the principal shareholders nor the

8    company makes any representation or warranty, express or

9    implied, at law or in equity in respect of the company or any

10   of its assets, liabilities or operations.  The representations

11   and warranties set forth in this Article IV supersede and

12   replace all prior statements, representations, projections,

13   forecasts, warranties and other understandings whether written

14   or oral that may have been previously given or made by the

15   principal shareholders and the company that may have related in

16   any way to the subject matter of this agreement, including the

17   projections set forth in the confidential memorandum relating

18   to the company dated August 2008/October 22, 2008."

19   Q.  And you understood that as well when you prepared your

20   report, didn't you, Mr. Erb?

21   A.  Yes.

22   Q.  And it's your understanding that what's been previously

23   marked as Plaintiff's Exhibit 8 somehow exonerated those

24   provisions, is that right?

25             THE COURT:  I'm sorry, what is 8?

1            MR. KORTMANSKY:  I'm sorry, Plaintiff's Exhibit 8 is

2      the e-mail exchange that was referred to earlier today.

3      A.  I wouldn't use that term, but the KPMG assignment was to

4      allocate the purchase price among the various assets of the

5      company and in so doing or in preparation to do that they

6      consulted with ADI, which at that time was the same as

7      preacquisition management and with Sekisui and with the

8      advisers of the buyer and the seller and at that time it was

9      deemed by that group appropriate to use the projections that

10     the PPA contained.

11           THE COURT:  I'm sorry, I just couldn't catch that

12     whole answer.  I'm going to have to read it back.

13           (Pause)

14           THE COURT:  Exhibit 8 was written in June '09?  The

15     e-mail exchange was June of 2009, right?

16           THE WITNESS:  That's correct, right.

17           THE COURT:  And the closing again was?

18           MR. WHITNEY:  April 2009.

19           THE COURT:  April 2009.  So these are post-closing

20     statements.  So, Mr. Kortmansky, I'm confused by your question

21     because the article we just read of the stock purchase

22     agreement talks about any statements made up to that time.

23     They're all superseded by the terms of the stock purchase

24     agreement.  This is the statement that postdates the closing,

25     right?

1          MR. KORTMANSKY:  Let me address that, your Honor.

2          THE COURT:  Okay.

3  Q.  So, let's turn to what is page 2 of the e-mail.

4          THE COURT:  E-mail, okay.

5          THE WITNESS:  This is PTX 8?

6  Q.  Yes, PTX 8.

7  A.  I have it.

8  Q.  It says --

9          MR. KORTMANSKY:  Actually, your Honor, again, if you

10 could, I'll read aloud and do my best to be slow.

11         THE COURT:  The one that says, "Hi Jeff and Doron?"

12         MR. KORTMANSKY:  "Hi Jeff and Doron."

13         THE COURT:  "We are currently working on a purchase

14 price allocation assignment for Sekisui and as part of that we

15 would like to understand in some more detail the basis for ADI

16 projection numbers in the offering memorandum.  We understand

17 CrossTree helped ADI put that together.  If it is okay,

18 Takesumi Semba from our valuation practice would like to talk

19 to you.  Let me know if he can do that."

20 Q.  And what happens next is that Mr. Ellis responds, and he

21 says, in sum, sure, we would be happy to talk to you, isn't

22 that what that says?

23 A.  Yes.

24 Q.  Then what happens is actually there is a communication with

25 questions, right, that's what happens?  That's the next e-mail

1  on page 1?

2  A.  Yes.

3  Q.  And Mr. Ellis simply responds to those questions, correct?

4  A.  Yes.

5  Q.  So this wasn't somehow a communication that was intended to

6  suddenly make the statements and the projections in the

7  confidential memorandum new warranties or a reaffirmation of

8  the information in the confidential memorandum, was it?

9  A.  No.

10  Q.  Thank you.  And as we already discussed the KPMG report was

11  not used to value the purchase when they actually bought it,

12  right?

13  A.  That was established in the stock purchase agreement.

14  Q.  If we can just go back one more time to Plaintiff's Exhibit

15  7, the confidentiality memorandum, and turn again to the same

16  page 5.  And we're going to read from one paragraph further

17  down than the last paragraph.  This one starts, "Except where

18  otherwise indicated."

19         THE COURT:  Okay.  "Except where otherwise indicated,

20  this confidential memorandum speaks as of the date of

21  August 2008.  Neither the delivery of this confidential

22  memorandum for the investment in the company shall under any

23  circumstances create any implication that there has been no

24  change in the affairs of the company since the date hereof.  In

25  furnishing this confidential memorandum neither the company nor

E1HFSEK3                        Erb - cross

1    CrossTree undertakes any obligation to update any of the

2    information contained herein."

3    Q.  Now, Mr. Erb, you were also aware of that paragraph?

4    A.  Yes.

5    Q.  And as a reminder the closing date was in April of 2009,

6    correct?

7    A.  Yes.

8    Q.  And so this confidential memorandum and whatever

9    information is in it relates to projections from seven months

10   earlier?  The math might be wrong.  I'm not a mathematician.

11   Six or seven months early earlier, is that correct?

12   A.  Yes.

13   Q.  And there's no requirement by the company to update the

14   information here, correct?

15   A.  As of this date, yes.

16   Q.  Or any date, there's no obligation to update.

17   A.  Yes, that's correct.

18   Q.  And there's no representation here that the company could

19   completely change -- strike that.  There's no representation

20   here that the company will not change substantially before the

21   closing date, correct?

22   A.  Yes.

23   Q.  Yet you still believed that the projections in this

24   document were appropriate to rely on for an April 20, 2009

25   valuation date?

E1HFSEK3                          Erb - cross

1    A.  Well, this goes back to the point we were just discussing

2    in PTX 8.  Because of the factors that you've alluded to here I

3    believe that was probably one of the reasons why KPMG undertook

4    to consult with the company, its preacquisition management,

5    which was still in place, and with Sekisui saying here are the

6    projections in the confidential memorandum, can you explain

7    them, and at that time if there had been any hesitation or

8    reservation on the part of either party about using these

9    projections I'm sure they would have said so.

10             MR. KORTMANSKY:  I move to strike that, your Honor.

11             THE COURT:  Well, that was responsive.

12   Q.  You don't actually know what happened in those

13   conversations, do you?

14   A.  No.  No.

15   Q.  And the only evidence in the record is that there were some

16   requests made by Sekisui and KPMG to ask management or, as you

17   say, preclosing management, to explain some of the projections

18   that were in the confidential memorandum, right?

19   A.  That is in the record but we also have the statements in

20   the PPA itself about their consultations.  We don't know that

21   this was the only consultation.

22   Q.  But there's no indication that these confidential

23   memorandum projected were rewarranted or reaffirmed?

24   A.  No.

25             MR. KORTMANSKY:  Give me one moment, your Honor, just

1   to make it easy.  This is that giant spreadsheet that we looked

2   at on Monday.  Thank you.

3   Q.  Mr. Erb, you were here on Monday when Mr. Takemura was

4   testifying regarding the spreadsheet that is now up on the

5   screen.

6   A.  Yes.

7   Q.  And do you recall his testimony that the appropriateness of

8   the acquisition and the purchase price, which is 25 and a half

9   million dollars was based on the third red and green bar?  I

10   can point you to the transcript reference if you need but you

11   probably remember that testimony, don't you?

12   A.  In general terms, yes.  However if we're going to discuss

13   specific parts of these charts I think it would be good to

14   review the testimony.

15   Q.  We can review if you'd like.  I'll get the transcript

16   reference for you, Mr. Erb.

17        THE COURT:  Your Honor, I'm assuming that all copies

18   of the transcript are the same.  It's a draft transcript, page

19   numbers may vary, but in my version of the transcript, you

20   actually asked Mr. Takemura on page 120, line 25, "Look at page

21   2, that little box, do you see on page 2 it says the above

22   analysis we conclude the acquisition price to be appropriate?

23   When you gave that testimony, what above analysis were you

24   referring to?

25   "A.  That's correct.  It's particularly referring to the bottom

1    bar graph."

2            "The bottom bar graph," the Court asks.  Court:  "Show

3    me which bar graph you're pointing to.  Can you show me on the

4    paper which bar graph is he pointing to?  Okay."

5            And now your Honor is still speaking.  "He pointed to

6    the third red and green bar."

7    "Q.  And we've established have we not, Mr. Takemura, that the

8    acquisition price you're talking about is 25 and a half million

9    dollars, is that correct?

10   "A.  Yes."

11           Do you recall that testimony?

12   A.  Yes, I do.

13   Q.  And do you recall that that third bar graph is an analysis

14   of the appropriateness of the acquisition price without

15   Femtelle?

16           MR. WHITNEY:  Object to the extent that misstates the

17   prior testimony.  I don't have the portions of the transcript

18   that he's reading from.

19           MR. KORTMANSKY:  I can read it, your Honor, if you

20   like.  If the witness doesn't recall I can read it to him.

21           THE WITNESS:  I don't recall so we'll have to go back

22   to the transcript.  Thank you.

23   Q.  This is question from Mr. Velie.  "So your -- let's go back

24   to page 2, the first page we were using.  So the final bar

25   graph, the last one is also sensitivity analysis, only core

1  plus synergy.  Sensitivity analysis only core.  So three and

2  four are again no Femtelle, is that correct?

3  "A.  Yes."

4          Does that refresh your recollection, Mr. Erb?

5          THE WITNESS:  Yes.

6          THE COURT:  I do forget what the red and the green

7  are, however.

8          MR. KORTMANSKY:  I believe the red is without

9  sensitive -- excuse me, the red is without synergy and the

10  green includes it, your Honor.

11          MR. WHITNEY:  Green is synergy.

12          THE COURT:  Oh, right, it says green synergy.  I see

13  that little box to the right.

14  Q.  And, Mr. Erb, do you also recall Mr. Takemura testifying

15  that Sekisui would only pay for Femtelle if it made some money?

16  Do you recall that testimony?

17  A.  No.

18  Q.  All right.  Well, let's go back to the transcript.

19          MR. KORTMANSKY:  Your Honor, I'm now reading from page

20  124.  This is line 7 through 12.

21          THE COURT:  This is still Mr. Takemura?

22          MR. KORTMANSKY:  This is still Mr. Takemura.  It's in

23  response to -- there was a very long back and forth but I'm

24  just going to read the answer, question and answer.  This is

25  now Mr. Takemura's answer.  "Yes at the very top portion we're

E1HFSEK3                        Erb - cross

1    only assessing the core.  The overall evaluation is certainly

2    inclusive of Femtelle.

3    "Q.  And then you'll pay for Femtelle later if it makes some

4    money, is that right?

5    "A.  Yes.  If it went beyond a certain level."

6    Q.  Do you recall that testimony?

7    A.  Yes.

8    Q.  Now, despite that testimony, despite Sekisui specifically

9    evaluating the purchase price without Femtelle and despite

10   Mr. Takemura specifically saying that they'll only pay for

11   Femtelle later --

12   A.  That is not my understanding of what he said.

13   Q.  No?

14           THE COURT:  Nor mine, but you're welcome to read that

15   again.  That's not what I thought I just heard.

16   "Q.  And then you'll pay for Femtelle later if it makes some

17   money, is that right?

18   "A.  Yes, if it went beyond a certain level."

19           THE COURT:  Yes.  If it went beyond a certain level.

20           MR. KORTMANSKY:  So it's not even a guaranteed

21   payment.

22           THE COURT:  That's not the way I'm hearing that.  I

23   don't know if Mr. Erb is hearing the same way I am.  It seems

24   to say if it goes beyond a certain level more money, but up to

25   that level it's included.  That's what I thought -- the first

E1HFSEK3                       Erb - cross

1   part I thought he said inclusive of Femtelle.  Would you read

2   that again?

3           MR. KORTMANSKY:  It says the very top portion which is

4   the acquisition price above it, we're only evaluating -- where

5   is it, we're only assessing the core, so the acquisition

6   price --

7           THE COURT:  No, you read the whole thing.  It had the

8   word "inclusive."  Read it.

9           MR. KORTMANSKY:  It says, for the overall evaluation

10  it's certainly inclusive of Femtelle.  We don't dispute that,

11  your Honor.  For the overall evaluation they're doing for the

12  acquisition rather than the acquisition prep, how much they're

13  going to pay.  And then he says, "and then you'll pay for

14  Femtelle later if it makes some money, is that right?"  He

15  answered, "Yes, because the acquisition price" --

16          THE COURT:  No, no, yes, only if --

17          MR. KORTMANSKY:  Only if it went beyond a certain

18  level.

19          MR. WHITNEY:  I object to defendant's characterization

20  of Mr. Takemura's testimony.  Mr. Kortmansky --

21          THE COURT:  We're going to get to that in summation

22  anyway.  You can object to it now but he's going to do exactly

23  that this afternoon.

24          MR. WHITNEY:  He keeps saying only pay for Femtelle.

25  That's not what Mr. Takemura said.

E1HFSEK3                     Erb - cross

            MR. KORTMANSKY:  Fair enough.  Thank you Mr. Whitney.

Q.  Now, Mr. Erb did you consider in preparing your analysis

Sekisui's analysis of the acquisition price?

A.  Yes.

Q.  Well, where in your report do you describe that the

acquisition price of 25 and a half million dollars is

appropriate without Femtelle?

A.  I don't believe that's a fair reading of the document.

Mr. Takemura also testified that the deal wouldn't have been

done without Femtelle because it needed Femtelle to get to an

established benchmark used by the authorities of the company or

its subsidiaries to determine -- my recollection is there was

an 11 percent return required and he said that you needed in

another part of this analysis Femtelle in there to get to that

benchmark.  I would also comment on the previous exchange that

my interpretation of that paragraph is he's referring to the

earnout payments.

            MR. KORTMANSKY:  Thank you.  That's exactly right.

            THE COURT:  Can you pause for a minute?  I just wanted

to read that last answer.

            (Pause)

            THE COURT:  Okay.  Thank you.  I'm ready if you are.

            MR. KORTMANSKY:  We're getting another -- I'm sorry,

it's our exhibit, DX MM.  This is the Savvian report from

February 6, 2009, your Honor.


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

E1HFSEK3                        Erb - cross

1           THE COURT:  All I want to know is has it been handed
2     to us?  Do we already have it?
3           MS. BRILEY:  It has been introduced.  I can hand you
4     another copy.
5           THE COURT:  I might have it.  It's called MM?
6           MS. BRILEY:  That's correct.
7           THE COURT:  I don't know if I kept it.  Let me look
8     through my pile.
9           THE WITNESS:  Let me show you the cover, your Honor.
10          MS. BRILEY:  I'm happy to provide you another copy.
11          THE COURT:  It's up to you.  There's a lot of paper
12    around.
13          MS. BRILEY:  We can always take it back later.
14          THE COURT:  Okay.  What is this again?
15          MR. KORTMANSKY:  This is the report prepared by GCH
16    Savvian.
17          THE COURT:  Yes.
18    Q.  Mr. Erb, you understood Savvian to be Sekisui's investment
19    banking advisor for the transaction, correct?
20    A.  I do.
21    Q.  And you've seen this report before, correct?
22    A.  Yes.  I'm having trouble.  It seems to be paginated --
23    Q.  I'm sorry, the report was issued in Japanese.  There's an
24    English translation behind it also attached.
25    A.  Actually it's sort of inter collated with my version here.

E1HFSEK3                          Erb - cross

1                THE COURT:  No, at some point --

2                THE WITNESS:  Here.  This is the cover page?

3                THE COURT:  There's a page 1 dated February 6, 2009.

4       Do you see that?  Are we looking at the same cover page?

5                THE WITNESS:  Yes.

6                THE COURT:  Okay, we're on the same page.  Okay.

7       Okay.  Anyway, we're both here, February 6, 2009.

8                MR. KORTMANSKY:  Thank you, your Honor.

9       Q.  I'm not going to ask this to be read back in the record

10      because it's already been read once.  My question to you,

11      Mr. Erb, do you recall Mr. Takemura's testimony that in

12      preparing his presentation to the board of Sekisui or to

13      management of Sekisui for approval he did not rely on what was

14      in the Savvian report?

15      A.  Yes.

16      Q.  Do you recall that?

17      A.  I do.

18      Q.  And that, the meeting where he first discusses it, there's

19      a February 9 management meeting for approval, do you remember

20      that?

21      A.  I don't recall that date, no.

22      Q.  Your Honor, we'll keep going back, February 9 --

23               THE COURT:  You repeated that.  I'll accept there was

24      a meeting on February 9.  But he testified he did not rely?

25               MR. KORTMANSKY:  Did not rely.  That's his testimony.

E1HFSEK3                         Erb - cross

1    I don't hear Mr. Whitney objecting so I must not be stating

2    something which is not accurate.

3    Q.  Now, the date of Plaintiff's Exhibit 49 is March 27.

4              THE COURT:  Wait, I'm lost.

5              MR. KORTMANSKY:  The big spreadsheet, Plaintiff's

6    Exhibit 49.

7              THE COURT:  That's March what?

8              MR. KORTMANSKY:  March 27.

9              THE COURT:  March 27, okay.

10             THE WITNESS:  Excuse me.  I believe Mr. Takemura

11   testified there were several versions of this and there were

12   earlier considerations and the document essentially remained

13   unchanged as it went through various meetings including

14   meetings with, as I recall, the English-speaking team in the

15   United States.

16   Q.  I understand that, Mr. Erb.  I'm talking about now this

17   February 6, 2009 document issued three days before that

18   meeting, the February 9 management meeting.

19             MR. KORTMANSKY:  And I'll represent this to the Court

20   and for the record that we received no other valuations after

21   this February 6, 2009 valuation from Sekisui.  So if it existed

22   it was not produced to us.

23   A.  Yes.

24   Q.  And this date, March 27, 2009, Mr. Takemura explained was

25   because he had to meet with some additional members of

E1HFSEK3                        Erb - cross

1   management who had not attended the first meeting.

2   A.  I recall that.

3   Q.  Now, you're a very experienced investment banker.  Do you

4   believe that an officer of a company who is asking management

5   of the company to spend millions and millions of dollars to

6   purchase an asset and to purchase an asset that's going to have

7   this contingent component of Femtelle, in fact it's a very

8   difficult asset to value, and he's going to present to

9   management not once but twice a month and a half apart without

10  relying on the report prepared by the investment banker they

11  hired to evaluate the transaction?  In your experience, is that

12  something that gets done?

13          MR. WHITNEY:  Objection.  This is not expert opinion

14  what Mr. Takemura intended to do and why he did it.

15          THE COURT:  I do understand that, but given Mr. Erb's

16  qualifications and given his reliance on various evaluations,

17  all the question is asking, it was very long winded but it was

18  asking essentially isn't it odd that he didn't bring to the

19  attention of his board or his managers the evaluation prepared

20  by his own investment banker.

21  A.  I don't find it odd, because I –– we have to look at this

22  particular document.  To answer the general question, of course

23  there are lots of factors that go into an evaluation what a

24  banker said and I can't tell you what a board or individual

25  should do, but in this particular case I find there is an

E1HFSEK3                          Erb – cross

1    inaccurate expression of what was at stake in this transaction

2    and I can explain that by going to Exhibit A to the SPA or

3    that's the document that I think explains the situation.  But

4    on pages 6 and 7 in this document there are what I regard as

5    inadequate or partial explanations of what's going on in the

6    transaction, so if I had been an executive looking at this

7    report I would have said, oh, there's something missing from

8    this table and I will rely on other factors as well as whatever

9    I'm receiving from the investment bank.

10   Q.  And Exhibit A is the future payments that would have to be

11   made for Femtelle, is that correct?

12   A.  That's a schedule of future payment, yes.

13          MR. WHITNEY:  Your Honor, he's referring to Exhibit A

14   to the SPA.

15          THE WITNESS:  Yes.  Did I misspeak?

16          THE COURT:  No, you said that, Exhibit A to the SPA.

17   Q.  Mr. Erb, in your report you testified earlier you assigned

18   damages both for the cost of -- sorry, both for the estimated

19   cost of remediation -- do you remember testifying about that

20   this morning, $1.4 million?

21   A.  I did.

22   Q.  The estimated cost for remediation.

23   A.  Yes.

24   Q.  And then you also charged the Harts for the actual cost of

25   remediation.  Don't you do that?

E1HFSEK3                          Erb - cross

1   A.  No.

2   Q.  What makes you think that you have not done that?

3   A.  The damages --

4   Q.  Strike that.  That's a bad question.  Please explain why it

5   is that you believe that you have not done that.

6   A.  The damages calculations were as I described, your Honor,

7   and the remediation costs in the damages estimate were the

8   present value of damage estimates which I made.  Subsequent to

9   the preparation of my first report I learned that there had

10  been new information regarding one of the aspects, one of the

11  issues that I included in my firs estimate of the costs

12  incurred and so I reproduced the costs incurred without that

13  change.  That claim was no longer asserted and I felt obliged

14  to correct the record, but I did not rely on the section of my

15  report, supplemental report concerning costs incurred in the

16  calculation of my damages.

17  Q.  I'm not sure that answered my question.

18          THE COURT:  All he's asking you, did you double count

19  remediation expenses?

20          THE WITNESS:  No.

21          THE COURT:  Is it in there once, the 1.4 million is

22  the only time the remediation expense is there?

23          THE WITNESS:  Yes.

24          THE COURT:  It's not in the other parts of the total,

25  the Femtelle was overvalued and the current assets were

E1HFSEK3                         Erb - cross

1  overvalued?

2          MR. KORTMANSKY:  And there was no testimony regarding

3  it this morning, so maybe Mr. Erb is now eliminating from his

4  report the actual expenses, the out-of-pocket expenses Sekisui

5  claims to have incurred for --

6          THE COURT:  As opposed to remediation expenses?

7          MR. KORTMANSKY:  Let me try --

8          THE COURT:  Separate and apart from remediation there

9  was something called out-of-pocket?

10          MR. KORTMANSKY:  They actually prepared in their

11  report a $2.9 million claim the actual cost of remediation they

12  incurred.

13          THE COURT:  I think now it's 1.4 million.

14          THE WITNESS:  That's right.

15          THE COURT:  And prejudgment interest and attorneys

16  fees.  That's it.

17          MR. WHITNEY:  Your Honor, this wasn't in the record.

18  He's not testifying to that.

19          THE COURT:  The only remediation costs sought is

20  1.4 million, not 2.9.  The other two components of the total

21  damage -- do you want to see that slide?  The two components

22  was the overvaluing of the Femtelle and overvaluing of the

23  other assets, that's it, and 1.4 for remediation?

24          THE WITNESS:  Yes.

25          MR. KORTMANSKY:  May I have a moment?

E1HFSEK3                        Erb - cross

```
1                THE COURT:  Sure.
2                MR. KORTMANSKY:  Your Honor, can we just ask
3     Mr. Whitney to put up the slide of the calculation of damages
4     by Mr. Erb?
5                THE COURT:  Sure.
6                MR. WHITNEY:  I believe the last slide.
7                MR. KORTMANSKY:  Just one more moment, your Honor.
8                (Pause)
9     Q.  Mr. Erb, this is the total damages Sekisui is asking for in
10    this litigation, is that correct?
11               THE COURT:  No, plus prejudgment interest and
12    attorneys fees.
13               MR. KORTMANSKY:  Correct, your Honor.
14    A.  These are my calculations of the total damages.
15               THE COURT:  Well, then, we can find out from counsel.
16    Is counsel seeking anything that this witness is not
17    mentioning?
18               MR. WHITNEY:  No, your Honor, other than prejudgment
19    interest and attorneys fees.
20               THE COURT:  I said that three times.  So not only is
21    it -- I just want to make sure you heard that.  Not only
22    Mr. Erb is saying this but so is the plaintiff.  This is what
23    they're seeking.
24    Q.  So, Mr. Erb -- and thank you for clarification,
25    Mr. Whitney.  Mr. Erb, in your report you included damages for
```

E1HFSEK3                          Erb - cross

1    a lease, you included damages for lyophilization, Mr. Whitney

2    is that all out now?

3            MR. WHITNEY:  Your Honor, I object to this testimony,

4    he did not testify to any of this information.  It's not in the

5    record.

6            THE COURT:  But he said it's in the report.

7    Apparently it's not being sought any longer.  This is it.  Mr.

8    Whitney just confirmed, this chart is it.  This chart is it.

9            MR. KORTMANSKY:  Your Honor, the discussion going on,

10   and perhaps if you actually can give us a couple of minutes

11   without interrupting you back and forth is to determine whether

12   we're actually done or we need something more.

13           THE COURT:  Okay.

14           MR. KORTMANSKY:  And so if it's okay with you, if we

15   can take a three-minute recess and discuss with Mr. Velie we

16   could be through with this witness.

17           THE COURT:  Okay.  It would be good to know before the

18   lunch recess, it will be good to know if you're done.  So we'll

19   sit here while you confer for three minutes.  You can confer

20   outside the room, too.  You can go use the jury room.

21           MR. KORTMANSKY:  Thank you, we'll do that.

22           MR. VELIE:  Thank you, your Honor.

23           (Recess)

24           MR. KORTMANSKY:  Your Honor, I have no further

25   questions for this witness.

E1HFSEK3                         Erb - cross

1          THE COURT:  Okay, good.  Redirect?

2    REDIRECT EXAMINATION

3    BY MR. WHITNEY:

4    Q.  Mr. Erb, could you take a look at PTX 48, please?  I know

5    we've seen this document already.

6    A.  Yes.

7    Q.  And counsel, defense counsel has referred you to a

8    statement on page 2 regarding the intended use of this

9    document, do you see that?

10   A.  Page 2 of the letter?

11   Q.  Page 2 of the letter.  Page 2 of the document, page 1 of

12   the letter, the first paragraph which we've seen and read many

13   times.  It doesn't say here that any other use of this

14   information is precluded, does it, Mr. Erb?

15   A.  No, it does not.

16   Q.  And why did you rely on this?

17   A.  Well, it was, as I stated earlier, I thought it an unbiased

18   third party report which had been very carefully prepared using

19   information from the company on the company, company

20   information from preacquisition management and there were

21   consultations with both the companies, the buyer and seller,

22   and their advisers and it estimated, the allocation included

23   the estimated fair values of the components of the transaction

24   and that was really an excellent basis I thought for proceeding

25   with analysis of the issues that we looked at.

E1HFSEK3                        Erb - redirect

1   Q.  And those values were bounded by the purchase price agreed

2   to by the party, correct?

3   A.  That's correct.  And we did not take, go outside that

4   limit, that's right.

5   Q.  If we could look at PTX 7.  Bates number ending in 979.

6   A.  Yes.

7   Q.  In the, I believe the fourth paragraph there was some

8   reading of the language in the agreement, in the memorandum.

9   Do you recall that?

10  A.  I do.

11  Q.  Have you ever seen that type of language before in any

12  financial projections, Mr. Erb?

13  A.  Yes.  It's normally in any information memorandum or

14  confidential memorandum.  It's done to conform with the

15  securities laws.

16  Q.  Is this standard boilerplate language you've seen in almost

17  any projections you've looked at?

18  A.  Standard language, yes.  Not necessarily exactly the same

19  but yes, standard language.

20  Q.  Let's go to Exhibit 3.  Do you recall reading Section 4.29

21  of the SPA?

22  A.  I do, but I'd like to see it.  Yes.

23  Q.  You're not relying on the projections in the confidential

24  memorandum for a determination that the failure to meet any of

25  the projections is a breach of this agreement, are you?

E1HFSEK3                          Erb - redirect

1   A.  No.

2   Q.  What are you relying on the projections for, if at all?

3   A.  Well, they were, these projections formed an input into the

4   PPA analysis.  That's how I used them.  I didn't use this

5   document, per se, but the inclusion of consistent projections

6   which had been accepted by KPMG after consulting with

7   preacquisition management and advisers and Sekisui, as I stated

8   before.

9   Q.  KPMG consulted with the preparer of the confidential

10   memorandum before using the information, correct?

11   A.  That's right.  We saw that in the e-mail involving

12   Mr. Semba.

13   Q.  Have you seen any information in the record, any evidence

14   in the record stating that anyone from CrossTree or ADI or

15   Mr. Hart said not to use those projections?

16   A.  No, I have not.

17   Q.  Did you see any evidence in the record to the contrary?

18   A.  No.

19   Q.  Did you hear the testimony of Mr. Takemura?

20   A.  I did.

21   Q.  Do you recall that Mr. Takemura confirmed that Mr. Hart

22   actually provided the Femtelle projections to KPMG?

23   A.  I did.

24   Q.  And in your analysis were those projections actually the

25   same projections that were used in the confidential memorandum?

E1HFSEK3                         Erb – redirect

1   A.  Yes.  Regarding Femtelle.

2   Q.  Regarding Femtelle, correct.

3          You mentioned earlier that you could explain --

4   withdraw that.  Is it your opinion that the only payment for

5   Femtelle in the SPA is contained in the earnout as defendants

6   are contending?

7   A.  No.

8   Q.  Will you look at I think what's PTX 5 which is Exhibit A to

9   the SPA?

10  A.  Yes.

11  Q.  Does this help inform your opinion?

12  A.  Yes, it does.

13  Q.  How does it do that?

14  A.  This is a schedule of payments that would be made under the

15  terms of the SPA if sales, that is revenue, from Femtelle

16  reached certain levels.  But you see, your Honor, at the bottom

17  of the table the earnout commences if sales reach $2,526,000.

18  But sales below that number, if one dollar less, one dollar was

19  subtracted from each of these numbers all that revenue would

20  still take place and would generate earnings for the company

21  and it adds up to roughly $20 million, your Honor.

22          THE COURT:  20 million from when to when?

23          THE WITNESS:  From 2010 to 2013.  That is to say, if

24  you add up 25, 125, 46, 999, that adds up to roughly, 20,

25  $21 million and that is real value that pertains to sales of

E1HFSEK3                        Erb - redirect

Femtelle under the assumptions that, under the assumptions that
had been made in the PPA.  And this is the document, as I said,
this is part of the purchase agreement which says that earnout
pages will be paid only between 2526 in the first year and
4042, the scale goes up by $500,000 a year, and this is also
embodied in that value analysis that we discussed, there's a
chart in there --

             THE COURT:  No, not 500,000 a year?

             THE WITNESS:  I'm saying that the top line, your
Honor, it goes from --

             THE COURT:  Oh, during the --

             THE WITNESS:  If you look at the payment column.

             THE COURT:  I am.

             THE WITNESS:  The first year you're going to go from
1 million to 1.5.

             THE COURT:  Oh, the payment column.  Okay.

             THE WITNESS:  If it exceeds that number you're still
capped at 1.5.  The next year it's 2 million, next year
2,000,500.  That's what I'm saying.  So there's a bound at the
bottom and the top and below the trigger level which is 2526
the revenue goes to the company, Sekisui, and no payments are
made to the sellers.

             I would also say that I find it unreasonable to say
that they wanted nothing from Femtelle when we have evidence
that Richard Hart wanted consideration for the sums that had

E1HFSEK3                          Erb – redirect

1    been invested prior to this transaction.

2    Q.  Under the structure of the earnout payments, Sekisui can

3    make tens of millions of dollars of revenue from Femtelle and

4    not be paid a penny of the, earnout is that correct?

5    A.  That's right.  And that was the heart of my objection to

6    the Savvian document we reviewed because it left that out.

7    Q.  And in addition at the top end of the earnout Sekisui could

8    make tens of millions, infinitely more money, and not pay a

9    penny more for an earnout, is that correct?

10   A.  Yes.

11   Q.  So in your expert opinion having valued some amount of M

12   and A transactions and purchase agreements, do you believe that

13   the value of Femtelle is solely contained within the earnout

14   payments?

15   A.  No, I do not.

16           MR. WHITNEY:  Thank you, your Honor.

17           MR. KORTMANSKY:  I have no questions, your Honor.

18           THE COURT:  Thank you.  You're done.

19           THE WITNESS:  Thank you.

20           (Witness excused)

21           THE COURT:  All right.  Are there new exhibits?

22           MR. WHITNEY:  Your Honor, can we have the lunch

23   break –– oh, for Mr. Erb?

24           THE COURT:  Yes.

25           MR. WHITNEY:  I believe all the exhibits I used on

E1HFSEK3                    Trial

1      redirect were already --

2                THE COURT:  Not redirect.

3                MR. WHITNEY:  I read all the exhibits I used before.

4                THE COURT:  Subject to checking your exhibit list does

5      the plaintiff rest?

6                MR. WHITNEY:  Could we have the lunch break just to

7      make a determination?  We have no more witnesses.

8                THE COURT:  That's what I said, subject to your adding

9      to your exhibits or going over your exhibit list does the

10     plaintiff rest?

11               MR. WHITNEY:  Yes.

12               MS. HAGBERG:  We just have one question that we wanted

13     to raise with the Court about the spoliation and rebutting the

14     presumption and how you wanted to handle that because some of

15     the exhibits we would have used would have been -- we weren't

16     sure whether you wanted us to do that during the trial itself

17     or you wanted us to do that in briefing afterwards.

18               THE COURT:  I would have thought during the trial

19     itself.

20               MS. HAGBERG:  We have --

21               THE COURT:  I was going to say and I remember you did

22     a couple --

23               MS. HAGBERG:  We have, your Honor, but because it's

24     not clear to us exactly what presumptions they are seeking,

25     it's difficult --

E1HFSEK3                    Trial

1          THE COURT:  That the material that's missing would

2    have been favorable to the defense.

3          MS. HAGBERG:  I'm going to ask, Mr. Whitney had

4    prepared to --

5          MR. WHITNEY:  Sorry, your Honor.  I thought I would

6    address this after lunch.  So Mr. Velie asked in his opening I

7    think five different adverse inferences.  As your Honor states

8    these are permissive inferences not mandatory inferences and to

9    the extent that your Honor chooses to take those adverse

10   inferences we have the right to rebut those inferences.

11         THE COURT:  Correct.

12         MR. WHITNEY:  We believe that none of those inferences

13   should be taken, but in the event that the Court decides to

14   take those adverse inferences we'd like the ability to put into

15   the record exhibits we believe --

16         THE COURT:  You have to do that now.  We're not

17   reconvening this trial.  I'm not going to issue a ruling on

18   this whole trial and have it be a tentative ruling subject to

19   rebuttal.  No, we do it now.  One record, close the record,

20   rule and be done, then there's another Court, but that's it.

21         MR. WHITNEY:  Sorry if I wasn't clear.  When we

22   reconvene from lunch we'll move in any exhibits we have to

23   rebut that presumption.

24         MR. VELIE:  One housekeeping.  Is your practice with

25   respect to summations to have defendant first then plaintiff or

E1HFSEK3                        Trial

1    do you want plaintiff-defendant-plaintiff?

2              THE COURT:  I never do three in civil cases.  That's

3    out.  There's one each.  As to who goes first, it would be the

4    party with the burden of proof goes last.  The problem is that

5    there's a counterclaim here, so to some extent you both have

6    the burden of proof but on the openings who did I hear from

7    first?

8              MS. HAGBERG:  You heard from me first, your Honor.

9              THE COURT:  Then Mr. Velie can go last.  So it will be

10   plaintiff first and then defendant.  That's it.

11             MS. HAGBERG:  Your Honor, would it be possible to take

12   a slightly longer lunch break to prepare?

13             THE COURT:  I want to make sure Mr. Velie has not

14   changed his mind from last night.  Is it still your decision to

15   call no witnesses?

16             MR. VELIE:  Yes, your Honor.  That's our decision.

17             THE COURT:  Okay.

18             MR. VELIE:  I will explain it in summation if that

19   would be helpful to the Court.

20             THE COURT:  That's fine.  As I said yesterday it's

21   completely your call.  Okay.

22             MS. BRILEY:  And, your Honor, we do need to, we did

23   not move our exhibits from yesterday and this morning into

24   evidence yet so at some point we will need to do that.  Now is

25   fine or after lunch?

E1HFSEK3                    Trial

1        THE COURT:  Now is fine.  Let's get the record going

2   so when we get back from lunch, extended lunch break, we can

3   get into summation.

4        MR. VELIE:  One final point, your Honor.  Do you want

5   to hear, when they close, when they say they're done with their

6   case do you want to hear motions then or do you just want to

7   decide the case?

8        THE COURT:  I think you have to preserve your motions,

9   but I sincerely doubt this is a case where any of the claims

10  are going to be disposed of on motion.  What I would usually do

11  in a non-jury trial after all this is reserve decision on the

12  motions, close the case, rule and if I grant it on motion as

13  opposed to decisions it's quite a trivial difference.  You need

14  to preserve them so you need to very briefly state your

15  positions as does plaintiff if they want to move on their

16  counterclaim.  That's all brief.  I'll take that on summation.

17       You were going to read the list of exhibits first then

18  we'll reconvene at 2:30.

19       MS. BRILEY:  DX C, DX E, DX 8Q, DX 8A, DX 8R, DX 8C,

20  DX 8S, DX 8D, DX 8U, DX 8I is, DX 8J.  Thank you.

21       THE COURT:  All right, 2:30.  See you then.

22       (Defendant's Exhibits C, E, 8Q, 8A, 8R, 8C, 8S, 8D,

23  8U, 8I, 8J received in evidence)

24       (Luncheon recess)

25       (Continued next page)

E1HZSEK4

1              A F T E R N O O N   S E S S I O N

2              2:30 P.M.

3              THE DEPUTY CLERK:  All rise.

4              THE COURT:  All right, please be seated.

5              All right, Ms. Hagberg, are you going to --

6              MS. HAGBERG:  I think, your Honor, before we close, we

7      were going to make put in our exhibits, and we'll be quick.

8              THE COURT:  All right.

9              MR. WHITNEY:  I got to get Ms. Fleming.  She has

10     the --

11             MS. BRILEY:  Your Honor, we also would like to enter

12     some exhibits.  I could just go ahead with that.

13             MR. WHITNEY:  Start with the defendant.

14             MS. BRILEY:  DX-3Z, DX-2I, DX-5G, DX-4O, DX-4Q.

15             THE COURT:  What are all of those?  Those were not

16     shown to any witness?

17             MS. BRILEY:  That's correct, these are on our exhibit

18     list and they were not shown to a witness, nor objected to.

19             THE COURT:  That's good, but why are they being put

20     in?

21             MR. VELIE:  We could do it after they rest if you

22     like.  It would be our case.

23             THE COURT:  Say again?

24             MS. BRILEY:  We could wait to explain the basis for

25     these exhibits after they've put in their exhibits and rested

E1HZSEK4

1    and --

2              THE COURT:  That's fine.  All right.  You ready to

3    read your list?

4              MR. WHITNEY:  Yes.  The PTX-1, PTX-15, PTX-44,

5    PTX-103, PTX-130.

6              THE COURT:  Let me interrupt.  Are all of these not

7    shown to any witness.

8              MR. WHITNEY:  No, your Honor.  They're just, they're

9    admissions and they're just statements or facts for the record.

10             THE COURT:  I don't know what that means.  This is an

11   unusual procedure.  I've been doing this a long time.  I don't

12   know what these free floating exhibits are that aren't being

13   shown to witnesses.  What are these?  You said admissions.

14   Some of these statements of --

15             MR. WHITNEY:  Statements of the party opponent.  We

16   would have offered them through the defendant's case in chief,

17   they didn't put one on, so we're just going to offer them into

18   the record in our case in chief.

19             THE COURT:  You said that some of them.

20             MR. WHITNEY:  Well, they're some business records.

21             THE COURT:  Business records of who?  I mean I

22   can't --

23             MR. WHITNEY:  So --

24             THE COURT:  I'm sorry, I'm not about to do the work

25   for you.  If I don't know why an exhibit's in evidence, I can't

E1HZSEK4

 1    deal with it.

 2          MR. WHITNEY:  Sure.

 3          THE COURT:  Whose business records?  How do I know

 4    it's a business record.  You are saying here's 20 things, you

 5    solve the problem.  So I'm not accepting -- I'll accept the

 6    ones that you're calling admissions and only those.  Which are

 7    those?  Those are not in evidence.  Sorry.

 8          MR. WHITNEY:  PTX-15.  And then, your Honor, we have

 9    the documents that we were going to use to rebut the adverse

10    inference.  So that's a separate set that I want to present.

11          THE COURT:  Separate set.

12          MR. WHITNEY:  Yes.

13          THE COURT:  Not some of the ones you started to read?

14          MR. WHITNEY:  No.  I'll give you the separate set.

15          THE COURT:  All right.

16          MR. WHITNEY:  Let me confer with my colleague.

17          So this is PTX-281 and PTX-282.  I'll hand you copies

18    because they're rebuttal exhibits so they weren't on our

19    original list

20          MS. BRILEY:  Your Honor, we object to PTX-282.  This

21    document was created after the relevant time period after the

22    company was sold to plaintiffs.

23          THE COURT:  Yes, but that's not the point.  That would

24    be exactly the appropriate time period, I think.  Your point is

25    certain information was deleted or destroyed, whatever the

E1HZSEK4

1    right word is, in 2000 -- I don't know what 11, 12 or 13.  So

2    of course this policy was in effect then, that is the

3    appropriate time period.

4              MS. BRILEY:  That was our point.  Thank you.

5              THE COURT:  So anyway I'm receiving 281 and 282 in

6    evidence.

7              (Plaintiff's Exhibits 281 and 282 received in

8    evidence)

9              MR. WHITNEY:  Then 279 and 280, which are both

10   admissions.

11             THE COURT:  One second.  Just one second, please.  I'm

12   sorry, what's next?

13             MR. WHITNEY:  279 and 280.

14             THE COURT:  The same issue?  Is this on the same

15   issue?

16             MR. WHITNEY:  These are admissions, your Honor.

17             THE COURT:  Oh, there's admissions?

18             MR. WHITNEY:  Yes.

19             THE COURT:  These are statements of ADI?

20             MR. WHITNEY:  These are statements of the Harts.

21             THE COURT:  Harts.

22             MR. VELIE:  Your Honor, we object to these because

23   they were not on the exhibit list.

24             THE COURT:  Right.  But he's saying he expected there

25   to be a defense case, he was going to use them for rebuttal.

E1HZSEK4

1    There is no way he could.

2              MR. VELIE:  He was going to use them for impeachment,

3    presumably.

4              THE COURT:  Fine.  Impeachment or rebuttal.  Either

5    way, he didn't expect there to be no defense case.  Frankly,

6    neither did I.  You listed a group of witnesses, you said your

7    case would take two days.  We don't play games.  He was going

8    to use these exhibits.  He was not required to offer them in

9    his case in chief.  Now you rested now, he wants to put in,

10   hopefully not too very am, looks like right now there is two of

11   them, 279 and 280.  One is an e-mail from Mr. Hart dated

12   June 23rd, 2010 and one is Mrs. Hart April 12th, 2012.

13             MS. BRILEY:  Your Honor, we do object to PTX-280.

14   Mrs. Hart testified at deposition that she did not write this

15   e-mail.  We have --

16             THE COURT:  That's nice, that's not in the trial

17   record.  I can't take what she said in deposition.  You're

18   welcome to call her.

19             MS. BRILEY:  They're adding it to the trial.

20             THE COURT:  I know.  So you're welcome to call her.  I

21   don't deal with deposition testimony.  I deal with what occurs

22   in my courtroom.  You can call her.  You can call Mr. Besze,

23   you can call any witness you want.  You gave me a whole list of

24   witnesses.  You want to take, her take the stand for one

25   minute, say she didn't write this, that's fine, but then she's

E1HZSEK4

1    open to cross-examination on that issue, but it's up to you.

2              MS. BRILEY:  Just on that issue.

3              THE COURT:  Yeah, take one second.  She doesn't even

4    have to walk up.  Just raise your right hand.

5     LOUISE HART,

6         called as a witness by the defendant,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. BRILEY:

10             THE COURT:  Fine.  Take a look at Exhibit 280.  It

11   purports to be an e-mail from you to you dated April 12th,

12   2012.  It's titled "thoughts on Vince."  Would you read this to

13   yourself and then tell me whether you wrote this e-mail?

14             THE WITNESS:  I did not write this e-mail.

15             THE COURT:  All right.  Have you ever seen it before?

16             THE WITNESS:  I was shown this e-mail during my

17   deposition.

18             THE COURT:  And that was the first time you saw it?

19             THE WITNESS:  That's correct.

20             THE COURT:  All right, thank you.

21             Any questions for the witness on this subject only?

22   CROSS EXAMINATION

23   BY MR. WHITNEY:

24   Q.  Is this your e-mail address, Mrs. Hart?

25   A.  I don't have the paper in front of me.  Yes, it is.

E1HZSEK4                          Hart - cross

1    Q.   Okay.  And does the designation show that it came from your

2    files, the Hart Bates stamp?

3    A.   Well, it's from Louise Hart to Louise Hart, but I didn't

4    write that e-mail.

5              THE COURT:  He means the Bates stamp in the lower

6    right-hand corner, hart and a bunch of numbers.  Does that

7    indicate to you that it came from the files?

8              THE WITNESS:  I have no clue.

9              THE COURT:  You don't know, okay.

10             MS. BRILEY:  We'll represent that it does.

11             THE COURT:  All right.

12   Q.   And is Callback@hotmail.com the e-mail address that you

13   normally use.

14   A.   I do.

15   Q.   And does anyone else normally use that e-mail address?

16   A.   No.

17             MR. WHITNEY:  Your Honor, I think it's pretty clear

18   that this came from Mrs. Hart.  Who else --

19             THE COURT:  She denies it, so that's --

20             MS. BRILEY:  One further question.

21   REDIRECT EXAMINATION

22   BY MS. BRILEY:

23   Q.   Does anyone else have access to your e-mail address?

24   A.   No.  Sometimes my son, who is right there, uses my hot mail

25   account.  And I believe he was the one who wrote that.

E1HZSEK4                          Hart - redirect

1              THE COURT:  Oh, maybe.

2    Q.  But you don't know?

3    A.  I don't know.

4    Q.  Okay, thank you.

5              THE COURT:  Okay, all right.  I'll take it in

6    evidence, but I may choose not to give it any weight in view of

7    the testimony, but it's in evidence.  All right, so 279, 280

8    came in.

9              (Plaintiff's Exhibits 279 and 280 received in

10   evidence)

11             THE COURT:  281 and 282.

12             MS. BRILEY:  No objection to 281, 282.

13             279, we -- this is no objection.

14             THE COURT:  Okay, all right.

15             Now, does the plaintiff rest?

16             MR. WHITNEY:  The plaintiffs rests, your Honor.

17             THE COURT:  All right.  Now, is there anything more

18   from the defense?

19             MR. VELIE:  Yes.  Well, would you like to have the --

20   We have a few motions, your Honor, that we'd like to put on the

21   to the record.

22             The first motion, your Honor, is under 28 United

23   States Code, Section 1927.  As the Court may recognize, this is

24   a motion for sanctions for bringing vexatious litigation.  This

25   case has been an imposition on the Court and of course on the

E1HZSEK4

1    Harts, number one.  Plaintiffs destroyed documents after they

2    had filed their notice of claim.  The Court has already found

3    that this was done willfully.  We're going to show during our

4    summation that this has been -- this has materially impacted

5    and pervaded the case.

6            Number two, the plaintiff's narrative of the case,

7    their basic fact theory, they represented to this Court that

8    the company was noncompliant, but that Mr. Morrissey, aided by

9    Mr. Campo, rode like a white knight to the rescue and fixed

10   everything.  And they knew, they knew, their witness Takemura,

11   who is here, their witness Hugh Fryer, who is no longer here,

12   but still works for the company, they knew that they had cause

13   or fired, caused to be fired or fired Morrissey for total

14   incompetence.  They knew that Campo's views were extreme.  They

15   knew that Morrissey did not know anything about the regs, but

16   had wasted millions of dollars in incompetent efforts to change

17   everything around at the company when it had passed 13 audits

18   and never failed a single one.  I believe that it is an

19   imposition on the court to come in and claim that this guy

20   fixed everything, when they knew he was incompetent, and they

21   fired him for incompetence, and we were able to bring that out

22   on cross-examination.  They never came clean with the Court

23   with respect to this.

24           Number three, they did not furnish --

25           THE COURT:  Wait.  Number three?  I thought that was

E1HZSEK4

number two.

        MR. VELIE:  It was number two.

        THE COURT:  What was --

        MR. VELIE:  First is they destroyed the documents, number two, they represented the Morrissey story as being valid, when in fact they knew it was bogus.

        THE COURT:  Okay.

        MR. VELIE:  Number three, they did not furnish all of their documents to the FDA expert.

        THE COURT:  You mean Ms. Kuehn.

        MR. VELIE:  Yes.

        THE COURT:  Okay.

        MR. VELIE:  Number four, we were forced to fight through two Erb reports, and we're still fighting about this, despite the fact that this Court has held, and it's in a written opinion from the Court, that there are no Femtelle damages; that if they're right about Femtelle, all they get is that they don't have to pay the earn out that the risk of developing Femtelle was on them.  This is plain from the SPA. This Court has already been through all of that in interpreting --

        THE COURT:  What ruling are you discussing?

        MR. VELIE:  When we moved to dismiss the complaint.

        MR. WHITNEY:  The fraud claim, your Honor, not the breach of contract claim.

E1HZSEK4

1          MR. VELIE:  We moved to dismiss everything.  You read

2     the SPA and held that what the SPA held was that the entire

3     risk of getting Femtelle approved and Femtelle marketed was on

4     the plaintiffs, that the risk of failure was on the plaintiffs,

5     and that should there be a failure of Femtelle, well, then the

6     only damages that might be considered for the plaintiffs would

7     be that they didn't have to pay the earn out.  Despite those

8     clear rulings and clear statements in the SPA, we've had to

9     battle at huge expense, which I tell you the Harts cannot

10    afford, to deal with this through repeated Erb reports.  The

11    first one was dismissed when the Court insisted that it be

12    dropped.  That's our first motion, your Honor.

13          The second motion essentially underlies it.  We

14    believe we are entitled to a ruling that it is the law of the

15    case that the risk of developing Femtelle is on the plaintiffs,

16    the risk of getting Femtelle approved is on the plaintiffs;

17    that this is clear from the SPA, and that the only damages are

18    consequences from the failure on the part of Femtelle would be

19    that they don't have to pay the earn out.

20          I think Mr. Kortmansky has another couple of motions

21    to put on the record.

22          MR. KORTMANSKY:  Your Honor, we also seek to strike

23    Mr. Erb's testimony, his methodology of using a hypothetical

24    buyer and a hypothetical seller to determine what the value was

25    at the time of the purchase, then using a reasonable person

E1HZSEK4

1    standard to determine what the purchase price should have been

2    is in direct contradiction of New York law.  And as decided by

3    Judge Stein in Buckley V. Deloitte and Touche, that the opinion

4    of an expert who reaches his conclusion independent of the

5    actual facts must be stricken.

6            In addition, Mr. Erb's methodology does not comply

7    generally with New York law, which requires that contract

8    damages must put a plaintiff in a position it would have been

9    if the contract had been performed as written.  And you can not

10   put the plaintiff in a better position than they would have

11   been based on your damages calculation.  And for those reasons

12   we think that Mr. Erb's report and his testimony regarding his

13   calculations should be struck.

14           Similarly --

15       THE COURT:  Let's just pause there.  When I asked him

16   why he used a hypothetical buyer, hypothetical seller

17   reasonable person, he said he was relying on controlling Second

18   Circuit law.  I didn't ask him to cite the case.  He wasn't

19   here as an attorney.  But, Mr. Whitney, what case was he --

20       MR. WHITNEY:  I'll get the citation for you in a

21   moment.  It's my, unfortunately, my folder is in the jury room,

22   it will here in about a second, it's the Merrill Lynch case,

23   it's black and white Second Circuit law that the damages for

24   breach of representations and warranties is determined by

25   difference between the value of the company as warranted and

E1HZSEK4

1  the value as delivered from the point of view of a knowledgable

2  investor with knowledge of the breaches at the time of the

3  transaction.  It's clear law, in fact the case that Mr.

4  Kortmansky cited in his trial pretrial memo for the point that

5  he's trying to make now actually cites that Second Circuit case

6  as a basis for it's position.

7           THE COURT:  Is that your colleague?

8           MR. WHITNEY:  Yes.

9           THE COURT:  No.  It doesn't happen to be Allegheny, is

10 it?

11          MR. WHITNEY:  Yes, it is actually.

12          THE COURT:  What a memory.  Okay.

13          MR. WHITNEY:  Better than mine, your Honor.  So that

14 is 500 F.3d 171, and I can read the --

15          THE COURT:  Go ahead.

16          MR. WHITNEY:  -- clear part.  This was remanding the

17 district court's decision.  On remand, the difference between

18 the value of GEM -- target company, GEM as warranted and its

19 value as delivered should be calculated.  GEM's value as

20 delivered should reflect any deductions from its purchase price

21 necessary to reflect --

22          THE COURT:  Would you read at a speed that can be

23 taken.

24          MR. WHITNEY:  Sorry, your Honor.  GEM's value as

25 delivered should reflect any deductions from its purchase price

E1HZSEK4

1    necessary to reflect the broken warranties.  In other words,

2    the district court should determine how GEM would have been

3    valued by knowledgable investors at the time of the sale where

4    such investors aware of any breaches proved by Allegheny.  As

5    any such damages are general rather than consequential,

6    Allegheny is required to show reasonable certainty, the fact of

7    damage, not its amount.

8                THE COURT:  Okay, thank you.

9                MR. KORTMANSKY:  Your Honor, Merrill Lynch is not

10   relevant to the proceedings here.  In Merrill Lynch the issue

11   was that the seller had provided fraudulent financial

12   representations.  And, in fact, the gentleman that provided

13   those fraudulent financial representations eventually went to

14   jail as I recall from the case.  And those circumstances,

15   because breach related to fraudulent financial representations

16   which were the sole basis on which the plaintiff in that case

17   determined their purchase price, obviously that breach could

18   not be remedied simply by giving the purchaser what they

19   thought they had actually purchased.  You had to come up with

20   some other valuation for the company in that circumstance,

21   because the financial reps and warranties regarding the

22   finances were false.

23               In our case, there is no allegation -- well, there is

24   an allegation it was false, those rep and warranties are not in

25   the case.  This is a case about a breach of a rep and warranty

E1HZSEK4

1  related to FDA compliance.  And so Mr. Erb relying on Merrill

2  Lynch we think is improper.

3          THE COURT:  Okay.  Your final motion?

4          MR. KORTMANSKY:  Yes, your Honor.  We also believe

5  that Mr. Ulatowski's testimony should be struck as irrelevant.

6  His testimony only went to the success of the 2009 510(k).  And

7  what he testified to was that 2009 510(k) was destined to fail

8  because the company simply could not provide all the

9  information required in time.  He did not testify that Femtelle

10  was destined to fail.  And, in fact, there is no rep or

11  warranty in the contract that requires Femtelle to succeed, nor

12  is there any rep or warranty in the contract related to the

13  2009 510(k).  It's simply irrelevant to the issues in the case,

14  whether the 2009 510(k) would or would not fail.

15          THE COURT:  Thank you.

16          All right.  I'm not going to be ruling on any of the

17  motions.  I'm going to reserve decisions on all of them and

18  rule on the case and the motions at one time.

19          So with that, do you want to respond to the motion or

20  do you want to just handle that in your summations?

21          MR. WHITNEY:  We could handle that in the submissions,

22  your Honor.

23          MS. HAGBERG:  Submission?

24          THE COURT:  Summations.

25          MR. WHITNEY:  Oh.

E1HZSEK4

1          THE COURT:  I wasn't thinking of any more submissions.

2          MR. WHITNEY:  I'm sorry.  Yeah, then I will handle the

3    motions that were just raised.

4          With regard to the first motion brought, 28 U.S.C.

5    Section 1987, the first issue about the destruction of

6    documents, your Honor, I believe that's been decided here.

7    There was a finding, there was sanctions issued, there's a

8    motion pending for fees.  I don't see how that impacts the rest

9    of the case.

10          With regard to the characterization of Mr. Morrissey

11    and Sekisui's knowledge of Mr. Morrissey, all that testimony

12    came out through the testimony of Hugh Fryer where there was

13    clear animus between the two witnesses.  I don't think that

14    necessary reflects Sekisui's view and it certainly doesn't

15    represent the facts of the case and the credibility of Mr.

16    Morrissey.  We believe Mr. Morrissey is a credible witness and

17    we -- clearly the issues that he found at the time he came on

18    in 2010, which is what we're dealing with here, is separate

19    from anything that had arisen over the next year or two after

20    that, which is when the dispute between Mr. Fryer and Mr.

21    Morrissey arose.

22          The issue, the testimony they're referring to from

23    Mr. Fryer was occurred late in 2011, early 2012, different time

24    period; in fact, dealing with different Campo reports that were

25    not even included in the record because your Honor had excluded

E1HZSEK4

1    them.  They are not referring to the May and June Campo reports

2    that are in the record.  They're referring to subsequent

3    reports that were not part of the record here today.

4            In terms of the argument that documents were not

5    furnished to Ms. Kuehn, clearly Ms. Kuehn was unaware of

6    certain documents as a result of her testimony.  Candidly, it's

7    illogical that plaintiffs would have not provided documents to

8    their expert and then provided it to the defendants on the

9    hopes that somehow plaintiff's expert would testify and

10   defendants would, I don't know, miss those documents or

11   something like that.  So from a logical standpoint, there's

12   clearly no animus or misconduct, willful misconduct here.

13           And the force to fight through two Erb reports, I

14   don't understand that argument because Mr. Erb testified.  His

15   testimony was credible.  He's a qualified witness.  And they

16   didn't call any rebuttal damages expert or anything like that

17   in response to Mr. Erb's report, certainly not a supplemental

18   report.  So Mr. Erb's testimony is part of the record and he's

19   a credible witness.  And the fact that they had to deal with

20   his report is how it worked, you know, that's how litigation

21   works.

22           THE COURT:  I think you missed the point of that

23   argument entirely.  The point of that argument is if his report

24   is based on an inappropriate legal assumption, the wrong legal

25   standard, then none of it makes any sense because he applied

E1HZSEK4

1    the wrong standards.  So it has to do with the debate, which is

2    we just went through about whether Merrill Lynch versus

3    Allegheny is the right standard or not the right standard in

4    this breach of warranty representation case as opposed to fraud

5    case.  That's the point.  If you applied the wrong methodology,

6    the whole thing should fall.

7         MR. VELIE:  Your Honor, excuse me.  Exactly it's the

8    Femtelle argument.

9         THE COURT:  I started to say --

10        MR. WHITNEY:  I'm sorry, I had a different issue.

11        THE COURT:  Femtelle argument.

12        MR. WHITNEY:  So the law of the case argument, your

13   Honor, they're referring to the motion to dismiss opinion that

14   was issued in response to fraud claim that we had alleged on

15   Femtelle.  The Court's decision actually at one point

16   explicitly noted that the fraud claim was duplicative of the

17   breach of contract claim and that's why the fraud claim was

18   dismissed, obviously leaving open the possibility of bringing a

19   breach of contract claim for Femtelle which is what was done

20   here.

21        In addition, the Court was not dealing with the issues

22   that Mr. Velie is looking to have the ruling focus on now, it

23   was dealing with whether or not there was an action for fraud

24   for Femtelle, which is separate whether there is action for

25   breach of contract.

E1HZSEK4

1          Further, the ruling with regard to whatever Mr. Velie

2     is looking to hold with regard to risk, clearly that was risk

3     of Femtelle not taking it to market.  Clearly whatever risk

4     that Sekisui was absorbing that Femtelle making it to market

5     was with the assumption that the representations and warranties

6     in the stock purchase agreement are true.  If the

7     representations and warranties were false, then we're entitled

8     to damages for the consequences of that falsity.

9          THE COURT:  I think you're moving over now to his

10    motion with respect to Mr. Ulatowski, because he's saying Mr.

11    Ulatowski's testimony that the 2009 Femtelle application was

12    destined to fail is irrelevant to anything here.

13         MR. WHITNEY:  I thought Mr. Velie was arguing that the

14    risk of failure was on Sekisui.

15         THE COURT:  He was.  But then you began I thought to

16    move over to the notion that the 2009 510(k) with respect to

17    Femtelle.

18         MR. WHITNEY:  I will certainly address that.  Just to

19    finalize this point, we're not arguing, your Honor, that the

20    failure to reach, to have Femtelle in the market in and of

21    itself is a breach or that that was the defendant's

22    responsibility.  We're arguing that the defendants did not have

23    the mandatory or the required clinical data or the design

24    history file that the FDA wanted in order to clear Femtelle in

25    2007 and 2009.

E1HZSEK4

1          THE COURT:  And therefore what?

2          MR. WHITNEY:  And, therefore, Femtelle was unable to

3    make it to market as a result of that breach of representation

4    and warranty, 4.1(c).  So it was the resulting damage from the

5    breach of representation and warranty that caused the harm to

6    Femtelle.  But for that breach, you know, Femtelle should have

7    been able to make it to market since that was the impediment.

8          With regard to Mr. Ulatowski.  Again, Mr. Ulatowski

9    testified that Femtelle's 2009 application was destined to

10   fail.  The 2007 application failed, as the facts showed,

11   because in part it didn't get approval because it lacks the

12   necessary clinical data in order to reach 510(k) approval.  The

13   ADA asked for it, the Harts spent years looking for it.  They

14   didn't have it.  They didn't do the test themselves.  It was

15   done in Germany and they didn't have the clinical data, and

16   they couldn't satisfy the FDA's concerns.  They refiled the

17   application in 2009.  Again, the FDA came back and said we

18   need --

19         THE COURT:  I know.  We should get to the point.  He

20   said it's not relevant to an issue in the law so --

21         MR. WHITNEY:  It is relevant because --

22         THE COURT:  To what, just tell me what issue?

23         MR. WHITNEY:  Because that the Harts represented they

24   had all clinical data for product.

25         THE COURT:  I'm sorry, not tying it to the 2009 510(k)

E1HZSEK4

1    submission which he testified was destined to fail.  To what

2    issue is that so?

3         MR. WHITNEY:  It's relevant to the -- I'm sorry, maybe

4    I miss --

5         THE COURT:  Ulatowski's opinion.

6         MR. WHITNEY:  Is relevance -- I'm sorry.

7         THE COURT:  The 2009 FDA application, 510(k)

8    application for Femtelle is destined to fail, to what issue is

9    that relevant, his opinion?

10        MR. WHITNEY:  His opinion is relevant to breach of

11   4.14(c).

12        THE COURT:  Thank you.  All right.

13        MR. WHITNEY:  Sorry.  And the basis of Mr. Ulatowski's

14   opinion in 2009, and the fact that the company couldn't get the

15   data.

16        THE COURT:  I don't need to hear all that.  I'm sure

17   it's going to be in summation.  I just wanted to hear to what

18   issue you thought the opinion was relevant to, because Mr.

19   Velie said or Mr. Kortmansky said it's not relevant to any

20   opinion and the issue in the case.

21        MR. WHITNEY:  That is the issue to which it is

22   relevant, your Honor.  Oh, that's correct, your Honor, it's

23   actually also relevant to their counterclaim, which is that we,

24   that Sekisui did not use commercially reasonable efforts to

25   get --

E1HZSEK4

1          THE COURT:  That's what I thought the answer was,

2     but --

3          MR. WHITNEY:  But, your Honor, principally it's

4     related to affirmative claim 4.14(c).

5          THE COURT:  Okay.

6          MR. WHITNEY:  We talked about Mr. Kortmansky's

7     argument with regard to Mr. Erb's methodology.  We submit

8     that's the proper --

9          THE COURT:  You already told me that.

10         MR. WHITNEY:  And one item I didn't note, by the way,

11    is that in the defendant's submission to the Court on

12    September 16th, 2013 in a letter signed by Mr. Velie, he states

13    that breach of contract, quoting, citing to Aroneck V. Atkin,

14    he notes that breach of contract damages are based on, quote,

15    what knowledgable investors anticipated the future conditions

16    and performance would be at time of alleged breach.  So the

17    defendants agree with the position several months ago, and now

18    seem to claim otherwise.

19         THE COURT:  Okay.  As I said before, I'm going to

20    reserve decision on all of these motions and reach all at once.

21    Thank you.

22         All right.  Now, are we ready for summation?

23         MR. WHITNEY:  We have one motion, your Honor.

24         THE COURT:  And what is your motion?

25         MR. WHITNEY:  Well, we don't know if defendants have

E1HZSEK4

1    rested their case yet.  That was we were waiting for.

2              MS. BRILEY:  We just wanted to enter three exhibits

3    into the record.  One is marked as defendant's Exhibit 4Q, it

4    is from the FDA website and it contains definitions of the

5    inspection classifications.  Mr. Velie used it on voir dire of

6    Ms. Kuehn.

7              THE COURT:  Okay.

8              MS. BRILEY:  And the other two are party admissions

9    from plaintiffs and they are DX-3Z and DX-2I.  They were on our

10   exhibit list and were not objected to, but I can show them to

11   plaintiffs.  If they would like to dispute their --

12             THE COURT:  What are they, what do they go to?

13             MS. BRILEY:  They go to the claim regarding expired

14   raw materials and the claim regarding the Femtelle batch

15   records or the design history file.

16             THE COURT:  Okay.

17             MR. WHITNEY:  Your Honor, I mean they're statements of

18   employees.  I don't know they're corporate admissions of the

19   company.

20             MS. BRILEY:  Business records at any rate.

21             THE COURT:  Probably both, all right.  I think they're

22   admissions.  You don't need to be a senior person, you need to

23   be an employee acting in the scope your employment, that's all

24   you need for admission.

25             MR. WHITNEY:  Okay, your Honor.

E1HZSEK4

1           MS. BRILEY:  Thank you.

2           THE COURT:  So both are received.

3           (Defendant's Exhibits DX-3Z and DX-2I received in

4  evidence)

5           THE COURT:  I have to say to both sides that you're

6  going to need to, each side prepare a list, a list of all the

7  exhibits that were received in evidence from your side and

8  either put them on a new disk or new notebook.  The defense

9  certainly doesn't need to do any more photocopy, but I don't

10 think plaintiffs do either given all the books they've given

11 me.  I want you to give you back all your notebooks, and then

12 just submit one set of exhibits with the table of all the

13 exhibits received from your side and a copy of each exhibit,

14 either on the disk or hard copy.  Pretty much got it on hard

15 copy, but that's -- I can't do that.  I don't have the staff to

16 do that effort.  So after the trial just go through all these

17 lists of exhibits received and do it, all right.  I'd like that

18 earliest possible time.  I would think one day next week.

19          MR. KORTMANSKY:  We can get that for you by Tuesday or

20 Wednesday next week.

21          THE COURT:  I'll give you the benefit of the doubt.

22 Close of business Wednesday if both sides could submit the list

23 of exhibits and copies, that would be great, all right.  I

24 don't think I need any more submissions in this case.  You both

25 submitted proposed findings of fact and conclusions of law.

E1HZSEK4

1    The only thing that would be helpful to the Court is to

2    resubmit the very same piece of paper annotated, so where you

3    have a proposed finding of fact or conclusion of law, you could

4    put, paren, see exhibits ABC, or see transcript pages ABC, so

5    to annotate the proposed finding of fact and conclusions of law

6    I often want post trial.  I don't want more arguments and more

7    briefs.

8            MR. VELIE:  Your Honor, we understand that.  However,

9    some of the things that we can invite you to find as

10   conclusions, findings of fact we learned on cross-examination,

11   they were not in our prior submission so.

12           THE COURT:  Then you can each put in supplemental

13   proposed findings of fact.

14           MR. VELIE:  Thank you, your Honor.

15           THE COURT:  Conclusions of law along with the

16   annotated finding of fact and conclusion of law that you

17   submitted pretrial, but again I don't want this to take very

18   long.  I want this to remain fresh in my mind.  So can you get

19   in the proposed supplemental finding of fact and annotated had

20   findings of fact by no later than two weeks from today, I mean

21   it's more than I want to give but no later than two weeks from

22   today?  Today is January 17th, so no later than the 31st and

23   earlier if you can that would be fine, but no argument, no

24   reason to respond to each other, just annotate any supplemental

25   proposed findings or conclusions and annotate previously

E1HZSEK4

1    submitted, by no later than the 31st, all right?

2              MS. HAGBERG:  Yes, your Honor.

3              THE COURT:  Now, are we ready for summation?

4              MR. WHITNEY:  Now we have our motion if defendants are

5    resting.

6              THE COURT:  Do the defendants rest?  Do the defendants

7    rest?

8              MR. VELIE:  Yes, your Honor.

9              THE COURT:  What's your motion?

10             MR. WHITNEY:  We would move for judgment as a matter

11   of law, your Honor, on their counterclaims.  They've offered

12   really no proof to support either of their claims.

13             THE COURT:  They have two.

14             MR. WHITNEY:  They have two.  One we never even heard

15   of in this entire case.

16             THE COURT:  What's that?

17             MR. WHITNEY:  It's a claim that the notice, the claim

18   notice was deficient for the escrow.

19             THE COURT:  I thought maybe that was being abandoned.

20   Was that?

21             MR. KORTMANSKY:  Your Honor, there is no point in

22   pursuing that claim any more because of the proceedings, so.

23             THE COURT:  That's what I thought.

24             MR. WHITNEY:  So that one -- the second counterclaim,

25   the commercially reasonable efforts, your Honor, commercially

E1HZSEK4

1    reasonable efforts is an objective standard that needs to be

2    established as to what framework it should can be evaluated in.

3    Defendants have not done that.  They've not offered any expert

4    testimony of anyone in the industry or anything that could

5    replace that to show what a commercially reasonable effort to

6    bring Femtelle to market could be and what, how Sekisui's

7    conduct could be compared against that standard.  And so we

8    submit that we would cite to in MBNA Insurance Corp. versus

9    Patriarch Partners, which give the Lexis site is 2013 U.S.

10   District Lexis 81473 at 141 for support, and that there the

11   defendant's counterclaim should be dismissed as a matter of

12   law.

13              MR. VELIE:  I can address that in 30 seconds, your

14   Honor.  I'm looking at the SPA on page 18.  And if I remember

15   correctly, it's 2.6(d)(1).  It's on page 18.  It not only says,

16   as Mr. Whitney points out, undertake commercially reasonable

17   efforts to market and sell or cause the marketing and sale of

18   the Femtelle product, including providing commercially

19   reasonable personnel technical and financial resources

20   therefore, and submitting to the FDA an analogous nongovernment

21   and so on, it does however say, not willfully take any actions

22   or omit to take any actions, with the intent to prevent

23   business from meeting with Femtelle targets.  And as the proof

24   was abundantly clear, they withdrew a pending Femtelle

25   application.  We believe the proof clearly shows that they did

E1HZSEK4

1    that to avoid an audit or possibly for tax reasons, but what's

2    most important is they omitted thereafter to ever offer

3    Femtelle to the FDA again, or to market it in any fashion, that

4    this was done despite the fact that they put in their own

5    report to their own auditors an 80 percent chance of success of

6    getting it approved and marketed.

7         THE COURT:  Okay.  As I say, I'm going to reserve

8    decision on all motions.  I think we're ready for summation.

9         MS. HAGBERG:  Yes, your Honor.  Your Honor -- okay?

10        THE COURT:  Yes.

11        MS. HAGBERG:  Defendants have had three themes since

12   this case began back in the very beginning.  The first is that

13   we didn't do it, and the second is that we did it, it wasn't so

14   bad, and the third is even if we can't prove one or two, that's

15   because they threw away all of the documents that it would have

16   proved our case.

17        Plaintiffs have shown during the last five days that

18   none of those arguments is true, and I'd like to address them

19   in the order I just listed them.

20        First, defendant's argument that we didn't do it.

21   Defendants argued in there opening that conditions at the

22   company had to be okay because ADI has been inspected and

23   audited a number of times in the period from 2004 to 2011.

24        But defendants also argued that the only thing the

25   Court would hear from plaintiffs would be general anecdotal

E1HZSEK4

1    statements about noncompliance.  The documents and evidence

2    that we presented, however, showed that that was just not the

3    case.  The documents painted a picture of a company that was

4    lacking the rudimentary fundamentals of compliance.

5         Now, Mr. Morrissey, who spent decades in the medical

6    device field, including being senior head of manufacturing at

7    Siemens, arrived at ADI in March, 2010.  And he explained all

8    of  the problems that confronted him when he arrived, and that

9    those problems even in the first weeks were so pervasive and

10   systemic, that they affected hundreds of the products that were

11   on the market.  He commented that those problems resulted from

12   the lack of knowledge of FDA regulations at the company, the

13   lack of proper documents to support products that were

14   currently on the market, and the fundamental disregard or lack

15   of knowledge of how a company should be run in order to meet

16   the regulatory structure that applies to medical device

17   manufacturers.

18        And I don't think there is any dispute in this case

19   that 21 CFR 820 and its sub parts applies to ADI.

20        So Morrissey arrives on his first day of work.  He

21   goes in the office that gets assigned to him and he finds this

22   pile of records.  And this is his story.  He picks them up, he

23   does an initial review and he sees they're out of

24   specification.  They reveal the use of expired materials, and

25   they didn't reflect the proper quality control oversight.  And

E1HZSEK4

```
 1    if you would put up 158.  He said I discovered batch records

 2    that had data in them that didn't meet specification.  I found

 3    that a number of raw materials had been expired.  I reviewed

 4    records that weren't approved or QA released before they went

 5    into the market.  And why is that a problem?  It's a problem

 6    because the regulations require that product is released by QA

 7    before an IVD goes into the market to ensure that they meet

 8    specifications.  And Ms. Kuehn, and I believe also Mr. Fryer

 9    testified and maybe even Ms. Gaikwad, that these products we're

10    talking about are testing products.  They go to clinics, they

11    go to hospitals and doctors, clinicians use them to determine

12    whether a patient needs a certain treatment, a certain

13    medication, and Mr. Morrissey took those responsibilities very

14    seriously as you saw, your Honor.

15            He further described those records a little later in

16    his testimony.  He stated that there was a stack of probably 70

17    or 100 records in his office of product that was out in the

18    field that hadn't been processed appropriately.  And yes, your

19    Honor, he didn't do a recall, and defendants make a big deal

20    about that.  But they suspended the product release and they

21    waited until they could confirm that the product could be

22    released before they let it out into the market.  And

23    defendants try to say that's no big deal.  But they don't know.

24    No one could tell what the qualifications of the product were

25    and what the impact that they might have of false diagnosis or
```

E1HZSEK4

1    anything else. And releasing product, IVD product that
2    contains expired materials is a huge issue. A product that has
3    materials is expired materials is considered adulterated under
4    21 U.S.C. 321 and the other provisions following. So that
5    action alone constitutes a breach of three of the four
6    representations and warranties in the SPA that defendants
7    breached. And to say that that is not a material breach is
8    not, has not been disputed by the defendants to cross
9    examination of Mr. Morrissey, Mr. Fryer and Ms. Kuehn. Efforts
10   by defense to say, well, FDA didn't know this or INTERTEK still
11   passed us are unavailing. And just to reduce this to a very
12   simplistic analogy. If I'm driving 80 miles an hour in a
13   30-mile zone, I'm not compliant with the speed limit, and the
14   fact that I don't get caught that doesn't make a difference.
15   And Mr. Ulatowski and Ms. Kuehn said that a company has an
16   obligation to comply with the regulation. It's not a matter of
17   whether someone notices the noncompliance or not. It's a
18   matter of whether you are compliant. And Ms. Kuehn put the
19   slide up with management control in the center and said
20   management, and that's at the executive level.

21            THE COURT: Well, the difference between your analogy
22   and what happened here is if you're going 80 in a 30-mile zone
23   and you don't get caught, that doesn't mean you were compliant
24   with the speed limit. But here you actually have inspections
25   and audits where people come from the outside and are looking

E1HZSEK4

1    at all parts of the company and interviewing people, reviewing

2    records and using their eyes and ears and actually looking to

3    evaluate those very areas of compliance, and then they don't

4    find something wrong.  So it's a little different than the fact

5    there was no policeman in your speed zone.

6         MS. HAGBERG:  I understand, your Honor.  But I think

7    my analogy is more to the point.  The fact that you know they

8    come in, they spend a day, they spend two days and they don't

9    find anything.

10        THE COURT:  I don't know.  Two days is a lot of time.

11        MS. HAGBERG:  But each one of these reports, and by

12   that I mean the main ones, the FDA inspection, they did find

13   violations.  They did find deficiencies.  And so they didn't

14   get a clean record, and they didn't pass.  And so to say so

15   what, they improved it, they improved the things that were

16   identified when the FDA was there.  But that didn't mean there

17   weren't other problems that FDA didn't notice.  And in fact our

18   fact witnesses who were at the company during the entire

19   relevant time period said this is this was the way the company

20   operated, and it's driving force was to get the product to the

21   customer, as quickly as possible.  And there is an exhibit

22   PTX-187.  And again I'm reading this, you know, without the

23   context of Mr. Hart, but he's saying there is a back order on

24   885, so we're looking sales --

25        THE COURT:  Wait, I'm sorry.  Where are you?

E1HZSEK4

1              MS. HAGBERG:  Sure.

2              THE COURT:  I don't know where you're reading.

3              MS. HAGBERG:  It says the first sentence, I've been

4    look at the back order situation.

5              THE COURT:  Oh.

6              MS. HAGBERG:  So he says yes, you know, users need

7    this.  But he also says if we can't make a perfect or

8    sufficiently perfect 885, then at least surely we could stock a

9    less than perfect but acceptable one.  And Ms. Gaikwad said,

10   this is the way the company was run.  Your Honor, it wasn't

11   until Mr. Morrissey came in who had 35 or whatever years of

12   background in FDA compliance, that the individuals who worked

13   at ADI were, came to understand that they weren't doing

14   business the way they should have been.

15             THE COURT:  You know, you make light or you did

16   through when Mr. Whitney's motion, Dr. Fryer's criticism of Mr.

17   Morrissey as if to say, well, those guys were just in a

18   personal feud.  But Fryer was an impressive witness.  He had a

19   lot of credentials.  And he, frankly, thought that Morrissey

20   was an extremist and he was misinterpreting the regs and he had

21   developed some super super perfection standard that was not

22   appropriate.  He said you don't know anything about what you're

23   writing about.  I mean, you're asking me to ignore that to say

24   oh, boys will be boys and they're just fighting and, you know,

25   that's how guys are.  But, you know, and I understand.  But

E1HZSEK4

1    Fryer has credentials, and he was serious about his criticism

2    at the time.  He said Morrissey is way out and he doesn't like

3    when he's involved with Campo, who is also way out.  And there

4    are real documents at the time of the Christmas correspondence

5    and just after New Year's where really points out this is not

6    the standard, this is not a standard you're -- you know, you're

7    sort of having a -- you know what a rule book strike is -- sort

8    of a rule book strike, you're setting a standard nobody meets,

9    it's super perfection and its costing us millions and wasting

10    our time.  You're saying to me don't pay attention to Fryer's

11    criticism, it was just a spat.  I have trouble with that.

12        MS. HAGBERG:  But, your Honor, in context I'd like to

13    put that in date context if I may.

14        THE COURT:  Well, I know the spat wasn't until

15    December of 2011, January 2012.  But basically he's saying

16    Morrissey shouldn't be trusted, he was a bit of a nut and he

17    teamed up about this guy Campo who he then went off with to

18    make money, neither of them knew what they were doing really

19    and they were extremist just off the spectrum.

20        MS. HAGBERG:  You did hear Mr. Morrissey's testimony.

21        THE COURT:  I did.  But if I weigh way Morrissey

22    versus Fryer, that's what I'm left with.  I will have to do it.

23    One of them is credible on that issue, maybe the other one

24    isn't.

25        MS. HAGBERG:  I think the other thing that's important

E1HZSEK4

1    to realize about that testimony, your Honor, is that there had

2    been subsequent, the notice letter goes out in October 2010,

3    and as you recall --

4           THE COURT:  I'm sorry, which notice letter?

5           MS. HAGBERG:  The notice letter under the SPA that,

6    letting plaintiff, defendants know about the claim.

7           THE COURT:  Oh that, yes.

8           MS. HAGBERG:  So in the spring of 2010 when Mr. Fryer

9    first starts working with Mr. Morrissey, he's working with Mr.

10   Morrissey and Mr. Campo together and they're trying to come up

11   with a plan to fix the company.

12          THE COURT:  Yes.

13          MS. HAGBERG:  There is no, there was no objection at

14   that time by Mr. Fryer to what Mr. Campo or Mr. Morrissey was

15   doing.  Two more reports come out that where they were

16   excluded, your Honor, because they, by that point Mr. Campo had

17   been retained by --

18          THE COURT:  I --

19          MS. HAGBERG:  -- morgan Lewis.

20          THE COURT:  I remember.

21          MS. HAGBERG:  That starts a fight in the company, as

22   Mr. Fryer acknowledged, and it was who was going to be able to

23   take over the lead of the company.  And on rebuttal, Mr. Fryer

24   stated that in fact, Mr. Morrissey's knowledge of compliance

25   was significantly more substantial than his, and he stated --

E1HZSEK4

```
 1              THE COURT:  He back tracked and tried to save the day.
 2     But I can't discount his written contemporaneous documents.  I
 3     can't discount the fact Mr. Morrissey was in fact terminated
 4     and terminated based on alleged incompetence.  And he then in
 5     the throws of litigation wants to rehabilitate him and say, oh,
 6     he knows so much about compliance, when earlier he said he was
 7     an idiot who didn't know what he was talking about.  I'm just
 8     saying it's not an easy argument that you have in terms of the
 9     credibility of Morrissey, but -- okay, I didn't really mean to
10     interrupt.  I just wanted to have the question and answer
11     opportunity and I had it.
12              MS. HAGBERG:  And I would just go onto add that
13     regardless of the fight that's going on there, there are
14     contemporaneous records, there are batch records, there are --
15              THE COURT:  Oh, of all the deficiencies.
16              MS. HAGBERG:  Of all --
17              THE COURT:  Oh, sure, we'll get to that.
18              MS. HAGBERG:  That existed in that time period.
19              THE COURT:  For sure.  And your witness --
20              MS. HAGBERG:  Miss Gaikwad.
21              THE COURT:  Kuehn, certainly collected all that.
22              MS. HAGBERG:  Yes, your Honor.  So regardless of
23     whatever caused those December Christmas day New Year's
24     e-mails, there is that fact evidence that shows, and Ms. Kuehn
25     pointed out where there were deficiencies.
```

E1HZSEK4

1           THE COURT:  Yes.

2           MS. HAGBERG:  And it doesn't have to be --

3           THE COURT:  I think that would bring us inevitably to

4    materiality, because I don't know what Mr. Velie plans to say

5    in summation, but there certainly were deficiencies at least

6    I'm convinced, there were areas of things weren't perfect

7    that's for sure.  I think he's going to end up arguing

8    materiality, but we'll see.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. HAGBERG:  But I just want to point out one other

2        point, your Honor, that we think is kind of a theme and

3        critical here, is that as Ms. Kuehn stated, that Section 820 of

4        Title 21 of the CFR, it applies to every product every time.

5        So it's not as if you can squeak by or you can get some product

6        out and if it's got a problem, you know, okay, well most of

7        it's okay.  That's not what the standards require.  And I think

8        all of our witnesses with knowledge and in particular, Mr.

9        Ulatowski, had said why the FDA takes this so seriously.

10             So if I could show Plaintiff's Exhibit 213.  So these

11        are the problems that were identified by Mr. Morrissey after he

12        had been in the office for a relatively short time and the

13        actions that needed to be improved, all of the different areas

14        of the company that needed to be improved.  And again, your

15        Honor, I don't think that defendants have successfully shown

16        that each one of these separate categories of problems that

17        Ms. Kuehn defined is not material.  I think that they have made

18        a general blanket statement and tried to challenge it on a

19        pretty superficial high level, but when you look at each one of

20        these problems and the documents that we have submitted to

21        support them, I believe that defendants have not made any kind

22        of a defense that the company was acting within the

23        requirements of 820, of Section 820.

24             So if we could put up PTX 235.

25             THE COURT:  If they were out of compliance with 820,

1   then what was their duty under the SPA to disclose that?

2          MS. HAGBERG:  The breaches of reps and warranty, your

3   Honor, are in 412, 414(a), well, the reps and warranties I

4   should say were in 412, 414(a), 414(c) and 414(d).

5          THE COURT:  And did one of those talk about being in

6   compliance with FDA regs?

7          MS. HAGBERG:  Yes, they did, your Honor.  And I'm just

8   trying to find it here in my outline.  414(a), your Honor,

9   under 414(a), Harts warranted that since January 1, 2006 ADI

10  has been in compliance -- I'm paraphrasing -- in all material

11  respects with all applicable laws, and laws is a pretty broadly

12  defined term in the SPA and certainly includes CFR regulations.

13  It would also be a breach of 414(c) and I would submit a

14  material breach because 414, in that provision the Harts

15  warranted to all records relating to the company's products

16  including design history files, medical device reports, data

17  relating to non-clinical and clinical testing have been

18  maintained in accordance with, quotes, "sound business

19  practice."  But, again, as it turned out that was just not the

20  case.  Again, your Honor, this warranty applied not just to the

21  core products or the products that were then on the market but

22  it also applies to Femtelle.

23         THE COURT:  You're using the word Femtelle?

24         MS. HAGBERG:  Products is defined in another section

25  of the agreement, your Honor.

E1HFSEK5                         Summation - Ms. Hagberg

1                THE COURT:  And uses the word Femtelle?

2                MS. HAGBERG:  I'm sorry, it doesn't use the word

3      products but it's a pretty broad -- can we put up the

4      definition of products?  I can't give you the citation.  I'm

5      sorry, we'll put it in a --

6                THE COURT:  All right.

7                MS. HAGBERG:  And as we've seen there are categories

8      of documents that didn't exist or weren't in the form that they

9      needed and the witnesses testified about the lack of batch

10     records or batch records that had information scratched out,

11     they were missing expiration dates there were no design history

12     files, there were maybe pieces here and there but nothing in

13     the context to fit what a design history file is supposed to

14     disclose.

15               And Harts also warranted and this is also relevant to

16     the breaches that under 414D no products had been misbranded or

17     adulterated within the meaning of the federal Food Drug and

18     Cosmetic Act of 321 and that also since January 21, 2006 they

19     had not received any correspondence or other communication from

20     FDA, the subject matter of which could be reasonably expected

21     to have a material adverse effect.

22               THE COURT:  Since when?

23               MS. HAGBERG:  Since January 1, 2006.  That's why the

24     relevant time period is January 2006 to the end of 2009.

25               THE COURT:  And what disputes that?  What did they

1    receive since January 1, 2006?

2         MS. HAGBERG:  There was correspondence with FDA about

3    Femtelle during this time period that was not disclosed.  And

4    there was also, your Honor, under the first part of 14(d) as I

5    stated a few minutes ago if a product is released on the market

6    and it has expired materials or doesn't have the proper

7    documentation then it's considered adulterated and that would

8    be a breach and we would submit that there's no question that

9    that's a material breach of 414(d).

10        I skipped ahead there.  I just want to make sure I

11   don't have anything else.

12        THE COURT:  All right.

13        MS. HAGBERG:  And just in terms of, again, on

14   expiration dates, your Honor, Mr. Fryer who joined the company

15   in 2006 testified during the trial that, quote, and maybe you

16   could call this up, page 271 at lines 23 to 25?  He said we

17   made what we considered to be educated guesses on what the

18   expirations were.

19        We also heard about problems with the quality system

20   and the lack of overall implementation of that system.  And we

21   heard witnesses say we have significant deficiencies in our

22   quality system.  Mr. Morrissey in PTX 172 stated, "We had the

23   issues with batch records and using expired materials but we

24   also had no CAPA system.  So we weren't investigating technical

25   and customer issues."

E1HFSEK5                    Summation – Ms. Hagberg

1        I'm sorry, your Honor, he's looking at PTX 172 and

2   that's from the transcript at page 168 lines 19 to 23.

3        Mr. Ulatowski also testified about the importance of

4   quality system regulation.  And this is in the transcript at

5   page 427, lines 20 to 428 lines 1 and 2.  And he stated, he

6   explains that regulation speaks to the design process for a

7   medical device and that the regulation moves into the

8   requirements regarding manufacturing of the device and also

9   addresses the marketing of the device, monitoring the device in

10  terms of complaints and problems.  And basically it covers a

11  life cycle of a medical device.  And so these documents are not

12  something that if they don't exist or if they're not complete

13  or that they're missing portions of them or that they have

14  blanks that they can be considered to be, well, it's a little

15  off but not so much that it's a material breach.

16       Another problem was the lack of training as required

17  by 31 CFR 820.  Both Ms. Gaikwad and Mr. Fryer testified that

18  when they got there they were handed a stack of forms, the GEN

19  41, other forms that were introduced into evidence and

20  testified about during the trial this week, your Honor, and

21  they sat down at the table and read them.  Mr. Fryer, although

22  he had a very impressive legal background and had worked in a

23  couple of life sciences companies, he had spent a few years

24  prior to joining ADI as a carpenter and the six months or a

25  year before he had worked as a medical writer.  And so he

E1HFSEK5                        Summation - Ms. Hagberg

1    really had no knowledge of what the regulations require.  He

2    went through it very quickly, your Honor, but he said I was a

3    carpenter and then I was a medical writer.  So he spent this

4    time period and he comes in, he's a research scientists and

5    he's given these documents and said okay, go develop products.

6    Bhavna Gaikwad said the same thing; I was given these documents

7    I was told to read them, but there was no QSR system, no detail

8    and specific procedures, there was just a series of other

9    documents that were unclear and gave no guidance of the

10   specific procedures and processes for which they were intended.

11          Ms. Gaikwad testified at 524, lines 5 through 10 --

12   can you put the question up there too, Mr. Fisher?

13   "Q.  Did Ms. Ayres have meetings with employees where she tried

14   to talk about training?

15   "A.  Yes.  There used to be a group of individuals who used to

16   be called, typically a training used to be reading the SOP in

17   front of a group of individuals and if anybody had any

18   questions they were supposed to ask -- I don't know, none of

19   the employees felt that the training was sufficient enough to

20   apply it on their daily job."

21          We also heard from Mr. Fryer about the lack of DHF's,

22   design history files, and those are required under 21 CFR

23   820.30 and defendant specifically represented that they had

24   those in Section 4.1(c), 414(c) of the SPA.  Mr. Fryer and

25   Ms. Bhavna Gaikwad both testified that in the absence of any

E1HFSEK5                    Summation – Ms. Hagberg

1      forms and any direction from management they both kept notes in

2      their laboratory notebooks.  They followed no procedure or

3      protocols and working on the research and development of new

4      product.  Ms. Gaikwad explained, well, sometimes there was a

5      system in place but it wasn't a hard and fast rule.  Sometimes

6      people wrote, sometimes people did not write.  I mean, there

7      was nothing like somebody supervised that or was wanting that

8      the lab notebooks were looked at.  And she said the conditions

9      remained that way from 2002 when she joined the company until

10     after the acquisition.

11            Mr. Fryer testified that design history files did not

12     exist and they couldn't be found and as a result in 2010 he and

13     several members of his group had to create those design history

14     files.  He testified that because it was such a massive

15     undertaking the company prioritized recreating the DHF's in

16     2010 and he worked with a number of people at the company to

17     prioritize the review based on need in the marketplace as well

18     as the volume of sales that were had for each of these

19     products.

20            Fryer also reviewed for us, if you recall, an example

21     of the design history file that had been created in 2010 for

22     product 860 Imubind tPA ELISA and that's PTX 60.  He explained

23     that the record he created had to be created by a collection --

24     PTX 60 is the batch document history file that was created and

25     he said it had to be created by going through a collection of

E1HFSEK5                    Summation – Ms. Hagberg

1    documents that he could find anywhere in the company and some

2    of those, in fact many of those came from Femtelle submissions

3    that had been made and because of those they were still around.

4         And we also heard from Mr. Fryer that these DHF's that

5    they created could not have been created in the way they should

6    have been done because the files should have contained the

7    records from the stage at which the design began right up

8    through its release to the market with each step being reviewed

9    for quality purposes along the way.

10        Ms. Gaikwad also noted that although she was in R and

11   D she would make kits sitting at her desk that were released

12   directly into the market and even if a transfer was made to

13   manufacturing there was no validation or procedures in place to

14   insure that the transfer from design to manufacture was

15   successful.  And defendants argued, well, those were RUO's,

16   weren't they Ms. Gaikwad, and that's research use only and,

17   yes, they were RUO's with respect to most of them although she

18   also worked on 102201 which was ultimately a Femtelle –- 101201

19   which is ultimately released in the market as an IVD.  But even

20   if they were RUO's the idea of somebody sitting there and

21   putting a kit together and sending it off without anyone

22   reviewing it or anyone in manufacturing being involved just

23   shows a company where following procedures didn't matter.

24        We also looked at examples of preacquisition batch

25   records because that's another critical component.  And

E1HFSEK5                    Summation - Ms. Hagberg

1    Mr. Fryer walked us through one that was created in 2007 for

2    Quest Diagnostics and that's PTX 210.  And we saw a record that

3    was riddled with crossouts and with missing expiration dates.

4    The records showed the use of SOPs that were not associated

5    with the manufacture of that kit and Mr. Fryer, unfortunately,

6    your Honor, in quite a detailed way went through a number of

7    pages of that document showing everywhere it was not compliant.

8    And in fact he testified that the final product was not quality

9    reviewed until several months after its release.  Even more,

10   although the product was set to expire in a year as Mr. Fryer

11   testified ADI wrote to Quest in January 2008 and extended the

12   expiration date and they've conducted no verification that it

13   was safe to do so and when they subsequently attempted to

14   verify it, it failed.

15          We also saw another example of batch record and that's

16   PTX 211, where expiration dates were changed haphazardly by

17   adding an A with no confirmation or validation testing and

18   Mr. Fryer said he saw instances where not only A, but B, C and

19   D were added further extending the dates.  He testified these

20   were not isolated incidents but many of the batch records he

21   worked with or that he remediated in 2010 contained the same

22   types of problems.  We think the record is clear that ADI's

23   quality system was materially non-compliant during the relevant

24   period.

25          That brings me to the second point that I think we've

E1HFSEK5                    Summation - Ms. Hagberg

1      just shown, that even if we did it, it wasn't so bad, and I

2      think this testimony and the documents show that it was, it was

3      bad.  So what defendants point to again are these audits and

4      the FDA inspections and they say that because those were passed

5      we were okay.  But those were passed and done in the time

6      period when all of these problems that the fact witnesses

7      identified existed.  Not all of them, your Honor, I'm just

8      saying some of them, and the auditors didn't find those,

9      Intertek didn't find those and they found other things, though.

10     In all of the audits, in each of the significant audits and by

11     that I'm kind of eliminating the customer audits because I

12     don't think that Ms. Kuehn puts them in the same category as

13     the Intertek and the FDA inspections.  And Mr. Morrissey noted

14     that with Intertek the audited party had significant control on

15     what the auditor hears.  He said that by controlling or

16     suggesting the questions the audited company can also control

17     the outcome.  And as he testified, and this is at page 210 and

18     211 --

19             THE COURT:  Which witness was this?

20             MS. HAGBERG:  This was Mr. Morrissey.  The biggest

21     difference between FDA and Intertek, and you can read that from

22     the context, is we hire Intertek and they do an audit for our

23     company.  In response to the question of whether Intertek goes

24     through and reviews every part of the company every time he

25     bluntly responded no.  And, your Honor, your Honor asked

1    Mr. Morrissey is Intertek a private company and has competitors
2    in the field and Mr. Morrissey's response to that was yes.

3           The FDA did issue a warning letter in 2004 and one of
4    the things that it said was that ADI lacked a CAPA system.  And
5    when the FDA returned the following year FDI signed off on it
6    and thought that ADI as represented by ADI had put procedures
7    in place to address the concerns, but FDA made three additional
8    observations which ADI then also allegedly addressed.  And
9    again, the FDA never came back.  They never came and inspected
10   this 30-employee company, whatever it was at that time, in
11   Connecticut, and defendants make a big deal about the fact that
12   well, we didn't get audited again.  But the big deal is that
13   you have to be compliant.  It's not that you didn't get
14   audited.  The big deal is are you compliant.  And while ADI may
15   have addressed some of FDA's concerns that they noted in 2004
16   and 2005, it was clear from what Mr. Morrissey uncovered in
17   2010 and from what Mr. Fryer and Ms. Gaikwad acknowledged were
18   going on during the relevant period that the procedures ADI put
19   in place were not regularly followed.  And as Ms. Kuehn
20   testified the failure to follow procedures is not immaterial.
21   And again, she said at 633, line 25 to 634, line 2, the QSR
22   system is meant to insure that your device, every device, every
23   test, every time, is made the exact same way that it was, that
24   quality is designed into that.

25          When FDA came back in 2011 Mr. Morrissey testified

E1HFSEK5                        Summation - Ms. Hagberg

1    that Sekisui was already working to remediate its problems for

2    a year.  He told the FDA of the past issues that had existed

3    and he told the FDA that ADI was fixing it.  But the FDA still

4    found that there was a problem with the company and notably

5    that ADI did not have a CAPA system in place prior to 2010

6    which was the same problem identified by the FDA in 2004 and

7    also identified by Intertek.

8            And despite that, each of the audits resulted in

9    observations being made.  While the 2004 FDA inspection

10   resulted in a deficiency letter which identified issues those

11   issues were continuing to be fixed in 2010 and 2011 after

12   Sekisui had taken over control of the company and Mr. Hart had

13   left the company or at least had stopped coming into work.

14           Mr. Takemura explained that Sekisui relied on the

15   representations and warranties in the SPA and they expected to

16   be purchasing a compliant program, company, and that was

17   important to them.  We told the Court and I think we've just

18   gone through previously, your Honor asked me about the reps and

19   which ones we believed were breached and I think I've already

20   covered that.

21           THE COURT:  You have, yes.  So maybe you're up to

22   damages.

23           MS. HAGBERG:  I have one more thing to talk about

24   before I get to damages.  I'd like to talk about Femtelle.

25   Picking on Mr. Takemura again here.  He testified that Femtelle

E1HFSEK5                    Summation - Ms. Hagberg

1    was critical to the transaction.  Oh, your Honor, I just want

2    to call your attention to one other provision of the SPA and

3    that is Article 9.1 and that provision states that

4    notwithstanding any right of any party, whether or not

5    exercised, to investigate the affairs or the accuracy of the

6    representations and warranties contained herein or of any other

7    party hereto, each party hereto has the right to fully rely --

8    to rely fully on the representations, warranties, covenants and

9    agreements of each other party contained herein.

10           So going back to Femtelle.  As Jeff Ellis' testimony

11   noted, prior to initiating contact with Sekisui and after

12   unsuccessfully shopping ADI for almost a year CrossTree revised

13   the confidential memorandum to push up the value of Femtelle

14   and show that Femtelle was by far the most potentially

15   profitable product in ADI's line.  And Mr. Takemura explained

16   that the only way they could get board approval for the

17   acquisition was by including the projected value of Femtelle

18   sales into the calculation of the projected operating profit.

19   And Sekisui did an analysis confirming that the purchase price

20   without Femtelle was potentially viable and that was that third

21   right hand bar in the upper right-hand corner of Exhibit 49,

22   your Honor, that Mr. Velie was -- I'm sorry, Mr. Kortmansky was

23   directing Mr. Erb's testimony to this morning.

24           But what Mr. Takemura said was yes, they did an

25   analysis without potential, without Femtelle and it was

E1HFSEK5                    Summation - Ms. Hagberg

1    potentially viable but the full analysis prepared for the board

2    showed that Femtelle was an important component of the purchase

3    price and it let them meet the board's acquisition requirements

4    of a certain level of projected income, and that they could not

5    have done the deal and paid 25.5 million if it were not for

6    Femtelle.

7              Even with Femtelle, your Honor, defendants argue

8    that --

9              But Femtelle was not the product that it was warranted

10   to be, and Mr. Velie argued in his opening that Femtelle was

11   not destined to fail and he says that based solely on the fact,

12   I think, that Mr. Ulatowski did not opine on whether another

13   future application might succeed, but plaintiffs introduced

14   significant evidence showing the problem with both the 2000

15   application and the 2009 Femtelle submission -- 2007 submission

16   and the 2009 submission.  Mr. Ulatowski told us with respect to

17   the 2007 application that, quote, and this is at 434, lines 14

18   through 19, the IVD group, and that's the IVD group at FDA,

19   more often than not liked to have the raw data in order to

20   conduct their own analysis of information because historically

21   FDA found that applicants may err in their analyses or may not

22   focus in on important aspects.  FDA had an interest in

23   manipulating the data itself and that's why these requests were

24   made.

25             That information and other requested information was

1    not provided in connection with the 2007 submission, despite

2    getting two additional extensions, and when the deadline passed

3    FDA deemed that the application had lapsed.

4          And if we could put Exhibit 42 up.  Mr. Ulatowski

5    reviewed this Exhibit 42 and testified that this indicated that

6    they still had a need for the data and what he said was the

7    data they needed was source data, line data, the background

8    data for the studies that had been submitted.  I'm sorry, your

9    Honor, I don't have it highlighted.  Is that PTX 43?

10          THE COURT:  You said 42, didn't you?

11          MS. HAGBERG:  I did say 42.  I just can't see it from

12    here, your Honor.  I want 42.  I don't see it there, your

13    Honor.  "I hope that we can work this out.  We are at the end

14    of the 510(k) process with the FDA and have already submitted

15    the graphs and tables.  FDA will surely ask us how could we

16    submit the graphs and tables of the clinical studies without

17    having the raw data behind the graphs and tables.  This will

18    look very bad."

19          And then Mr. Ulatowski looked at PTX 43 and in this

20    communication which went from Robert Greenfield -- your Honor,

21    I'm afraid I have the -- oh, yes, from Robert Greenfield to

22    Manfred Schmidt, who was involved in the studies in Germany,

23    with copies to David Teicher, Mamoru Koseki and Richard Hart,

24    Mr. Greenfield, who was in the preacquisition company director

25    of R and D, one of the directors in charge of the Femtelle

1    application and one of Richard's Hart's executive team, noted

2    in his May 2010 e-mail that without patient data from one of

3    the German studies, and if you can highlight paragraph 3 -- I'm

4    sorry, paragraph four.  "It is quite possible that because of

5    the this the analysis will fail and we will have no" -- that's

6    one of the clinical studies -- "to present to the FDA that is

7    valid.  I cannot do anything about this.  If this happens the

8    510(k) will not move forward and we may have to abandon the

9    project.  Femtelle has a good chance of failing in the U.S.  We

10   may only be able to market it as an IVD in Europe and CE."

11          He noted a later e-mail from PTX 39 --

12          THE COURT:  I'm sorry, we're going to have to move

13   over to damages.  It's just getting too late.

14          MS. HAGBERG:  Sorry, your Honor.  Let me add just one

15   more.  As a result of all of these problems, Ulatowski

16   concluded that the 2009 submission was destined to fail and

17   with respect to management's decision ultimately to withdraw

18   the pending application, Mr. Ulatowski testified if I were

19   management there I would have made the same choice.

20          As Mr. Fryer testified, ADI continued but was

21   ultimately not successful in locating the clinical data, and

22   they also couldn't locate and recreate the batch records that

23   FDA had asked them for and they were having problems with other

24   types of data as well.  Accordingly, the company ultimately

25   made the commercially reasonable decision not to pursue a third

E1HFSEK5                          Summation - Ms. Hagberg

1   submission.

2              I'll turn now to damages, your Honor.

3              THE COURT:  Okay.

4              MS. HAGBERG:  Shortly after the closing, KPMG

5   conducted an independent valuation of the company for financial

6   and tax purposes.  This was an unbiased, thorough and legally

7   required analysis by a respected accounting firm of the value

8   of the assets and you heard Mr., your Honor heard Mr. Erb

9   testifying about this this morning.  And the value of the

10  assets is reflected in the 25.5 million purchase price.  That

11  projection for the valuation of Femtelle, the financial

12  projections for the valuation of Femtelle were provided to KPMG

13  by Richard Hart who was the CEO of the company and they were

14  based on the CrossTree confidential memorandum.  The

15  projections for ADI's current products were also based on the

16  CrossTree memorandum prepared by preacquisition management

17  which were confirmed with CrossTree and Hart following the

18  acquisition.  Using this information KPMG was able to allocate

19  a fair value of ADI's assets within the bounds of the purchase

20  price.  And we heard Mr. Erb with decades of real world

21  experience valuing companies with Goldman Sachs and others and

22  he testified that he looked at PPA for the determination that

23  Femtelle was valued at approximately 7 million of the purchase

24  price.

25             THE COURT:  The only problem with that argument is

1    what was brought out on cross that the SPA says that anything

2    preclosing is superseded and nothing in any of those materials

3    should be relied upon.  So if KPMG relied on the confidential

4    memorandum and shouldn't have, does that wipe out that

5    valuation?

6            MS. HAGBERG:  Your Honor, I don't think it does wipe

7    out that valuation.  Mr. Erb looked at it as the basic, the

8    best, he wasn't using it -- that kind of a representation is

9    based on protecting KPMG from liability for --

10           THE COURT:  No, it's in the SPA.

11           MS. HAGBERG:  In the SPA.

12           THE COURT:  The SPA says anything said before this

13   closing doesn't count any longer, it's over.

14           MS. HAGBERG:  Yes and that was in one of the reps

15   represented to the financial breach, your Honor.  That's what

16   it related to and we're not contesting a financial breach here.

17           THE COURT:  I'm sorry, I don't really understand that

18   answer.  What it says in the SPA, anything that's said up to

19   this closing cannot be relied on, must be discounted and then

20   KPMG relies on a confidential memorandum in relation to this

21   valuation and then it says anything can change in the next

22   eight months too.  It was made before the closing, which of

23   course was made in 2008 which wasn't a good year financially.

24   All right.  I don't want to argue, I just wanted to point that

25   out.

1           MS. HAGBERG:  But Mr. Erb did say that Hart provided

2  that after it was signed and he also said the information

3  Mr. Hart provided was after that date.

4           Taking into account the representations and warranty

5  breaches, you heard Mr. Erb testify that he made alternative

6  projections using the same type of data and techniques that a

7  knowledgeable investor would use and determined the value of

8  Femtelle and current products within the company as it was

9  actually delivered.  In other words, non-compliant with FDA

10 regulations and lacking the necessary clinical data and design

11 history files to bring Femtelle to market.

12          He also, after reviewing the SPA, the financials of

13 the company and other information that was available at the

14 time of the acquisition as well as from speaking with industry

15 experts, Mr. Ulatowski and Ms. Kuehn, along with company

16 employees and management, he concluded that the value of

17 Femtelle as delivered had a slim chance of FDA approval and had

18 years and millions of dollars to go due to the need for

19 additional clinical trials or at least data that would replace

20 the data that could not be found.

21          He also calculated the value of current products using

22 the same methodology, given the impact of non-compliance with

23 the FDA regulations at 6.23 million.  And, finally, Mr. Erb

24 consulted with Ms. Kuehn, confirmed by the testimony of

25 Mr. Morrissey, and concluded that the expected cost to

E1HFSEK5                        Summation - Ms. Hagberg

1    remediate ADI's numerous deficiencies would be two to three

2    million dollars over two to three years which he conservatively

3    discounted applying the same discounts that he applied at every

4    level to be 1.4 million as at the time of closing.  Taken

5    together Mr. Erb concluded that the value of ADI was delivered

6    was just over $13 million resulting in 12.183 million in

7    damages to Sekisui.

8              And I just very briefly want to address the

9    counterclaims, your Honor.

10             THE COURT:  There's only one counterclaim.

11             MS. HAGBERG:  Oh, counterclaim.  We heard Mr. Velie

12   this afternoon saying that we had, that they had shown certain

13   things with respect to the counterclaim but the one issue that

14   defendants have not shown is what is a commercially reasonable

15   effort and I'm not going to dwell on that --

16             THE COURT:  Good.

17             MS. HAGBERG:  Because Mr. Whitney -- it's a long week,

18   your Honor, sorry -- who are you?  Mr. Whitney testified about

19   that so I don't think I need to cover it.

20             THE COURT:  Not testified, but he certainly spoke

21   about it.  Okay.

22             MS. HAGBERG:  Based on that lack of evidence we

23   believe that plaintiffs are entitled to have defendant's

24   counterclaim for the earnout dismissed.

25             THE COURT:  Okay.

E1HFSEK5                    Summation - Ms. Hagberg

1          MS. HAGBERG:  Thank you, your Honor.

2          THE COURT:  Thank you.  Now, wait, Mr. Velie, I'm very

3     anxious to hear you, but I need to stretch just to be sure that

4     I'm awake and aware and listen to every word.  So let's try to

5     keep this break to five minutes but I could use the five

6     minutes just to stand up and walk around.

7          (Recess)

8          MR. VELIE:  May it please the Court.  There are a lot

9     of things to talk about.  Let me just start with a couple of

10    things that might put the entire thing in context.  Just a

11    moment ago near the very end of her summation Ms. Hagberg said

12    Femtelle was not the product it was warranted to be.  As your

13    Honor must know by now, there wasn't a single warranty in the

14    SPA regarding Femtelle or its possibility of success or its

15    value.  In fact, any projections with respect to it were

16    expressly disclaimed.  We'll just start with that.

17         Second, and this has to do with the credibility of the

18    entire presentation.  The plaintiffs have scattered a lot of

19    marbles and expect us to pick them all up.  There may be, I

20    don't know, 20 or 30 different things that their expert talked

21    about and Ms. Hagberg talked about that are, she, one or the

22    other of them claims might be a non-conformity and Ms. Hagberg

23    claims is a material non-conformity.  I did not hear Ms. Kuehn

24    say that, but perhaps she did.  But let's just take CAPAs.  How

25    many times have CAPAs come up in this case and they came up in

1    the summation again.  The plaintiff's claim is that there were

2    no CAPAs during the relevant period but we saw there were

3    CAPAs.  In the letter responding to the FDA in 2011 the FDA had

4    mistakenly written down there's no documentation of CAPAs

5    between I think 2006 and 2010 and the company, Sekisui,

6    Mr. Morrissey prepared this letter too.  He said oh, no, you're

7    wrong about that, there were CAPAs during this period they were

8    just decentralized and he gave some examples of where they

9    were.  However, you don't have to take Mr. Morrissey's word for

10   this.

11           There was an Intertek audit on January 10, 2006.  It's

12   in evidence, Defendant's Exhibit M.  It was a documentation

13   review, one and a half days.  They reviewed the documentation

14   for one and a half days in January of 2006.  Actually, they did

15   it from March 23, 2006 through March 24, 2006, right in the

16   middle of the relevant period.  Do you think if Intertek had

17   seen no CAPAs they might have said something?  Nothing is

18   noted.  This is the audit itself, I'm told, on page ending 354

19   in Exhibit M --

20           THE COURT:  M or N?

21           MR. VELIE:  M as in Mary.

22           MS. BRILEY:  No, that's L, DX L.

23           MR. VELIE:  I'm sorry.  The first thing I showed you M

24   as in Mary is the document review immediately followed by an

25   audit, is that correct?

E1HFSEK6                        Summation - Mr. Velie

1              MS. BRILEY:  No, the one -- DX L is the document

2       audit.  The document audit is noted in the cover letter to the

3       on-site audit that followed the document on it by a month.  The

4       on-site audit was in April 2006.  The document audit was in

5       March of 2006 and the cover letter references both.

6              MR. VELIE:  DX L is the latter?  The actual letter

7       itself.  Here's what it says at page 354 at the end.  "8.52,

8       corrective action.  Does the organization take action to

9       eliminate the cause of non-conformities in order to prevent

10      recurrence and are corrective actions appropriate to the

11      effects of the non-conformities encountered?  Yes."  And it's

12      initialed by the auditor.  There are CAPAs.  They saw them.

13      They were there for a day and a half.

14              There's another, I believe this is an Intertek

15      audit -- is this the same document?  Okay, I'm going, I'm

16      sorry, your Honor, I'm going back to DX M as in Mary.  On page

17      3 of 4, the auditor notes noteworthy positive observations

18      regarding the implementation and effectiveness of the

19      management system.  Quote, "Good use of customer complaints,

20      internal audits, corrective actions, preventive actions and

21      management review to continually improve."

22              I think we can lay to rest the claim that there were

23      no CAPAs.  Apparently there were no CAPAs presented to

24      Ms. Kuehn, but I don't know why that would be.  She doesn't

25      know why that would be and it doesn't prove anything.  In fact,

1   Mr. Morrissey says that there were none to be seen simply to be

2   false.

3           There's been a contention here that there are missing

4   design history files.  Well, everybody agrees that you can't

5   get a 510(k) without design history files.  In fact, that's the

6   whole business of their saying Femtelle wouldn't pass in 2009

7   because a piece of the design history file is missing, a

8   certain batch record from twenty years before.  Okay?  So you

9   need DHF's to get 510(k)s.  All of the products they were

10  selling had 510(k)s.  There were design history files for every

11  last one of these and they were reviewed by the FDA.  Now,

12  apparently Mr. Morrissey thought it was important to put these

13  all in one binder instead of having them in different places

14  like lab notebooks.  That's nice, but that doesn't mean any

15  non-compliance.

16          There was some reference to Bhavna Gaikwad's

17  testimony.  Number one, product 101201.  Was there a problem

18  because she had lab notebooks?  Of course not.  It got 510(k)

19  approval, which means the FDA, as it almost certainly did,

20  looked into the design history of this thing and said all

21  right, you got it, we're great.

22          It is important to note that Ms. Gaikwad, and for that

23  matter, Mr. Fryer, were research scientists, by and large,

24  perhaps exclusively, except to the extent that Mr. Fryer noted

25  otherwise, they worked only in the research department.

E1HFSEK6                    Summation - Mr. Velie

1   They're working on research use only products.  You can sell

2   those, and as Ms. Kuehn told us today you can sell them, just

3   label them research use only, that's all the customer can use

4   them for and they are not covered by the quality system

5   regulations.  They are irrelevant to the QSRs.  So everything

6   you heard from Ms. Gaikwad that said, oh, I didn't do this and

7   I didn't do that, whatever she said she didn't do, it doesn't

8   matter.  She wasn't obligated to do it in accordance with the

9   QSRs to the extent that she was working on research use only

10  materials.

11        Your Honor put your finger right on a critical issue

12  with respect to the documents that were missing from Ms. Kuehn.

13  I believe you asked this.  I'm scrambling to write notes during

14  summation but I think I've got this in the right context.  The

15  issue is the materiality of the various things pointed out by

16  Ms. Kuehn and for that matter by the anecdotal evidence of some

17  of the witnesses.  It's not only materiality, it's context, and

18  I covered this with Ms. Kuehn and she was kind enough to tell

19  me she has no idea how many documents were missing.  She was

20  honest enough to say, look, this makes me less certain than I

21  was, but she also said context is all.  What can possibly that

22  mean except this?

23        Okay, on day one you've got a document that's

24  terrible.  On day two they might have corrected it.  That's

25  compliance.  That's the one thing that we're clear on and every

E1HFSEK6                        Summation - Mr. Velie

1    witness in the case who talked about it is, you don't have to

2    be perfect, you have to have a system that addresses

3    imperfections as they come up, and that's what we can't tell

4    here because we'd have a totally incomplete data set. So that

5    everything, virtually everything that Ms. Kuehn told us I can't

6    tell you, she couldn't tell you, the plaintiff's lawyers

7    couldn't tell you if two days later that thing wasn't fixed or

8    a week later or in due course. We just don't know.

9    Accordingly, on the context the plaintiffs have failed to meet

10   their burden of proof with respect to this very important

11   matter.

12           In short, your Honor, it's impossible for us to

13   address every single little dinky claim and even major claims

14   that these plaintiffs have raised. There's an incomplete data

15   set. We're not the company, we don't have the records.

16   Wherever we could, we showed you they were wrong. I showed

17   Ms. Kuehn in one case she was talking about nonconforming,

18   NCR's, non-conforming reports or non-conformity reports,

19   whatever the acronym is. I said that's good compliance, isn't

20   it? She said, yes, of course. That's not evidence of

21   something bad. In another instance she had misread the

22   document she was saying was so terrible. She had put it up on

23   the screen and said I don't understand this but this is not

24   compliant. And when we read it together and the Court read it,

25   it was obvious what it was saying, it was compliant. And she

1    said, well, okay, you're right about that, show me another one.

2    Okay, show me another one.  I can't.  I can't and it's

3    unreasonable to ask me to in view of the fact that there's an

4    incomplete data set here.

5        The burden of proof here is on these plaintiffs.  It

6    is not on the Harts to show that the company was perfect.  It's

7    not on the Harts to show even that it was compliant, not even

8    to show that it was in material compliance although we think we

9    have shown that.  So this was, when I opened, I said to the

10   Court we have two major questions here.  One is was the company

11   compliant in all material respects with applicable regulations.

12   The question here, as the Court properly noted, is materiality.

13   The second question is was Femtelle destined to fail.  Not the

14   Femtelle 2009 application, but was Femtelle destined to fail

15   or, on the other hand, did plaintiffs fail or omit, omit to get

16   it approved and marketed.

17       I'll talk about compliance first.  The issue --

18       THE COURT:  I must say I'm a little bit confused.  I

19   almost hate to ask this question.  I'm a little bit confused

20   about the incomplete data set argument.  You're not talking

21   about spoliation anymore because these records go back years

22   and years and years before any of you were served, so I don't

23   quite understand what you're saying.  If there's no spoliation

24   with respect to these types of records from back in '04 or '05

25   or '06, if they're not complete, one can still look at the

1    records that do exist and that's what Ms. Hagberg brought out

2    in her redirect examination of Ms. Kuehn today.

3                 MR. VELIE:  Yes.

4                 THE COURT:  She said look, doesn't matter what else

5    you find, you still have records that show, for example, that

6    products were expired or that dates were extended, that

7    crossouts were made changing numbers.  That's still all wrong,

8    it doesn't matter what else you find that was right, that's

9    wrong and no document can change that.  And so working with the

10   records that do exist, of which she reviewed 100,000 records,

11   that's a lot, she still found a fair amount of evidence of

12   non-compliance.

13                MR. VELIE:  I totally agree.  But that evidence is

14   totally out of context.  We have no idea how many other records

15   there were.

16                THE COURT:  It doesn't matter.

17                MR. VELIE:  But it does.

18                THE COURT:  No, that's her point.  She's saying in

19   some instances, fine, you were able to show, she says there was

20   no signature, there was a signature, that troubled her,

21   troubled me.  But in other instances such as extending

22   expiration dates or changing batch numbers or drawing

23   crossthroughs or whatever, there were a lot of things like

24   that, doesn't matter what else you found, the ones that were

25   reviewed showed non-compliance.

E1HFSEK6                    Summation - Mr. Velie

1          MR. VELIE:  Thank you, your Honor.  That's exactly the

2    issue and let me address it this way.  It's not a spoliation

3    issue.  It's a context issue.  Let us suppose, let's take

4    hypothetically that on day number one somebody down there in

5    the research department, Ms. Gaikwad, crosses out something

6    that she shouldn't have crossed out.

7          THE COURT:  Okay.

8          MR. VELIE:  What we don't know is whether on day two

9    somebody said, look, that's a violation of the regs, let's do

10   this the right way here's another document, sign this one.  We

11   just don't know.  I can't disprove all of these things because

12   we have no idea how many are missing.  Therefore the ones that

13   are there and are pointed to by Ms. Kuehn are almost certainly

14   completely out of context.

15         THE COURT:  I don't really follow that, I must say.

16   We're talking about 100,000 records were reviewed.  She found

17   examples after examples in different categories of

18   non-compliance.  Not just one category, not just no signoffs,

19   not just changed dates, not just crossouts, not just expired

20   materials, but all kinds of problems.  There are regulations

21   governing this industry and what was of concern was that she

22   found so many examples of non-compliance.

23         MR. VELIE:  I understand.  I understand your concern,

24   your Honor, and I know exactly why she said that and what the

25   plaintiffs pointed out and let me say if that was the only

E1HFSEK6                        Summation - Mr. Velie

1    proof in the record that would be impressive.  But the rest of

2    the proof in the record is we have no idea how many other

3    documents Ms. Kuehn did not look at.  Please, what I'm

4    trying --

5            THE COURT:  I don't know what evidence you have of

6    that other than your say-so.

7            MR. VELIE:  I asked her, do you have any idea what's

8    missing.  No.

9            THE COURT:  You're starting with your developed view

10   of something being missing.  I don't know what proof there is

11   of what's missing other than what I've already addressed in

12   various opinions over the years, you know, if somebody deleted

13   Mr. Hart's e-mail, fine, but we're not talking about Mr. Hart's

14   e-mail here, we're talking about company records, design

15   history records, not Mr. Hart's e-mails, or for that matter

16   Ms. Ayres' e-mails.  We're not talking about that kind of

17   record which I've addressed for a different purpose.  We're

18   talking about company records.  You presume hundreds of

19   thousands are missing but I don't know what the proof of that

20   is.

21           MR. VELIE:  Judge, allow me to give an answer in

22   context which will take perhaps 45 seconds to do.  Number one,

23   compliance, as we have seen repeatedly with everybody who

24   talked about is not a matter of doing everything perfect.

25           THE COURT:  No, I agree, and I've stated it for the

1    record.  Perfection is not the standard.  The standard is to

2    have procedures in place, do the best you can and if you have

3    problems you're supposed to try to correct.  I understand that.

4          MR. VELIE:  Bingo.  That's step one.  If you do

5    something wrong, try to correct it.  What Ms. Kuehn has -- what

6    Ms. Kuehn has pointed out is a number of instances, I don't

7    know whether it's 20 or 30 or 40, whatever it is, where they

8    did something she says is wrong, okay?

9          THE COURT:  Yes.

10         MR. VELIE:  The next question is did they do anything

11   compliant with respect to that wrong thing and therefore they

12   utterly fail in their proof because the one thing we do know is

13   the data set she was looking at was incomplete.  Now, the point

14   of my cross-examination is not, oh, you were wrong because this

15   had a signature.  It was Ms. Kuehn would you please consider

16   whether or not you got all the documents.  And this morning she

17   acknowledged, I didn't have to show her anymore.

18         THE COURT:  Of course not, because at the end of the

19   day yesterday you were able to pull up four signature pages

20   that she thought were unsigned and she was troubled by that.

21         MR. VELIE:  Yes.

22         THE COURT:  I still don't know what level, what

23   quantity of material is allegedly missing.  I don't know and

24   you don't either.  That's the problem.

25         MR. VELIE:  Nobody knows and that's why --

E1HFSEK6                    Summation – Mr. Velie

1          THE COURT:  I'm not sure it's missing at all because

2     even the ones she didn't get when she said obviously she didn't

3     get a complete data set, as Ms. Hagberg pointed out you did

4     have those completed pages.  They weren't missing at all, they

5     just weren't given to her, those four pages.  They were given

6     to you, so they weren't missing.  You got them.  She should

7     have gotten them.  She didn't.  You did.  The company gave them

8     to you.  I don't know if anything is missing.  I'm confused.

9          (Continued next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E1hzsek6

1            MR. VELIE:  Nobody does, but the one thing --

2            THE COURT:  No, you're arguing that lots is missing.

3    I don't know if that's true.  It's an argument, not evidence.

4            MR. VELIE:  Let's take the facts that we've got and

5    see if there are fair inferences that could be drawn from that.

6    We know that she did not get a complete data set.

7            THE COURT:  She didn't, but you did in that example.

8    You got those four signed pages.

9            MR. VELIE:  Judge, forgive me for saying this, but I

10   really need to say two or three sentences in a row.

11           THE COURT:  Yeah, but I need to keep making the point

12   that raised the question that's concerning me.  She may not

13   have gotten it, but there wasn't missing --you got it.

14           MR. VELIE:  I'm addressing that question.

15           THE COURT:  All right.

16           MR. VELIE:  By whatever windfall, we got some

17   documents, maybe 30 or 40, that I was -- I will represent to

18   the Court if you want, that I was prepared to show about 30

19   instances where I had some documents and she said absolutely

20   they didn't exist.  Now I know and you know and we all know

21   that I don't have all the records of the company.

22           THE COURT:  I don't know.  I know you don't have the

23   access, but I don't know that you didn't receive them.  I don't

24   know that there's anything missing.  That's my problem.  It's

25   good lawyer --

E1hzsek6

1          MR. VELIE:  Believe me, I'm getting there in a couple

2     of sentences.

3          THE COURT:  It's good lawyer argument, but I'm looking

4     for the evidence.

5          MR. VELIE:  I'm looking for inferences from the

6     evidence that we have, because we do not have any certainty

7     here.  We have no certainty.  The one thing we are certain of

8     was she didn't get a complete data set and somehow or other I

9     got some documents and was able to get her to agree with me

10    that she didn't get all the documents.  Okay.

11         But the one thing she readily agreed with, as a person

12    who says she has experience in compliance, is she has no idea

13    how much was missing.  And she agreed with me in a context

14    terribly important, and she agreed with me that she was less

15    certain of her conclusions as a result of this.  In other

16    words, I think that the fair inference -- and this is not an

17    inference from spoliation, I'm not claiming that these were

18    destroyed willfully, I have no proof of that.  I'm saying for

19    whatever reason, they don't have a complete data set.

20    Accordingly, it is impossible for her to say that they are

21    noncompliant, meaning that they didn't address the issues that

22    she saw.

23         THE COURT:  Where we're parting company is your

24    phrase, they don't have a complete data set.  What is your

25    proof on that?

E1hzsek6

1              MR. VELIE:  Ms. Kuehn's testimony.

2              THE COURT:  And I keep arguing with you.  She may not

3    have seen it all, but you may have been given it all.  I don't

4    know where the proof is that anything's missing.  I know she

5    didn't see it, but I don't know that it's missing from the

6    company records that were produced to you.

7              MR. VELIE:  Okay.  I can make a representation about

8    this, but it doesn't matter, Judge, I have no burden here.

9              THE COURT:  No, you don't.

10             MR. VELIE:  Okay.  So I represent to you that we did

11   the best we could to show what was missing.  However --

12             THE COURT:  Missing from her review.

13             MR. VELIE:  Yes.

14             THE COURT:  Okay.

15             MR. VELIE:  That's all we're looking at here, what's

16   missing from her review.

17             THE COURT:  No, you're saying records are missing, and

18   nobody will know ever how many are missing and how it would

19   affect the analysis.  I don't know if anything is missing.  I

20   know there were certain records she didn't get.

21             MR. VELIE:  Okay, let's start with that.

22             THE COURT:  Yeah.

23             MR. VELIE:  The records she didn't get.

24             THE COURT:  Right.

25             MR. VELIE:  Therefore her testimony is less certain.

E1hzsek6

1          THE COURT:  Right.

2          MR. VELIE:  Than it should have been.  Okay.  And why

3     is it less certain?  Because there is no context.

4          THE COURT:  But she was -- that was rehabilitated on

5     redirect.  Ms. Hagberg's redirect this morning took her through

6     every category of noncompliance and said, even if you saw

7     another batch that was compliant, that wouldn't change this

8     noncompliant batch, for example.  Even if you found other

9     design histories, that wouldn't change the lack of design

10    history, even if find some dates that some products that wasn't

11    adulterated, that wouldn't affect the ones that used expired

12    materials, and of course she agreed with all that over and

13    over.

14          MR. VELIE:  Of course.

15          THE COURT:  She said yes, that's right, that's right,

16    that's right, so.

17          MR. VELIE:  Okay, but I recrossed and I got up and I

18    said isn't the context important?  And basically what I was

19    asking and I believe I actually asked it, but forgive me if I

20    get the transcript wrong, you've got a transcript, something

21    that was wrong on day one could have been fixed on day two.

22    That's the problem here.  We don't know, she doesn't know.  And

23    she and Ms. Hagberg are the people who have to show you that it

24    was noncompliant, which means not only was something wrong

25    done, but that it wasn't properly addressed and that it was

E1hzsek6

1    material.  We don't have that in this record.

2              THE COURT:  Okay.

3              MR. VELIE:  The other thing is we certainly know that

4    she claimed that there were missing DHF's, design history

5    files.  We know that's false.  How do we know that's false?  I

6    argued this just a few minutes ago.

7              THE COURT:  Yeah.

8              MR. VELIE:  You need them.  You got to have them.

9    They were there.  They were rewriting them.  So perhaps I'm

10   doing this too much and forgive me if I am.  But the plaintiffs

11   who have the burden came to this Court to say from an

12   incomplete data set, here are the problems, when in fact nobody

13   from that incomplete data set could say that these --

14             THE COURT:  The only problem is with the words

15   incomplete data set.  It's something that you said about 100

16   times.  So if people repeat it enough, everybody starts to

17   believe it, but I don't know that it's incomplete, okay.  Can

18   we move on?  I think it's the argument is well --

19             MR. VELIE:  I'm going to respond only to that.

20             THE COURT:  Because the argument's well developed.

21             MR. VELIE:  Thank you, your Honor.  The only response

22   I'm going to make to that is Ms. Kuehn could only testify to

23   from what she saw which is --

24             THE COURT:  100,000 records.

25             MR. VELIE:  And what she agreed was she knows that

E1hzsek6

1    that's incomplete and she has --

2              THE COURT:  Because you have some paper that she

3    doesn't have.  That's why she knows it's incomplete.

4              MR. VELIE:  I asked her, will you agree with me your

5    set was incomplete.

6              THE COURT:  Right.  Of course she said yes because she

7    knows you have paper that she doesn't.  I don't know if it's 30

8    pages incomplete or 50,000 incomplete, I don't know it's

9    incomplete at all.  I know -- we're going in circles.  I know

10   she didn't see everything you had, okay.

11             MR. VELIE:  No, I asked her the next question.  Do you

12   have any idea how many documents you didn't get.

13             THE COURT:  Of course she doesn't.

14             MR. VELIE:  Thank you, that's all my point.

15             THE COURT:  The question is do you have any idea

16   whether you didn't get every document, you know, in other

17   words, I don't know there is any incomplete data set, but we've

18   covered it so let's go on.  Are we ready for --

19             MR. VELIE:  Thank you for your patience.

20             THE COURT:  Are we ready for Femtelle?  Where are we

21   up to.

22             MR. VELIE:  No -- well, maybe we are.

23             THE COURT:  Okay.

24             MR. VELIE:  The issue as we set out in opening I think

25   is fairly phrased as do you prefer the evidence of 13 audits or

E1hzsek6

1    inspection before, during and after the relevant period from

2    '06 to '09, or Ms. Kuehn's opinion and some anecdotal proof,

3    okay.  Every single audit was passed.  Now it's possible --

4              THE COURT:  Well, no, you see that was opening then we

5    had a trial --

6              MR. VELIE:  Yes.

7              THE COURT:  -- for five days.

8              MR. VELIE:  I put in the 13 --

9              THE COURT:  Hold on.  What I've learned I think that

10   audits or inspections aren't passed, they're opened and closed.

11   Deficiencies are noted, deficiencies are sometimes corrected,

12   life goes on.  Certainly none of them were failed.  I'll go

13   that far.  They were closed.  They weren't failed, but it's not

14   a good seal stamp of approval either.  It makes observation.

15   Those observation repeat, sometimes the same observation has

16   appeared in more than one audit or more than one inspection.

17   Problems were noted.

18             And also I don't know that inspectors or auditors can

19   see 100,000 records over six months of studying and look at

20   everything.  They're there day or day and a half, they're doing

21   on-site looking around, they're talking to people and they're

22   examining some records.  I don't know that their job is the

23   same as hiring, you know, a private investigator to go to sit

24   down and go through 100,000 records and come up with a full

25   analysis.

E1hzsek6

1          MR. VELIE:  May I respond?

2          THE COURT:  They're not what -- these things maybe are

3     not what you say they are.

4          MR. VELIE:  Some of them are.  All of the INTERTEK

5     audits, which are substantial number of these --

6          THE COURT:  They are, substantial.

7          MR. VELIE:  End up with a certification.  The company

8     is certified as compliant.  So it's not just we had some

9     observation.  They give a certification.  That is a task, okay.

10    And we saw --

11         THE COURT:  Only answer to that is that's not the FDA,

12    that's still not the FDA.

13         MR. VELIE:  Understood.

14         THE COURT:  That's a privately hired entity, may have

15    its own relationship and interests in being rehired, it may

16    have its own motivation.  I can't judge the thoroughness of

17    that particular audit.  I don't know how it was conducted.

18    There is no testimony, other than the document itself, reveals

19    the conclusion.  But I don't know what that auditor did, what

20    that auditor reviewed.  I don't -- just all I can read is the

21    findings and then in the case of INTERTEK, final certification.

22         MR. VELIE:  That's all correct, your Honor.  However,

23    the point is every year within the relevant period they were

24    certified by an audit team.

25         THE COURT:  From a private entity, certainly not the

E1hzsek6

1    FDA.

2            MR. VELIE:  And twice within the period FDA mandated

3    within the relevant period of time.  It was FDA before and

4    after, but during the relevant period, two FDA mandated audits

5    by customers, okay.  One was by Siemens and one was by Trinity

6    Biotech.  These were under the QSRs; in other words, these are

7    for FDA compliance.  And these customers are obligated by the

8    FDA to make sure that everything is exactly the way it's

9    supposed to be or they can't buy from ADI.

10           Now, we read to you extensive portions from the

11   Trinity Biotech largely to prove to Mr. Fryer that his

12   contentions about expired raw materials was utterly false,

13   because the Trinity Biotech auditor made specific findings,

14   that there are were good systems in place with respect to the

15   company and the use of materials.

16           The second audit was by Siemens, and we know Siemens

17   means business.  They're not doing this as a slap-thing because

18   in 2012, three years after we sold the company, they flunked

19   Sekisui.  These people know what they are doing, and they went

20   in there and they looked and they flunked Sekisui, but they

21   passed ADI.  Now, it may be that it would be interesting -- oh,

22   and nobody disputes, Ms. Kuehn told us, that the ISO

23   regulations were there, and the FDA went and changed their

24   regulations to bring them into compliance with ISO.  So these

25   are very close, and on a number of these audits, particularly

E1hzsek6

1    the customer audits, they do it the same time, ISO and QSR.

2    No, really no difference.

3                THE COURT:  ISO and FDA?

4                MR. VELIE:  Yes.

5                THE COURT:  You said QSR.

6                MR. VELIE:  Yeah, QSR means FDA.

7                THE COURT:  Oh.

8                MR. VELIE:  QSR is quality system relations.

9                THE COURT:  I know.  That means FDA?

10               MR. VELIE:  Yeah, that's what it means.

11               THE COURT:  Okay.

12               MR. VELIE:  What the FDA requires --

13               THE COURT:  Yes.

14               MR. VELIE:  -- is a QSR certified company, okay.  So

15   the INTERTEK auditor, Siemens or whoever it was, the ones who

16   do both, Siemens and Trinity did both, QSR meaning FDA

17   standards and ISO, passed.  There wasn't even a finding of

18   Trinity Biotech audit.  They didn't find anything to complain

19   about.  In Siemens it passed, then later Siemens, who does mean

20   business, flunked.

21               Now, you could argue, and they might argue, if they

22   ever get a chance to argue it again, okay, well, they didn't

23   catch me this time, you know, I was speeding, they didn't see,

24   or you know, they only do a certain narrow set of questions.

25   But 13 audits in every year, I mean there is one in or more in

E1hzsek6

1    every year.  What are the odds that a company that would be as

2    rotten as they complained it would be, would pass every single

3    one of them?

4         The next point is, and this I think is a terribly

5    important point.  Ms. Kuehn said the observations in these

6    various audits, they supported her opinion.  But what does that

7    really prove?  What it proves is observations were made, the

8    audit team didn't think they were sufficiently material not to

9    grant a certification or to say, look, you're not QSR

10   compliant.  They said you're fine.  Ms. Kuehn, on the other

11   hand, says oh, no, this is terrible.  What this really proves

12   is that Ms. Kuehn, to Ms. Kuehn everything is terrible.  We

13   can't trust her judgment on what's material and what's not for

14   a couple -- number of reasons.  One is that.  But the other is

15   as you saw is, he has no experience.  She's never even seen an

16   audit.  She never sat through an audit.  She was never paid to

17   help anybody.

18        THE COURT:  No, she really is just somebody who

19   reviewed the documents with an education.

20        MR. VELIE:  Thank you, your Honor.  That's exactly the

21   case.  So what is the issue that has to be addressed here?  A

22   company says we warrant that we are in material compliance with

23   all applicable regulations, and they got a record shows they're

24   audited 13 times.  No problems.  What more can you do?  I mean

25   say look I never had a document with a cross out on it?  Nobody

E1hzsek6

1    could pass that standard.  That doesn't exist.  That's not

2    materiality.

3            THE COURT:  But using expired materials is troubling.

4            MR. VELIE:  It could be troubling if we could, there

5    were proof that --

6            THE COURT:  There is proof of using expired materials.

7    I saw it in the documents as I sat here for five days.

8            MR. VELIE:  But we have --

9            THE COURT:  There were batches and batches of expired

10   materials.  You don't remember seeing any expired materials?

11           MR. VELIE:  There were expired materials, but where do

12   they show there were actually used?  It was like one or two

13   anecdotal documents with a cross out.  It turns out that that

14   was a special order from somebody who specially tested it.

15   That's all it was.  That's the thing that Fryer looked at.

16   That's the only record they've got.  Is that the use of expired

17   materials in a way that says we were materially not compliant?

18   I don't think so.  And I don't believe that you could so find.

19   In addition --

20           THE COURT:  I don't know without rereading this entire

21   record whether there is only one or two pieces of exhibits that

22   showed expired material being used in these kits.  I thought

23   there was more than one or two.  That was my memory.

24           MR. VELIE:  Maybe there were, maybe there were.  But

25   the real question is was the company compliant.  Was the

E1hzsek6

1    company compliant means that have a system to deal with the

2    problem of maybe using a raw material that shouldn't have been

3    used.  And the answer is, among other places, it's in several

4    audits, but the one I happen to recall is Trinity Biotech, and

5    I read it out, because they have procedures that Trinity

6    Biotech went and looked at and said this is grand, this is

7    perfect.  They've got procedures to make sure that they don't

8    use expired materials improperly.

9                THE COURT:  Seems like the process didn't work then,

10   because they used expired materials more than once, but okay.

11               MR. VELIE:  Maybe they did, Judge.  But I don't think

12   that's material noncompliance.  Because we just don't know from

13   the records whether the next day somebody said you shouldn't

14   have done that, don't do it again, here's a new label to use,

15   we just don't know.

16               Okay.  I think we may have exhausted the issue of Ms.

17   Kuehn's conclusions.

18               There is one other thing I like to say about Ms. Kuehn

19   and that is her method is retrospective.  Your Honor already

20   noted that.

21               THE COURT:  Yeah, I mean it's really not about Ms.

22   Kuehn, it's really about the documents she reviewed and what

23   they revealed.  And there is whole notebook of records that she

24   says showed noncompliance.

25               MR. VELIE:  I spoke about this earlier in the context

E1hzsek6

1    of the motion, but I'll just revisit very briefly.  You tell me

2    if you've heard enough, and that's the issue of the central

3    narrative of the plaintiff's case, because it's completely

4    bogus.  That's Mr. Morrissey, the white knight coming in, when

5    in fact the proof showed, as your Honor noted, he was possibly

6    a bufoon, I don't know whether he was acting in good faith or

7    bad faith or just idiocy, but whatever it was they fired him

8    for his incompetence, and I find it troubling that --

9              THE COURT:  Well, I do too.  Morrissey is a troubling

10   character in this drama.

11             MR. VELIE:  Thank you, your Honor.

12             THE COURT:  No question about that.  So now are we

13   ready for Femtelle?

14             MR. VELIE:  Let me see if I need to say a word about

15   Ms. Gaikwad or Hugh Fryer what he said.  Oh, I do need to say

16   something about this.  This does have to do with spoliation.

17   Both Ms. Gaikwad and Mr. Fryer, basically what they're saying

18   is there's something wrong with the manufacturing process;

19   they're not following the recipe, they're using expired

20   material, whatever it is, and we made complaints to Mr. Hart

21   and he didn't respond.  Well, we proved that's not true.  We

22   saw complaint that Ms. Gaikwad made to Mr. Hart and he

23   responded.  He responded appropriately; hey, let's call a

24   meeting, this is all wrong, we got to fix this.  But where are

25   the other complaints to Mr. Hart?  We know where they are.

E1hzsek6

1    Hugh Fryer collected them.  We have an e-mail chain from

2    Koseki, it ends up with Dicey Taylor, the document destroyer

3    saying Hugh Fryer's got all of these, he collected them, he's

4    given them to me, and nobody seen them since.  They didn't see

5    them in their preparation, they didn't put them in a trial.

6    They don't exist.  We know that the e-mails of Leigh Ayres and

7    Richard Hart were destroyed and they were willfully destroyed,

8    and with them went all proof of what might have been said if

9    somebody raised a problem about manufacturing.  I believe that

10   that's one of the places where your Honor ought to put the

11   inference and say we're entitled to an inference that they

12   responded to this, that they responded to it appropriately, and

13   that the way a compliant company in management would.

14           Okay, now I'm ready for Femtelle, if you're ready for

15   Femtelle.

16           The question here was Femtelle destined to fail.  And

17   as to this, there was no proof whatever by the plaintiffs.

18   They put in proof that the 2009 Femtelle application was

19   destined to fail, but that doesn't mean that Femtelle was

20   destined to fail.  In fact we know why the, we know the

21   exact --

22           THE COURT:  But their argument is for the reasons that

23   the 2009 Femtelle was destined to fail, any application was

24   destined to fail.  There's no clinical data, there is no design

25   history files, it can't be made up now.  The problem can not be

E1hzsek6

1    corrected, it's over.  They made a business judgment, it would

2    have taken millions of dollars to reconstruct records that were

3    gone.  You may call them 20 year old records.  You can call

4    them anything you wan, but they're gone.  And they can't put in

5    an application without it.  In fact, you just said although

6    products that this company sells must have had design history

7    files or they wouldn't have gotten 510(k) approval.  There is

8    one thing that seems clear is that the clinical data of the

9    trials here is gone with respect to Femtelle.  I don't know why

10   it's gone, but it's gone.

11              MR. VELIE:  Okay.

12              THE COURT:  But they would have put it in, you would

13   have put -- somebody -- the prior company, Sekisui.  It doesn't

14   exist, it's gone.

15              MR. VELIE:  Okay.  We got to remember what design

16   history means.  Design history means either the notebook that

17   you had or information that is referred to, can be referred to,

18   okay.  That's what it means.

19              THE COURT:  And that information could be clinical

20   trials and the results of those trials.

21              MR. VELIE:  It could be.

22              THE COURT:  And it's gone.

23              MR. VELIE:  No, it's not gone.  You have to remember

24   what the FDA --

25              THE COURT:  What do you mean, no it's not gone, where

E1hzsek6

 1    is --

 2              MR. VELIE:  It's not gone.

 3              THE COURT:  Where is your evidence?

 4              MR. VELIE:  I'm about to tell you the evidence.  The

 5    FDA sends an e-mail on June 28.

 6              THE COURT:  I remember it says give us what you have.

 7              MR. VELIE:  It says, get the information from your

 8    investigator, and then for your records, meanwhile give us

 9    everything else that we've asked for.

10              THE COURT:  Right.

11              MR. VELIE:  Okay.  So it's not gone.  The FDA

12    apparently said --

13              THE COURT:  It is gone.  It says FDA says even if it's

14    gone, give us what you have, we'll do the best we can, you

15    should do the best you can, we'll look at it.  Sekisui does not

16    follow-up with that maybe because they know how little there is

17    to give.

18              MR. VELIE:  What's the it?  The it is information.

19              THE COURT:  Right.

20              MR. VELIE:  Okay.  The information is available with

21    the investigators in Germany.  It's there.  She says go and get

22    it for your records.

23              THE COURT:  You can't.

24              MR. VELIE:  No, they can.  They never said they

25    couldn't get it.  They said they couldn't get it in time.  I

E1hzsek6

think the record is very clear on this.

Anyhow, it was for their records not to show the FDA. For all we can tell, the FDA did not care. They said over and over again, FDA won't tell us whether not having some batch records from 20 years ago matters or doesn't matter. This was something that was never even asked for by the FDA. They volunteered it to the FDA. And then they kept asking is this a problem, is that a problem, is that problem? They were never told it was a problem. And then the FDA, the final thing the FDA says is get the information for you records. That's fine, it's available some place else. You told us that your investigator could get it, go get it. That's the it. It's available.

I think, though, that the real -- I think that the real response to this is the party admission, which is absolutely devastating to the plaintiff's contention here.

THE COURT: Oh, the 80 percent.

MR. VELIE: 80 percent likelihood of approval and marketability, 80 percent. So to come in here now and to say oh, well, you know, I'm looking at an old e-mail and they told him we can't find the batch records -- oh, it's all over. It's not all over. They knew it was an 80 percent chance and they omitted -- and that's the important thing, we didn't fail in our proof -- they failed in their proof. They didn't show us, as they were obligated to, that they had done something other

E1hzsek6

1   than just withdraw this thing voluntarily, apparently because

2   they feared audit.  They feared because Morrissey told you

3   there is going to be an audit.  I know it because I'm a great

4   FDA expert.  That's why they withdrew it.  And the record is

5   very plain that that's the case.

6            But the record is also clear that they had an

7   80 percent chance of doing it and they omitted to doing

8   anything to do it.  They didn't even try again, even though

9   Mr. Fryer testified he recommended that they do it.  He also

10  put in his report to the management, the questions they asked

11  us in the may comments, which were the comments everybody's

12  going back and forth with to the FDA in 2009, 2010.  That's May

13  of 2010, right before they withdrew it.  He says, those are

14  softball questions, we could have answered those, but we

15  withdrew it.  That's a party admission.  If your Honor needs

16  it, I'll get you the exhibit for that.  It was used during

17  Fryer's cross-examination.  Your Honor, I'm without reference

18  to it, but surely you remember Mr. Fryer writes a report and he

19  says I recommend we do an IDE, and he explains what the IDE is;

20  in other words, he's recommending that they go forward with

21  Femtelle.  And there is a paragraph I called to his attention

22  and read into the record -- I've got it.  DX6K's and I'll read

23  it into the record again.  4.42 on page 429 of 6Ks'

24  August 29th, 2011.  I'm on page 429 at Section 4.42.  Many

25  minor points were raised in these comments, meaning the FDA's

E1hzsek6

1      comments, all of which could have been answered by ADI.

2      However, no actions were taken as the submission was withdrawn.

3      That's Mr. Fryer, who, as your Honor noted, was an impressive

4      witness.  And that's Mr. Fryer when he was writing down the

5      truth for his management and not coming here to testify for his

6      company.  I think it's plain from this that Sekisui did nothing

7      to try to market Femtelle and to get it cleared, despite the

8      recommendation of Mr. Fryer, despite Mr. Fryer's saying that

9      they could have done it.  It was easy, despite the FDA saying

10     just get the information from the investigator for your

11     records.  They did nothing, and they were obligated by contract

12     to do something, they were obligated by contract to do

13     something.  And it's not to use reasonably --

14             THE COURT:  Oh, that's right.  What about that

15     argument they say you never proved the commercially reasonable

16     standard?

17             MR. VELIE:  There are two things they have to do.  One

18     is to use reasonable efforts, which is commercially reasonable

19     standard, and the other is not to omit to do something to get

20     it approved.  This is a very broad, very important concession

21     they gave to us.  I'm reading from page 19 of the SPA, which I

22     believe is plaintiff's Exhibit 3, 2.6(d)(1)(b).  They promise,

23     quote, not willfully to take any actions or omit to take any

24     actions with the intent of preventing the business from meeting

25     the Femtelle revenue targets set forth on exhibit A or from

E1hzsek6

1   satisfying the condition set forth in Section 2.6B or that

2   could be reasonably expected to impair the ability of the

3   company and its subsidiaries to maximize Femtelle revenue.

4   They were obligated to do something.

5        THE COURT:  Where is that phrase about commercially

6   reasonable?

7        MR. VELIE:  That's in the predecessor paragraph, which

8   talks about, undertake commercially reasonable efforts --

9        THE COURT:  Right.

10        MR. VELIE:  -- to market and sell.  So they've got two

11   obligations.  One is to do the reasonable thing that they're

12   complaining we didn't prove, and the other is not to omit to do

13   anything.  And that's the one that we rely on and which is

14   proved here.

15        THE COURT:  So you're relying on which paragraph, 2.6?

16        MR. VELIE:  6 --

17        MS. BRILEY:  2.6(d)(1)(b).

18        MR. VELIE:  You'll find it on page 19 near the top.

19        THE COURT:  I got that.  But did (d)(1)(b) as opposed

20   to (d)(1)(a).  You're saying (d)(1)(a) is separate obligation.

21        MR. VELIE:  That's correct, that is the separate

22   obligation. (d)(1)(a) is the one they're talking about,

23   (d)(1)(b) is the one we proved.

24        THE COURT:  So you're saying if they failed (d)(1)(b),

25   that's enough to prove your case.  You don't need to prove

E1hzsek6

(d)(1)(a).

MR. VELIE:  That's exactly correct, your Honor.

Just a word about counterclaim damages.  It's exactly as I put it when I opened.  We proved that what the Harts gave up was their rights to Femtelle, and what they got back was a promise of an earn out.  So their out of pockets, if you will, which is a proper contract measure of damages.  You could even give benefit of the bargain or out of pockets.

THE COURT:  I'm sorry what did you say, the out of pockets?

MR. VELIE:  The out of pockets, what it cost them to get the earn out was to give up Femtelle.  They gave it up.  They don't own it any more.

THE COURT:  Yes.

MR. VELIE:  Sekisui owns it.  So they gave it, they didn't get the earn out.  That's a failure of consideration, breach of contract.

THE COURT:  Yeah.  And what's the damages?

MR. VELIE:  So the point of this is to value the damages for what they gave up.

THE COURT:  Yes.

MR. VELIE:  Let's just look in their own document, their own accounting record of what they value Femtelle has, 2012, which is the relevant period, $3.6 million.  That's what they took from the Harts and they failed to pay for it.

E1hzsek6

1            THE COURT:  Where is the $3.6 million?

2            MR. VELIE:  I'll show you, your Honor.

3            This is in defendant's Exhibit 4Js.  You'll find it at

4     page five, which is also 5023 of the Sekisui stamping system

5     and it says -- this is KPMG writes to the company and asks the

6     company questions.  Please provide the carrying amount of

7     Femtelle as of the valuation date.  The valuation date I

8     believe is October 1, 2012 as it says in the cover of this.  So

9     on October 1, 2012 Sekisui is carrying the value of Femtelle,

10    which they did not pay for, at $3.6 million.  At the very

11    least, that's what they owe the Harts.

12            If your Honor chooses instead the benefit of bargain

13    theory, then it's the value of the earn outs.  I acknowledge,

14    your Honor, that's -- there is less certainty in the earn outs

15    because we'd have to predict what there is.  I would actually

16    argue that they're estoped not to use the projections, but I

17    don't think we need to get into that.  We'd be satisfied if we

18    got back what we gave them, that's $3.6 million.

19            THE COURT:  Can we go back to their argument that

20    Femtelle had a value of the 25.5 million purchase price?

21            MR. VELIE:  Yes.  Would you like, what would you like

22    me to do about that?

23            THE COURT:  Well, tell me your view.  They say --

24            MR. VELIE:  Oh, it's --

25            THE COURT:  -- in their chart of Erb that it's 12 and

E1hzsek6

1   a half million dollars because KPMG said so in its valuation in

2   October as of the closing date in April or March.  That's what

3   it was.

4               MR. VELIE:  Okay.

5               THE COURT:  And then Erb also points out that had to

6   have a value because the earn out doesn't pick up until the

7   first two and a half million is sold in 2010, and then four and

8   a half million in 2011, et cetera.  So theoretically, Sekisui

9   was going to get $20 million of revenue before paying any earn

10  outs, so it must have had a value in the purchase price and

11  some evidence that they wouldn't have even been interested in

12  buying this company but for Femtelle.

13              MR. VELIE:  Let's --

14              THE COURT:  Did it have a value, any part of the 25.5

15  million if so how much?

16              MR. VELIE:  None, and that's clear from the evidence.

17  What Mr. Erb is looking at is things that happened after the

18  acquisition.  What he's --

19              THE COURT:  He has to know.  I made that argument with

20  him too about the KPMG in October, but KPMG says we're doing it

21  as of the closing in April.  We're looking at the documentation

22  then, we're looking back to the confidential memorandum.  It

23  did have a value and look at Exhibit A to the SPA.  It clearly

24  had a value because they weren't paying a earn out until $20

25  million was earned by the company from 2010 from to 2013 and

E1hzsek6

1    evidence they wouldn't have been interested in buying it but

2    for Femtelle.

3            MR. VELIE:  Okay, allow me to deal with this.  The

4    first thing is what about the valuation.  I believe you asked

5    Mr. Erb or possibly Mr. Kortmansky asked Mr. Erb, this was done

6    after the acquisition.  Nobody's contending that it was used by

7    them.

8            THE COURT:  Right.  I did all that.  I didn't rely on,

9    it didn't exist until October.

10            MR. VELIE:  So that's the first thing.

11            The second thing is let's look what they actually did,

12    and we did quite a bit of that.  We looked at what their

13    investment bankers told them.  Their investment bankers told

14    them don't pay a penny for it, use the earn out method, it's

15    too uncertain, okay, that's what's investment bankers advised.

16    And here --

17            THE COURT:  They didn't present it to the board.

18            MR. VELIE:  Well, wait a minute.  That's if you

19    believe them.  What's the credibility of this?  This is a

20    Japanese manager, Mr. Takemura -- I assume he's still with us.

21            THE COURT:  I don't know.

22            MR. VELIE:  Who says look I went to the board three

23    days after I got this thing, but I didn't tell them that the --

24            THE COURT:  What --

25            MR. VELIE:  I was told not to pay a penny for it,

E1hzsek6

1    okay.  Do we believe that from somebody who tells us, oh, my

2    God I got scolded?  What man -- he.  Nice of Mr. Erb to say

3    this, but real world, what manager would not cover his back

4    side and say I've got an investment banker, this is what the

5    investment banker -- I don't think we can credit Mr. Takemura

6    when he says that.

7              THE COURT:  Okay, but what about KPMG?

8              MR. VELIE:  Okay, let me leave KPMG for last.

9              The next thing we have is Mr. Takemura actually does

10   some calculations.  I took him through it.  Remember the little

11   red box.

12             THE COURT:  I do.

13             MR. VELIE:  This is what we value the company, the

14   following three things are how we valued he company.  And we

15   look up and there are three bars.  And with respect to each of

16   the bars, the value of the company without Femtelle and decided

17   25.5 million.  Then Mr. Takemura says, well, yeah, but we

18   wanted Femtelle.  Sure he did.  Of course he did.  It could

19   have been valuable.  So how did they get Femtelle?  They offer

20   an earn out for it.  They didn't pay a penny for it.

21             THE COURT:  You're ignoring exhibit A which Mr. Erb

22   did a good job of.  He points out that exhibit A doesn't kick

23   in from dollar one.  The company gets a total of something like

24   20 million over four years of revenue 2010 to 2013 without any

25   earn out.

E1hzsek6

1          MR. VELIE:  Very interesting, but it's not relevant,

2    because that just shows that the company got a really sweet

3    deal.  They don't even have to begin an earn out paying until

4    they --

5          THE COURT:  He says because we paid for it up front,

6    we paid something for Femtelle.

7          MR. VELIE:  How does he know what they paid for it?

8    What we know is that they didn't pay for it.  $25.5 million was

9    analyzed, and said this is the value of the company without

10   Femtelle, if we'd like to have Femtelle, let's do essentially

11   what the Savvian told us to do, we'll give them an earn out,

12   but --

13         THE COURT:  Then why weren't they getting a penny on

14   every dollar?  Why wasn't -- if you talk about an earn out,

15   hold on -- talk about earn out, why isn't the Harts getting a

16   penny on every dollar sold?

17         MR. VELIE:  Because Sekisui drove a hell of a good

18   bargain.  The Sekisui bargain is this, we'll give you an earn

19   out, but first we have to rake in a lot of bucks.

20         THE COURT:  Right.

21         MR. VELIE:  That doesn't mean they paid for it.  It

22   means they got a sweet deal.  They don't have to pay until all

23   those millions are in, then they have to pay.

24         THE COURT:  Maybe they paid.

25         MR. VELIE:  Maybe they paid.  There is no proof that

E1hzsek6

they paid.  What we have is the speculation from a valuation

done by KPMG for totally different purpose.  In fact there is

an excellent reason to give Femtelle a huge mark up in that

thing.  Why?  It's a chancy product.  If it fails, huge tax

write off.  That's in fact what they did.  There is no

credibility in the suggestion that the company had in mind that

Femtelle is worth $12 million and we're going to pay that in

cash in order to get Femtelle.  They were told not to do that,

they never wrote a memo to the board saying hey this is what

we're doing even though we're told not to do that.

         THE COURT:  No, I never said 12 million, but --

         MR. VELIE:  That's what they're saying.

         THE COURT:  I know it's what he said.  I haven't

brought into the 12 million yet, but it had some value, part,

some part of that purchase price is what I'm asking you.

         MR. VELIE:  Of course it has a value.  Let's put it

this way.  Is it fair to get a purchase price adjustment of

let's say $12 million when you don't pay any cash for the thing

that you got and you have no obligation to pay an earn out, is

that right?  Well, that's what Mr. Erb has done with his

jiggery pokery.  This is just magic.  He says, okay, I'm going

to take this completely different analysis after the fact.

         THE COURT:  Well --

         MR. VELIE:  I'm going to say woo --

         THE COURT:  That number comes from somewhere.  It came

E1hzsek6

1    from the company.

2              MR. VELIE:  Confidential memorandum.

3              THE COURT:  Yeah, it did.

4              MR. VELIE:  Okay.  But they're not supposed to rely on

5    that.  And yet here they are in this courtroom, when they know

6    they're not supposed to rely on it saying, oh, we relied on it,

7    and we relied on it for purposes of getting a purchase price

8    adjustment; in other words, this is what we relied on at the

9    time.  That, that just doesn't wash.

10             Do you have any other questions about damages?

11             THE COURT:  No.

12             MR. VELIE:  Okay.

13             I believe, I believe I have exhausted our topics.

14             THE COURT:  I think that's right.

15             MR. VELIE:  So in summation, which only takes a

16   second --

17             THE COURT:  Yes, it does.

18             MR. VELIE:  -- we've got a claim which I think is not

19   proved in view of all of these audits.  And the fact that they

20   are unable to say with reasonable certainty what it means if

21   documents are missing, or to claim that documents means

22   something when we don't have the context of those documents, in

23   the face of 13 audits by independent people, audit teams who

24   actually look at things, find problems that say these aren't

25   material and many of them are the very same problems Ms. Kuehn

E1hzsek6

1  found, as she acknowledged.  They're not material.  Ms. Kuehn

2  thinks everything is material.  Okay.  That's the claim.

3       What about the counterclaim?  It is undisputed that

4  80 percent -- I'm not even going to fight about 2009.

5  Following 2009, had 80 percent chance of success.  They did

6  nothing, and they're obligated to do something.  And at the

7  very least, we're entitled to $3.6 million.

8       THE COURT:  Okay.

9       MR. VELIE:  Thank you, your Honor.

10       THE COURT:  Well, thank you all for your efforts this

11  week on getting through this in five days.  It's obviously a

12  ton of evidence here and I know you all cut back and I know

13  each side feels it could have put in more evidence, but there's

14  already more one person can really fully digest and so you had

15  to do it this way.  I appreciate it and I look forward to your

16  final annotated missions and supplemental submissions, and I'll

17  get you a decision as soon as I can.  Thank you.

18       MS. HAGBERG:  Thank you, your Honor.

19       MR. VELIE:  Thank for your patience, your Honor.

20       THE COURT:  You're all excused.  I have one more case

21  today.  Have a good weekend.

22       MS. HAGBERG:  You too.

23       (Adjourned)

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    CARRIE KUEHN

4    Cross By Mr. Velie . . . . . . . . . . . . 723

5    Redirect By Ms. Hagberg  . . . . . . . . . 733

6    Recross By Mr. Velie . . . . . . . . . . . 750

7    GUY ERB

8    Direct By Mr. Whitney . . . . . . . . . . 755

9    Cross By Mr. Kortmansky  . . . . . . . . . 803

10   Redirect By Mr. Whitney . . . . . . . . . 832

11   LOUISE HART

12   Direct By Ms. Briley . . . . . . . . . . . 847

13   Cross By Mr. Whitney . . . . . . . . . . . 847

14   Redirect By Ms. Briley . . . . . . . . . . 848

15                    PLAINTIFF EXHIBITS

16   Exhibit No.                            Received

17    31, 93, 24, 178, 187, 201, 22, 23, 24,  . . . 754

18              25, 26, 27, 28, 29, 30, 42,

19              39, 32, 36, 38, and 40

20    240, 241, 242, 243, 244, 245, 246, 247, . . . 754

21              248, 249, 250, 251, 253, 273,

22              7, 8, and 56

23    67, 236, 60, 71, 74, 73, 72, 76, 77,  . . . . 754

24              81, 17, 18, 19, 54 and 78

25    8,  11, 12, 48, 50, 51, 195, 196, 214,  . . . 803
```

```
 1              234, 3 and 5

 2     281 and 282   . . . . . . . . . . . . . . . 845

 3     279 and 280   . . . . . . . . . . . . . . . 849

 4                         DEFENDANT EXHIBITS

 5     Exhibit No.                           Received

 6     O, P, N, L, P, R and T  . . . . . . . . . . 754

 7     C, E, 8Q, 8A, 8R, 8C, 8S, 8D, 8U, 8I, . . . . 841

 8              8J

 9     DX-3Z and DX-2I   . . . . . . . . . . . . . 865

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```